**No. 24-724**

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

### RAMIRO GOMEZ-REYES,

Defendant-Appellant

_____

Appeal from the
United States District Court
for the Southern District of California
Honorable Ruth B. Montenegro, District Judge Presiding

_____

## APPELLANT'S EXCERPTS OF RECORD

_____

KARA L. HARTZLER
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Attorneys for Defendant-Appellant

## INDEX TO EXCERPT OF CLERK'S RECORD

| Document | Docket No. | Page No. |
|---|---|---|
| 1. Judgment | 65 | 4-8 |
| 2. Portion of Conditional Plea Agreement | 55 | 9-11 |
| 3. Defendant's Response to United States' Supplemental Briefing on the Motion to Dismiss Under § 1326(D) | 34 | 12-18 |
| 4. Reporter's Transcript of Motion Hearing on May 5, 2023 Before the Honorable Ruth B. Montenegro | -- | 19-33 |
| 5. United States' Supplemental Briefing in Opposition to Defendant's Motion to Dismiss Under § 1326(D) | 32 | 34-76 |
| 6. Defendant's Reply in Response to United States' Opposition to the Motion to Dismiss Information Under §1326(D) | 31 | 77-83 |
| 7. United States Response in Opposition to Defendant's Motion to Dismiss the Information Pursuant to 8 U.S.C. § 1326(D) | 30 | 84-121 |
| 8. United States' Response in Opposition to Defendant's Motion to Dismiss Pursuant to *Arlington Heights* | 29 | 122-152 |
| 9. Defendant's Motion to Dismiss the Information Under the § 1326(D) and Motion for Leave to File a Reply Brief | 24 | 153-176 |

10. Defendant's Memorandum of Law and
    Motion to Dismiss Pursuant to
    Arlington Heights                              23          177-208

11. Notice of Appeal                              66          209

12. Information                                   14          210-211

13. Docket Report                                 --          212-220

**FILED**

FEB 0 5 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **V.** | (For Offenses Committed On or After November 1, 1987) |
| RAMIRO GOMEZ-REYES (1) | |

Case Number:   3:23-CR-00251-RBM

Nina B. Papachristou
_____
Defendant's Attorney

**USM Number**     40104-510

☐ –

THE DEFENDANT:

☒ pleaded guilty to count(s)     1 of the Information

☐ was found guilty on count(s)
after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title and Section / Nature of Offense** | **Count** |
|---|---|
| 8:1326 - Attempted Reentry Of Removed Alien (Felony) | 1 |

The defendant is sentenced as provided in pages 2 through **5** of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ is          dismissed on the motion of the United States.

☒ Assessment : $100.00 Remitted
–

☐ JVTA Assessment*: $
-

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

☒ Fine waived     ☐ Forfeiture pursuant to order filed                        , included herein.

IT IS ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in the defendant's economic circumstances.

January 26, 2024
_____
Date of Imposition of Sentence

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

# ER-4

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

---

DEFENDANT:      RAMIRO GOMEZ-REYES (1)             Judgment - Page **2** of **5**
CASE NUMBER:     3:23-CR-00251-RBM

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
TWENTY-FOUR (24) MONTHS AS TO COUNT 1

☐    Sentence imposed pursuant to Title 8 USC Section 1326(b).

☐    The court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant must surrender to the United States Marshal for this district:

     ☐    at _____ A.M.      on _____

     ☐    as notified by the United States Marshal.

☐    The defendant must surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐    on or before

     ☐    as notified by the United States Marshal.

     ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# ER-5

3:23-CR-00251-RBM

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | RAMIRO GOMEZ-REYES (1) | Judgment - Page **3** of **5** |
| CASE NUMBER: | 3:23-CR-00251-RBM | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant will be on supervised release for a term of:
THREE (3) YEARS

## MANDATORY CONDITIONS

1. The defendant must not commit another federal, state or local crime.
2. The defendant must not unlawfully possess a controlled substance.
3. The defendant must not illegally possess a controlled substance. The defendant must refrain from any unlawful use of a controlled substance. The defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter as determined by the court. Testing requirements will not exceed submission of more than 4 drug tests per month during the term of supervision, unless otherwise ordered by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (check if applicable)
4. ☐ The defendant must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (check if applicable)
5. ☒ The defendant must cooperate in the collection of DNA as directed by the probation officer. (check if applicable)
6. ☐ The defendant must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where the defendant resides, works, is a student, or was convicted of a qualifying offense. (check if applicable)
7. ☐ The defendant must participate in an approved program for domestic violence. (check if applicable)

The defendant must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

3:23-CR-00251-RBM

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | RAMIRO GOMEZ-REYES (1) | Judgment - Page **4** of 5 |
| CASE NUMBER: | 3:23-CR-00251-RBM | |

## STANDARD CONDITIONS OF SUPERVISION

As part of the defendant's supervised release, the defendant must comply with the following standard conditions of supervision. These conditions are imposed   because they establish the basic expectations for the defendant's behavior while on supervision and identify the minimum tools needed by probation   officers to keep informed, report to the court about, and bring about improvements in the defendant's conduct and condition.

1. The defendant must report to the probation office in the federal judicial district where they are authorized to reside within 72 hours of their release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when the defendant must report to the probation officer, and the defendant must report to the probation officer as instructed.

3. The defendant must not knowingly leave the federal judicial district where the defendant is authorized to reside without first getting permission from the court or the probation officer.

4. The defendant must answer truthfully the questions asked by their probation officer.

5. The defendant must live at a place approved by the probation officer. If the defendant plans to change where they live or anything about their living arrangements (such as the people living with the defendant), the defendant must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. The defendant must allow the probation officer to visit them at any time at their home or elsewhere, and the defendant must permit the probation officer to take any items prohibited by the conditions of their supervision that he or she observes in plain view.

7. The defendant must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment the defendant must try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about their work (such as their position or their job responsibilities), the defendant must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. The defendant must not communicate or interact with someone they know is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, they must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If the defendant is arrested or questioned by a law enforcement officer, the defendant must notify the probation officer within 72 hours.

10. The defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. The defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant must comply with that instruction. The probation officer may contact the person and confirm that the defendant notified the person about the risk.

13. The defendant must follow the instructions of the probation officer related to the conditions of supervision.

# ER-7

3:23-CR-00251-RBM

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | RAMIRO GOMEZ-REYES (1) | Judgment - Page **5** of **5** |
| CASE NUMBER: | 3:23-CR-00251-RBM | |

## SPECIAL CONDITIONS OF SUPERVISION

1. If deported, excluded or allowed to voluntarily return to country of origin, not reenter the United States illegally and report to the probation officer within 24 hours of any reentry into the United States; supervision waived upon deportation, exclusion, or voluntary departure.

//



1   TARA K. MCGRATH
    United States Attorney
2   JAMES MIAO
    Assistant United States Attorney
3   California Bar No. 326477
    Federal Office Building
4   880 Front Street, Room 6293
    San Diego, California 92101-8893
5   Telephone: (619) 546-9057

6   Attorneys for United States of America

7
                    **UNITED STATES DISTRICT COURT**
8
                   **SOUTHERN DISTRICT OF CALIFORNIA**
9
    UNITED STATES OF AMERICA,          Case No.   23CR251-RBM
10
              Plaintiff,               CONDITIONAL
11       v.                            PLEA AGREEMENT

12   RAMIRO GOMEZ-REYES,

13            Defendant.

14

15       IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF

16   AMERICA, through its counsel, Tara K. McGrath, United States Attorney,

17   and James Miao, Assistant United States Attorney, and defendant, Ramiro

18   Gomez-Reyes ("Defendant"), with the advice and consent of Nina

19   Papachristou, Federal Defenders of San Diego, Inc., counsel for

20   Defendant, as follows:

21                               I

22                             **THE PLEA**

23   **A.    THE CHARGE**

24       Defendant agrees to plead guilty to the single-count Information

25   charging Defendant with:

26       On or about January 17, 2023, within the Southern District of
         California, defendant RAMIRO GOMEZ-REYES, an alien, knowingly
27       and intentionally attempted to enter the United States of
         America with the purpose, i.e., conscious desire, to enter
28

Plea Agreement                              Def. Initials R-G-R
                                            23CR251-RBM

the United States without the express consent of the Attorney General of the United States or his/her designated successor, the Secretary of the Department of Homeland Security, after having been previously excluded, deported and removed from the United States, and not having obtained said express consent to reapply for admission thereto; and committed an overt act, to wit, crossing the border from Mexico into the United States, that was a substantial step towards committing the offense, all in violation of Title 8, United States Code, Section 1326(a) and (b).

## B. CONDITIONAL PLEA

Defendant is entering a conditional plea of guilty to the Information pursuant to Federal Rule of Criminal Procedure 11(a)(2), with the express purpose of reviewing on appeal the following adverse ruling of the district court:

1. The district court's denial of the Defendant's motions to dismiss the information pursuant to *Arlington Heights* and pursuant to Title 8 U.S.C. § 1326(d) [ECF Docket Entry 33, 35]. Defendant is limited to the arguments raised in the motions to dismiss, contained at ECF Docket Entries 23 and 24, and those arguments raised in Defendant's reply briefing contained at ECF Docket Entries 31 and 34.

Defendant agrees that he may appeal the district court's denial of the above motions and is limited to the arguments made in the pleadings and hearings in the motions listed above. On appeal, Defendant may use any fact within the record, statute or case law to support his arguments. No other motions or arguments are preserved for appeal. Defendant acknowledges that the United States may support the district court's rulings on appeal, on any ground raised in the district court.

Plea Agreement                     2                      Def. Initials R.G-R

23CR251-RBM

# ER-10

1    Defendant acknowledges and agrees that if he does not prevail on

2   his appeal of the district court's denial of the motion listed above,

3   he will not be allowed to withdraw his plea of guilty to the Information.

4                                    II

5                         **NATURE OF THE OFFENSE**

6   A.   ELEMENTS EXPLAINED

7    Defendant understands that the offense to which Defendant is

8   pleading guilty has the following elements:

9        1.   Defendant was removed or deported from the United States.

10       2.   Defendant had the specific intent to enter the United States
11            free from official restraint and without consent.

12       3.   Defendant was an alien at the time of defendant's attempted
13            reentry into the United States.

14       4.   Defendant had not obtained the consent of the Attorney General
             or the Secretary of the Department of Homeland Security to
15            reapply for admission into the United States.

16       5.   Defendant did something that was a substantial step toward
             committing the crime and that strongly corroborated
17            defendant's intent to commit the crime.

18       6.   Defendant was removed from the United States subsequent to
            January 8, 2009.

19

20  B.   ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

21   Defendant has fully discussed the facts of this case with defense

22  counsel.  Defendant has committed each of the elements of the crime,

23  and admits that there is a factual basis for this guilty plea.  The

24  following facts are true and undisputed:

25
         1.   On or about March 31, 2017, defendant was lawfully[1] removed
26            from the United States.

27  _____
    [1] Defendant's agreement to the legality of his removal from the United States is subject to the provisions of paragraph I-B.
    above, which permits Defendant to seek appellate review of the District Court's denial of his motion to dismiss the
28  Information pursuant to 8 U.S.C. § 1326(d).

ER-11

1  **NINA B. PAPACHRISTOU**
   California State Bar No. 345688
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5030
   Telephone: (619) 234-8467
4  Facsimile: (619) 687-2666
   Nina_Papachristou@fd.org
5
   Attorneys for RAMIRO GOMEZ-REYES
6

7              UNITED STATES DISTRICT COURT

8             SOUTHERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,          CASE NO.:   23CR0251-RBM

11              Plaintiff,             Hon. Ruth B. Montenegro
                                       Date: June 9, 2023
12      v.                             Time: 9:00 AM

13  RAMIRO GOMEZ-REYES,               **MR. GOMEZ-REYES' RESPONSE
                                       TO  THE UNITED STATES'
14              Defendant.             SUPPLEMENTAL BRIEFING ON
                                       THE MOTION TO DISMISS UNDER
15                                     § 1326(D)**

16  **I.    Introduction**

17       The government asserts that were the Court to find that Mr. Gomez's

18  predicate aggravated criminal sexual assault ("ACSA") conviction is not a

19  categorical crime of violence, the Court should apply the modified categorical

20  approach ("MCA"). *See* Gov. Supp. Br., ECF No. 32.

21       Mr. Gomez established in prior briefing that his Illinois ACSA statute of

22  conviction is neither a categorical crime of violence nor divisible. *See* Def. Brs. at

23  ECF Nos. 24 & 31. However, even if the modified categorical approach applied,

24  Mr. Gomez's ACSA conviction would still be an invalid predicate for purposes of

25  § 1326 prosecution.

26  **II.   The Government Has Not Met its Burden to Establish ACSA § (a)(1) is
           Divisible.**
27

28       The government relies on two arguments to support its contention that ACSA

                              ER-12

1   § (a)(1)[1] is divisible: (1) the methodologies and implements for committing ACSA
2   described in § (a)(1) are alternative elements which must be found by the jury; and
3   (2) the Illinois Supreme Court's decision in *Reveles-Cordova* instructs that when a
4   statute specifies alternative acts within a subsection, "they are to be construed as
5   *separately proscribed offenses*." Gov. Supp. Br. at 7 (italics in original). Neither of
6   these arguments is sufficient to find that ACSA § (a)(1) is divisible.

7       <u>First</u>, the government argues that because Illinois pattern jury instructions
8   "require[] an election" among the methodologies and implements listed in § (a)(1)
9   (such as weapon or object, use or display), the subsection is divisible. Gov. Supp.
10  Br. at 5. However, as the government acknowledges, Illinois courts "have not
11  explicitly weighed in on unanimity," and the jury instructions' use of parentheses
12  to distinguish words within the subsection is insufficient to support divisibility. *Id.*
13  In *Parzych*, the Seventh Circuit found that a blank space on pattern jury instructions
14  for burglary did not itself "suggest that the information to be inserted is a single
15  element." *Parzych v. Garland*, 2 F. 4th 1013, 1019 (7th Cir. 2021); *see also Hillocks*
16  *v. Att'y Gen. U.S.*, 934 F. 3d 332, 342–43 (3d Cir. 2019) (holding that jury
17  instructions did not establish that the statute was divisible because they included
18  "[crime]"); *Harbin v. Sessions*, 860 F. 3d 58, 67–68 (2d Cir. 2017) (holding that
19  jury instructions did not establish that statute was divisible because they included a
20  blank with the word "specify"). There, the government argued that burglary was
21  divisible because the instructions "allow[ed] for only a single intent offense,"
22  implying that intent was divisible. *Id.* at 1018. However, the Seventh Circuit
23  clarified, quoting *Mathis*, that "[s]tatutory alternatives carrying different sentences
24

---

25  [1] "A person commits aggravated criminal sexual assault if that person commits
26  criminal sexual assault and…
27      (1) The person displays, threatens to use, or uses a dangerous weapon, other
          than a firearm, or any other object fashioned or used in a manner that leads
28      the victim, under the circumstances, reasonably to believe that the object
          is a dangerous weapon;"

2                                           23CR0251-RBM

MR. GOMEZ'S RESPONSE TO THE UNITED STATES'
SUPPLEMENTAL BRIEFING ON THE MOTION TO DISMISS
THE INFORMATION UNDER § 1326(D)

must be elements of a crime," and the Illinois burglary statute punished "identically" regardless of how the blank was filled. *Id.* (quoting *Mathis v. United States*, 579 U.S. 500, 518 (2016)). Therefore, the statute was indivisible no matter how the jury elected to fill in the blank.

Here, the jury instructions themselves do not prove that a jury would be required to find beyond a reasonable doubt that an ACSA defendant either "used" or "displayed" the weapon in the offense, nor that a "weapon" or "any object" was the tool employed. *See Descamps*, 570 U.S. at 272 (rejecting the Ninth Circuit's modified approach of determining divisibility based on whether a statute has an "explicitly finite" or "implied" list of ways to commit the offense, and explaining that the MCA should only apply when the jury is required to find each element of the statute proven beyond a reasonable doubt). Indeed, the sample jury verdict forms included in the Illinois pattern instructions require only that the jury indicate a guilty or not guilty verdict—not that the jury find the methodology or offense implement as an element. *See, e.g.*, IPI Criminal No. 26.02. The Supreme Court's reasoning in *Mathis* dictates that where a state supreme court has not definitively found that a statute lists alternative means or elements, a state statute "on its face" could also resolve the question. 579 U.S. at 502. It defies common sense to find that Illinois requires juries to determine whether or not a defendant "used" or "displayed" a weapon in order to find that defendant guilty of an ACSA offense. Moreover, the statute's penalties provision does not provide for distinct penalties depending on whether a defendant used a weapon or an object to commit the offense, or merely displayed one. *See* 720 Ill. Comp. Stat. Ann. § 5/11-1.30(d)(1). Given the plain text of the statute, the so-called "elections" in the jury instructions do not demonstrate that ACSA § (a)(1) is divisible as to methodology and implement.

Second, the government argues that because an Illinois court has found that criminal sexual assault is a lesser-included offense of home invasion, the ACSA

MR. GOMEZ'S RESPONSE TO THE UNITED STATES'
SUPPLEMENTAL BRIEFING ON THE MOTION TO DISMISS
THE INFORMATION UNDER § 1326(D)

ER-14

subsection's list of "alternative acts" should be construed as separate offenses. Gov. Supp. Br. at 7; *People v. Reveles-Cordova*, 181 N.E. 3d 806, 811 (Ill. 2020). But simply because an Illinois court has once found that alternative acts listed in one subsection constitute separate offenses, it does not follow that the government has proved that with regard to ACSA. To apply the MCA, the government <u>must</u> prove that the ACSA subsection contains multiple crimes. Analyzing the Illinois Controlled Substances Act, the Seventh Circuit recently held that *general* divisibility—having multiple subsections and subparts regulating different drugs and quantities—is insufficient to establish that the MCA applies. *United States v. Ruth*, 966 F. 3d 642, 649–50 (7th Cir. 2020) ("General statute divisibility…is not enough"). The court found that the controlled substance subsection at issue was "clearly indivisible[,]" because it "list[ed] only one crime: possession with intent to distribute cocaine." *Id.* Like that subsection, ACSA § (a)(1) criminalizes only one crime: aggravated sexual assault. Where "there is no uncertainty" as to which act the statute criminalizes, "[the] inquiry ends there." *Id.*; *see also Descamps*, 570 U.S. at 265 ("We know Descamps' crime of conviction, and it does not correspond to the relevant generic offense…[so] the inquiry is over."). The government has not established that ACSA § (a)(1) is divisible *within* the subsection, so it cannot follow that the modified categorical approach applies to determine whether Mr. Gomez used a weapon or other object.

### III.   The Government Has Failed to Establish Mr. Gomez's CSA Predicate Required Use or Threat of Force.

The government also argues that Illinois criminal sexual assault, codified at 720 ILCS 5/11-1.20, is (1) a lesser-included offense of ACSA; and (2) divisible. All of the government's arguments concerning Mr. Gomez's purported CSA conviction are speculative, because none of the conviction documents the government has provided establish which CSA subsection Mr. Gomez was

1  convicted under.

2      Mr. Gomez does not dispute that § 5/11-1.20 is divisible among its

3  subsections, nor that ACSA itself requires a CSA conviction. Section 1.20 lists four

4  distinct ways a person can commit criminal sexual assault: (1) using force or

5  threatening force; (2) knowing the victim cannot understand the act or cannot give

6  consent; (3) where the defendant is a family member of a victim who is under the

7  age of eighteen; or (4) where the defendant is 17 years old or older, the victim is

8  between 13 and 18 years old, and the defendant holds a position of trust over the

9  victim. *Id.* §§ (1)–(4). The ACSA statute provides that a person must commit

10 criminal sexual assault to commit ACSA. *Id.* § 5/11-1.30(a). However, the ACSA

11 statute does not specify *which* CSA subsection is a valid predicate for an ACSA

12 conviction. *Id.*

13     The government acknowledges that Mr. Gomez's CSA subsection is

14 unknown when they suggest that "*if* this Defendant was convicted of committing

15 ACSA via CSA requiring the use of force or threat of force, then his conviction is

16 a crime of violence…" Gov. Supp. Br. at 9 (italics supplied). But two pages later,

17 the government claims that the information in the record "supports a finding" that

18 Mr. Gomez was convicted of CSA and ACSA subsections requiring force. *Id.* at

19 11. The government cannot have it both ways. Either they have proven Mr.

20 Gomez's underlying CSA conviction required force, or they have not. Neither Mr.

21 Gomez's Judgment and Conviction nor his Indictment mention his CSA conviction.

22 Nor is Mr. Gomez's CSA conviction mentioned in the plea colloquy the

23 government relied upon in its supplemental briefing. *See* ECF No. 24-1, Ex. B; ECF

24 No. 32-2 at 7; ECF No. 32-1.

25     Even assuming that Mr. Gomez's CSA predicate was indeed under the

26 subsection requiring use or threat of force, it is not clear that Illinois' force

27 definition matches the generic definition. In at least one case, an Illinois appellate

28 court affirmed that a defendant used sufficient "force" to support a CSA conviction

MR. GOMEZ'S RESPONSE TO THE UNITED STATES'
SUPPLEMENTAL BRIEFING ON THE MOTION TO DISMISS
THE INFORMATION UNDER § 1326(D)

ER-16

1    under circumstances that would not meet the generic force requirements. In *People*

2    *v. Blom*, the court wrote that "[a] rational trier of fact could find that a woman

3    locked in a dark room alone, naked, with a man, where she thought no one could

4    hear her yell…constituted a threat of force beyond a reasonable doubt." 147 N.E.

5    3d 226, 238 (Ill. Ct. App. 2019). There, the defendant sexually assaulted the victim,

6    but neither used nor threatened force against her—and the court still found force

7    proven beyond a reasonable doubt. *Id.* The force analysis in Mr. Gomez's case is

8    premature—the government has still not shown which CSA subsection predicated

9    his ACSA conviction. Without more information, the court cannot find that Mr.

10   Gomez was convicted of a CSA crime requiring force.

11       Moreover, Ninth Circuit and Supreme Court jurisprudence caution against

12   the precise line of argument on the MCA the government employs here. From the

13   *Descamps* decision onward, courts have reiterated the "clear prohibition on

14   substituting 'a facts-based inquiry for an elements-based one.'" *United States v.*

15   *Marcia-Acosta*, 780 F. 3d 1244, 1254–55 (9th Cir. 2015) (quoting *Descamps*, 570

16   U.S. at 277). In *Marcia-Acosta*, the court explained that the district court's reliance

17   solely on the factual basis from the defendant's plea hearing to determine whether

18   the defendant was convicted of a crime of violence was "erroneous," given the

19   *Descamps* court's admonishment to focus only on elements, not facts, of a

20   defendant's prior conviction. *Id.* at 1252.

21       In other words, the Ninth Circuit clarified that the government cannot work

22   backward from the factual basis of a defendant's prior conviction to show that under

23   the modified categorical approach, his actions matched those prohibited by the

24   generic offense. *See* Gov. Supp. Br. at 11 (arguing that the facts of Mr. Gomez's

25   case as laid out in the plea colloquy show that his conviction was for a crime of

26   violence); *see id.* at 10 (submitting that the language of Mr. Gomez's indictment

27   should be considered proof that he was not convicted of an age-related CSA

28   subsection). That is a misapplication of the modified categorical approach, and the

MR. GOMEZ'S RESPONSE TO THE UNITED STATES'
SUPPLEMENTAL BRIEFING ON THE MOTION TO DISMISS
THE INFORMATION UNDER § 1326(D)

ER-17

court should reject it here. The fact that the indictment and plea colloquy show that Mr. Gomez's case involved a knife does not bear on the categorical analysis. That fact does not help the government show that the jury would have to find the object was a knife in order to convict Mr. Gomez under ACSA. The government has not provided any evidence to establish that Mr. Gomez was convicted of a CSA subsection requiring force, nor has the government shown that ACSA § (a)(1) is divisible on elements.

## IV.   <u>Conclusion</u>

For the reasons laid out above, the government has not established the modified categorical approach applies. Moreover, they have not shown that the CSA and ACSA subsections would themselves be divisible as to elements. The court should find that Mr. Gomez's ACSA conviction is not a categorical crime of violence, and dismiss the § 1326 information.

Respectfully submitted,


Dated:  May 11, 2023                    *s/ Nina B. Papachristou*
                                        Nina B. Papachristou
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Gomez-Reyes
                                        Email:  Nina_Papachristou@fd.org

ER-18

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,        )
                                      ) No. 3:23-cr-00251-RBM
 4                  Plaintiff,        )
                                      ) May 5, 2023
 5        v.                          )
                                      ) 1:34 p.m.
 6   RAMIRO GOMEZ-REYES,              )
                                      ) Courtroom 5B
 7                  Defendant.        )
     _____) San Diego, California

 8

 9              TRANSCRIPT OF MOTION HEARING

10   BEFORE THE HONORABLE RUTH BERMUDEZ MONTENEGRO, DISTRICT JUDGE

11
     APPEARANCES:
12
     FOR THE PLAINTIFF:       JAMES MIAO, ESQ.
13                            Assistant U.S. Attorney
                              United States Attorney's Office
14                            Southern District of California
                              880 Front Street, Suite 6293
15                            San Diego, California 92101

16
     FOR THE DEFENDANT:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
17                            BY:  NINA B. PAPACHRISTOU, ESQ.
                              225 Broadway, Suite 900
18                            San Diego, California 92101
                              (619)234-8467
19

20   ALSO PRESENT:           CYNTHIA HERBER,
                             Spanish Language Interpreter
21

22   COURT REPORTER:         ADRIAN DALE BAULE, RMR, CRR, CSR
                             United States District Court
23                           333 West Broadway, Suite 420
                             San Diego, California 92101
24                           adrian_baule@casd.uscourts.gov

25   Reported by Stenotype; Transcribed by Computer.
```

ER-19

2

1          <u>Friday, May 5, 2023, 1:23 p.m.</u>

2          (In open court.)

3          (Defendant brought out from custody at 1:23 p.m.)

4          (Pause.)

5          THE CLERK:  Please remain seated.  Court is again in

6     session.

7          Calling matter No. 7, 23-cr-251*, United States vs.*

8     *Ramiro Gomez-Reyes*, on for motion hearing.

9          THE COURT:  All right.  Counsel, please state your

10    appearances for the record.

11         MS. PAPACHRISTOU:  Good afternoon, Your Honor.  Nina

12    Papachristou, Federal Defenders, on behalf of Mr. Gomez who is

13    present, in custody, and being assisted by the Spanish

14    interpreter.

15         MR. MIAO:  Good morning, Your Honor.  James Miao on

16    behalf of the United States.

17         THE COURT:  All right.  Good afternoon to both of

18    you.

19         All right.  Counsel, you may be seated.  All right.

20    Thank you.

21         We're on this afternoon for two motions from

22    Defendant:  The motion to dismiss pursuant to *Arlington Heights*

23    and the motion to dismiss the information pursuant to 1326(d).

24         And I'll start with the motion to dismiss pursuant to

25    *Arlington Heights*.  I've reviewed the briefing, and my

1  tentative is to deny the motion to dismiss.

2          Every court, to address this equal protection

3  challenge as to 1326, except for one, has denied dismissal --

4          THE INTERPRETER:  I'm sorry, Your Honor.  Could the

5  Court slow down just a tad bit?  So sorry.

6          THE COURT:  Sure.

7          All right.  Every court, to address this equal

8  protection challenge as to Section 1326, except for one, has

9  denied dismissal either under rational basis review or the test

10  in *Arlington Heights*.

11          If rational basis review applies, because we're in

12  the immigration context, 1326 meets the test.  Section 1326 is

13  rationally related to the Government's interest in regulating

14  immigration, specifically when someone can enter or reenter the

15  United States.

16          If we apply the *Arlington Heights* test, Defendant has

17  not established discriminatory intent based on the applicable

18  legislative history.

19          The history Defendant relies on to show Congress's

20  discriminatory intent as to Section 1326 is from the 1920s.

21  But Section 1326 was added in 1952 as part of the Immigration

22  and Naturalization Act.  The troubling views expressed by some

23  in the 1920s do not establish discriminatory motives in the

24  passage of the 1952 legislation.  The many courts that have now

25  engaged in this analysis as to Section 1326 and 1325 have found

```
1   we look to the motivation behind the statute being challenged.

2   Here, the statute being challenged is Section 1326.  It was

3   codified in the 1952 Immigration and Naturalization Act, not

4   the repealed 1929 Act.

5           Defendant has not established discriminatory intent

6   as to the 1952 legislation or any of the subsequent amendments

7   of Section 1326 to enhance its penalties.  And Defendant has

8   not established racial discrimination was a motivating factor

9   behind the passage of Section 1326.

10          All right.  Defense counsel, do you -- is there

11  anything that -- do you wish to be heard with respect to the

12  motion to dismiss pursuant to Arlington Heights?

13          MS. PAPACHRISTOU:  No, Your Honor.  Just to preserve

14  all the arguments that we made in our briefing.

15          MR. MIAO:  Given the Court's tentative, no further

16  argument, Your Honor.

17          THE COURT:  All right.  Very well.  The Court adopts

18  its tentative ruling as its final ruling.

19          As to the motion to dismiss the information under

20  Section 1326(d), my tentative is to deny the motion to dismiss.

21          I've reviewed the initial briefing addressing whether

22  Defendant's underlying attempted aggravated sexual assault

23  conviction qualifies under the categorical approach as a crime

24  of violence along with the due process challenges:  The motion,

25  the opposition, and the reply.  I've also reviewed the
```

ER-22

1  Government's supplemental brief in opposition on the modified

2  categorical approach that was filed after the Government

3  obtained Defendant's conviction documents.

4      The primary issue here is whether Defendant's state

5  conviction for attempted aggravated sexual assault is a crime

6  of violence, that is, an offense that has as an element the

7  use, attempted use, or threatened use of physical force against

8  the person or property of another.

9      I find that it qualifies as a crime of violence under

10  the categorical approach because even the least culpable

11  conduct criminalized by the state statute falls within the

12  federal standard for a crime of violence.  And even if it is

13  not a categorical match, under the modified categorical

14  approach, Defendant's conviction is a crime of violence.  And

15  as an aggravated felon based on commission of a crime of

16  violence, he cannot show he was prejudiced by defects in the

17  underlying administrative removal proceedings.  He was

18  removable and ineligible for any relief because he is an

19  aggravated felon.

20      All right.  Defense counsel, do you wish to be heard?

21      MS. PAPACHRISTOU:  I do wish to be heard on one

22  matter, Your Honor, which is I would like to clarify whether

23  the Court is denying the motion based on analysis of the

24  categorical approach or the modified categorical approach and

25  which of those two approaches is the Court finding applies.

1        THE COURT:  As I previously stated, I find that it

2    qualifies as a crime of violence under the categorical approach

3    and that even if it's not a categorical match, I also find that

4    it falls under the modified categorical approach as well.

5        MS. PAPACHRISTOU:  Thank you.  My -- my -- the reason

6    for my question is just to clarify.  You know, if it was under

7    the modified categorical approach, I would want to have

8    additional briefing on it in response to the Government's

9    motion or reply on -- on Tuesday, on May 2nd.  But understood.

10        THE COURT:  All right.  I'll go ahead and hear any

11    argument at this time.

12        MS. PAPACHRISTOU:  Okay.

13        THE COURT:  If you wish to do so.

14        MS. PAPACHRISTOU:  If I --

15        THE COURT:  And my -- yeah.

16        MS. PAPACHRISTOU:  I would.  Thank you.

17        I do think that the aggravated criminal sexual

18    assault statute is not a categorical match and is indivisible.

19    I do think that by the plain text of the statute, force is not

20    an element that must be proven beyond a reasonable doubt for

21    a -- for a conviction.

22        According to the plain text of the statute, someone

23    can be convicted under it simply for having nonconsensual sex

24    with the use of any object that the victim believes is a

25    weapon.  It does not require that it be a weapon.  It does not

USA V. RAMIRO GOMEZ-REYES - 05/05/2023

1  require that the defendant intend to use force with that object

2  during -- during the nonconsensual sex act.

3        So I don't -- you know, I would reiterate, you know,

4  what I've already supplied in the written briefing, that I

5  think that by a plain reading of the statute, it's both -- does

6  not require force as an element, and it also -- that

7  subsection, (a)(1), is indivisible.  And so I do think that the

8  inquiry should -- should end there.

9        And I'll submit unless the Court has other questions.

10       THE COURT:  Counsel.

11       MR. MIAO:  Thank you, Your Honor.

12       Given the Court's tentative, I guess what I would

13  just want to add regarding the analysis, the subsection of

14  conviction for the attempted aggravated criminal sexual assault

15  in this case, as the Court itself has commented and I put in

16  the Government's filing, even the least culpable type of

17  conduct criminalized by that, it just -- I'm not certain

18  what -- what type of scenario could be envisioned in which that

19  doesn't involve the use of force as against a person.

20       I understand the arguments raised in the papers, and

21  a very ably so, about the *Taylor* holding and there needing to

22  be some show of force against an actual person and not

23  speculative.  The attempt alone doesn't necessarily render it a

24  specific intent sufficient for the categorical approach

25  analysis.

1   But having said all that, I will also note, Your

2   Honor, I think, as has been fairly clear from the filings, we

3   were somewhat at the mercy of when the Cook County Clerk's

4   Office would get us back the documents.  I have no objection if

5   counsel would like to file a supplemental briefing about the

6   modified categorical approach analysis.

7   To the extent that -- just for clarity of the record,

8   I would just want to note in my argument today the Government

9   agrees that if -- even if that particular offensive conviction

10  is not a categorical match, although we believe that it is, we

11  believe this statute is divisible.

12  The key opinion on this, which I cited in the

13  supplemental briefing, is the Supreme Court of Illinois

14  decision *People v. Reveles-Cordova*.  What's striking about that

15  opinion is that in an almost identical context, that court was

16  called upon to decide, Do we require actual proof of different

17  distinct offenses?  And they made a very clear holding of yes,

18  the way that our criminal code is structured, each individual

19  subsection listed as a predicate offense, that should be

20  treated as an entirely separate offense.  I think that's the

21  definition of divisibility.

22  We believe that same analysis should apply here.  And

23  given the documents now in the record under the modified

24  categorical approach, it would be clear that the indictment

25  itself alleged "by use of force" or "threat of force."  So with

1  that now being on the record today, Your Honor, unless the

2  Court has further questions, I'd submit.

3          THE COURT:  Counsel, did you want to add something?

4          MS. PAPACHRISTOU:  Briefly, yes --

5          THE COURT:  Sure.

6          MS. PAPACHRISTOU:  -- if the Court would permit.

7          As concerns the categorical approach, what Government

8  counsel said about there's no circumstances under which a

9  conviction under the statute could occur without -- without

10 force, I do think that the fact that, you know, that under

11 *Taylor*, there's no need to show that there's -- that

12 circumstances could exist -- there's no need to show case law

13 on -- the statute -- the text of the statute should be --

14 should be enough.  The way that it's written, that's what --

15 the way the legislature intended it.

16          You know, if they had -- if they had intended to, for

17 example, only require a conviction where a dangerous weapon was

18 used, you know, whether Defendant intended to use -- to use a

19 weapon, then it would have been written that way.  So I do

20 think the broad language of "any other object used or fashioned

21 in such a manner" is exactly the type of overbroad language

22 that the Supreme Court in *Taylor* was -- you know, was

23 referencing -- obviously, on a different issue, but -- to

24 apply.

25          So -- and then as concerns the modified approach, you

1   know, as I already -- already said, our position is that that

2   doesn't apply.  And concerning the Illinois case law about

3   divisibility, I -- I -- I do think that the text of (a)(1)

4   itself is -- there's no indication that that is divisible.  You

5   know, that's a single subsection that says, you know, that when

6   a -- when -- you know, permits conviction with the use or

7   display of a dangerous weapon or any other object, I don't

8   think that that subsection -- I don't think that Illinois

9   precedent shows that that subsection itself could be -- could

10  be divisible.  But again, I don't -- based on *Taylor*, I don't

11  think that the modified categorical approach should apply where

12  the text of the statute itself is so facially overbroad.

13          THE COURT:  All right.  As to the categorical

14  approach --

15          I'm sorry.  Did you -- were you done, Counsel?

16          MS. PAPACHRISTOU:  Oh, sorry.  Yes, Your Honor.

17          THE COURT:  All right.  Thank you.  I wanted to make

18  sure I didn't interrupt you.

19          As to the categorical approach, Defendant focuses on

20  the portion of the statute that allows conviction based on the

21  display, threatened use, or use of any other object fashioned

22  or used in a manner that leads the victim, under the

23  circumstances, reasonably to believe that the object is a

24  dangerous weapon.  The circumstances Defendant describes in an

25  attempt to get within the statutory language, but not

1  constitute the use, attempted use, or threatened use of force,

2  stretch the statute beyond what it says.  In that scenario, a

3  cell phone being used for filming is misperceived as dangerous

4  by the victim when the offender does not intend for it to be

5  dangerous.

6       But this scenario takes the crime out of context.

7  This statute makes a criminal sexual assault into an aggravated

8  criminal sexual assault based on the display, threatened use,

9  or use of a weapon.  These are descriptions of the distinct

10 ways a weapon makes criminal sexual assault aggravated:

11 Display, threatened use of, or use of a weapon.

12      The final clause adds that an object can qualify if,

13 under the circumstances, a victim reasonably believes the

14 object is a dangerous weapon.  The offender must display it,

15 threaten to use it, or use it in the commission of attempted

16 criminal sexual assault.  This falls within the use, attempted

17 use, or threatened use of physical force against the person or

18 property of another.

19      Additionally, reliance on the victim's reasonable

20 perception of the object as a dangerous weapon does not change

21 that Defendant would still have to have the intent to commit

22 aggravated criminal sexual assault because this is an attempt

23 crime that requires intent to commit criminal sexual assault.

24      Even if it was not a categorical match, Defendant's

25 conviction is a crime of violence under the modified

1  categorical approach.  The modified categorical approach can be

2  applied because the statute is divisible.  It can be broken

3  down into six offenses:  Display, threatened use, or use with

4  each aligned with either a dangerous weapon or the object

5  discussed above.

6      Significantly, for purposes of assessing what a jury

7  would have to unanimously agree to, the jury instructions the

8  Government provides indicate that the trial court elects

9  between these options in instructing rather than a jury

10 selecting.  Because they are divided into separate offenses,

11 the statute is divisible.  The underlying criminal sexual

12 assault statute is also divisible as reflected in the jury

13 instructions with the Court electing between force or unable to

14 consent.

15     Applying the modified categorical approach,

16 Defendant's conviction qualifies based on the indictment and

17 the factual basis for the plea -- for his plea.  He was

18 convicted of attempted aggravated criminal sexual assault for

19 attempting the act of sexual penetration by the use of force or

20 threat of force.  He attempted to sexually assault the victim

21 with the use of a knife including pulling her clothes off

22 twice:  Once when he initially took her at knife point to an

23 alley, and then a second time after she attempted to run away.

24 This certainly qualifies as an offense that has an element the

25 use, attempted use, or threatened use of physical force against

ER-30

1    the person or property of another.

2            And with that, Counsel, you stated that you wish

3    to -- to file...

4            MS. PAPACHRISTOU:  Your Honor, my -- my point was

5    just that if the Court is applying the modified categorical

6    approach, I would like the opportunity to -- for a written

7    response.

8            THE COURT:  All right.  Well, I have my tentative --

9    I made my tentative ruling.  And if you wish to submit that,

10   you may.  How much time do you need?

11           MS. PAPACHRISTOU:  Just a week, Your Honor.  I was

12   going to propose to come back a week from today.

13           THE COURT:  All right.  Let's see.  What's today?

14   All right.  If you can go ahead and file your response by no

15   later than May 11th by close of business.  And then I'll --

16   I'll take it under submission without further hearing --

17           MS. PAPACHRISTOU:  Okay.

18           THE COURT:  -- oral hearing.  Okay.  Very well.

19           MS. PAPACHRISTOU:  Thank you, Your Honor.

20           THE COURT:  Anything further?

21           MR. MIAO:  Not from the Government, Your Honor.

22           THE COURT:  All right. Very well.  Thank you.  Have

23   a -- have a great afternoon.

24           MS. PAPACHRISTOU:  Thank you, Your Honor.

25           MR. MIAO:  Thank you, Your Honor.

```
 1              May we set a future date in this matter?  I don't
 2   know if we have another calendar date for this matter.
 3              THE COURT:  Oh, thank you for bringing that to my
 4   attention.
 5              All right.  So this is a motion hearing/trial setting
 6   as well, Madam Clerk?
 7              THE CLERK:  This was just a motion hearing.
 8              THE COURT:  Okay.
 9              THE CLERK:  So let me go and check the docket just to
10   make sure there's no other hearings.
11              THE COURT:  Counsel, do you have a proposed date,
12   joint proposed date?
13              MR. MIAO:  Your Honor, I would just suggest probably
14   something in the neighborhood of four to five weeks out.
15              MS. PAPACHRISTOU:  Yes, Your Honor.
16              THE COURT:  Will that work?  Okay.  Very well.
17              If we can look at five weeks out, Madam Clerk.
18              THE CLERK:  Yes.  So five weeks out puts us at one,
19   two, three, four -- it would put us out to June 9th.
20              THE COURT:  Will that work for both counsel?
21              MS. PAPACHRISTOU:  Yes, Your Honor.
22              MR. MIAO:  Yes, Your Honor.
23              THE COURT:  Okay.  Very well.
24              That'll be your next court date, sir, and that'll
25   be -- we'll set that for motion hearing/trial setting.
```

ER-32

1        And is time excluded?

2        MS. PAPACHRISTOU:  Yes, Your Honor.

3        THE COURT:  Okay.  Very well.

4        All right.  Thank you.

5        MR. MIAO:  Thank you, Your Honor.

6        THE COURT:  All right.  Court is adjourned.

7      (Defendant taken back into custody at 1:53 p.m.)

8      (Court adjourned at 1:53 p.m.)

9

10              C E R T I F I C A T E

11        I, Adrian Dale Baule, certify that I am a duly
     qualified and acting Official Court Reporter for the United
12     States District Court; that the foregoing is a true and
     accurate transcript of the proceedings as taken by me in the
13     above-entitled matter on May 5, 2023; and that the format used
     complies with the rules and requirements of the United States
14     Judicial Conference.

15        Date:  March 7, 2024

16

17

18     Adrian Dale Baule, RMR, CRR, CSR
     U.S. Official Court Reporter

19

20

21

22

23

24

25

1  RANDY S. GROSSMAN
   United States Attorney
2  JAMES MIAO
   Assistant United States Attorney
3  California Bar No. 326477
   Office of the United States Attorney
4  880 Front Street, Room 6293
   San Diego, CA 92101
5  Tel. Nos.: (619) 546-9057
   E-mail: james.miao@usdoj.gov
6
7  Attorneys for the United States

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10 | UNITED STATES OF AMERICA, | Case No.: 23-CR-251-RBM |

11 |         Plaintiff, | DATE:  May 5, 2023 |
                                   TIME:  1:30 p.m.
12 |              v. |

13 | RAMIRO GOMEZ-REYES, | **UNITED STATES' SUPPLEMENTAL**
                                   **BRIEFING IN OPPOSITION TO**
14 |         Defendant | **DEFENDANT'S MOTION TO DISMISS**
                                   **THE INFORMATION PURSUANT TO 8**
15                                 **U.S.C. § 1326(D)**
16

17      The United States submits this supplemental briefing in support of

18 its Opposition to Defendant's Motion to Dismiss the Information pursuant

19 to Title 8 U.S.C. § 1326(d). The United States has now received

20 documents detailing Defendant's underlying conviction for aggravated

21 criminal sexual assault, for which he was administratively removed from

22 the United States. Defendant's Motion attacks the validity of the

23 removal order predicated upon this conviction. Those same documents

24 were produced to the Defendant in discovery on May 1, 2023. Although

25 the United States still takes the position that the Illinois offense of

26 aggravated criminal sexual assault is categorically a crime of violence

27 within the meaning of Title 18 U.S.C. § 16(a), even if this Court finds

28 that the offense is not categorically a crime of violence, the analysis

ER-34

1   does not end. Rather, the Court should complete the three-step analysis

2   set forth by the Supreme Court in *Descamps* – first determining whether

3   the offense of conviction is divisible, and then applying the modified

4   categorical approach. *Medina-Lara v. Holder*, 771 F.3d 1106, 1112 (9th

5   Cir. 2014) citing *Descamps v. United States*, 570 U.S. 254 (2013).

6   Illinois court records, including the superseding indictment Defendant

7   pled guilty to as well as the transcript of his guilty plea colloquy,

8   reveal that the Defendant pled guilty to attempting to rape a woman at

9   knifepoint. Under the modified categorical approach, Defendant's

10  conviction for aggravated criminal sexual assault is clearly a crime of

11  violence and therefore serves as a valid predicate for his

12  administrative removal from the United States.

13                                    I

14                              **ARGUMENT**

15      **A. Three-Step Framework**

16      In *Descamps*, the Supreme Court outlined a three-step analysis for

17  determining whether a conviction may serve as a predicate offense

18  mandating removal under the Immigration and Nationality Act. *Id.*, *see*

19  *also Lopez-Valencia v. Lynch*, 798 F.3d 863, 867 (9th Cir. 2015), *United*

20  *States v. Torre-Jimenez*, 771 F.3d 1163, 1165 (9th Cir. 2014). First,

21  the Court applies the categorical approach to determine whether the

22  statute of conviction is a categorical match to the generic predicate

23  offense. The parties have already submitted briefing regarding the

24  categorical approach analysis, and Government counsel will not

25  duplicate that here. If the Court finds that the offense of conviction

26  is *not* a categorical match, it proceeds to determine whether the statute

27  is divisible. If the statute of conviction is indivisible, the analysis

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*                ER-35                    23-cr-251-RBM

1 ends and the conviction may not serve as a predicate. If the statute is

2 divisible, the Court applies the modified categorical approach.

3 **B. Divisibility Analysis**

4 Post-*Descamps*, the seminal Ninth Circuit case addressing the

5 divisibility of a statute is *Rendon v. Holder*, 764 F.3d 1077 (9th Cir.

6 2014). The key difference between a divisible and indivisible statute,

7 is that divisible statutes "contain multiple, alternative *elements* of

8 functionally separate crimes" *Id*. (emp. in original). The question of

9 whether a statutory provision is an element as opposed to an alternative

10 means of committing the offense turns on whether the jury must

11 unanimously agree on which portion of the statue a defendant is

12 convicted under. *Id*. at 1086-1087. In determining whether the statute

13 requires jury unanimity as to particular elements, federal courts look

14 to underlying state law for guidance. *Id*. at 1088. Subsequent to *Rendon*

15 and *Descamps*, the Ninth Circuit has continuously applied this approach

16 to the divisibility analysis. *See United States v. Simmons*, 782 F.3d

17 510, 517 (9th Cir. 2015), *Lopez-Valencia v. Lynch*, 798 F.3d at 867,

18 *Romero-Millan v. Garland*, 46 F.4th 1032, 1041 (9th Cir. 2022).

19 **C. Illinois Aggravated Criminal Sexual Assault Is Divisible**

20 On January 8, 2009, Defendant was convicted of attempted aggravated

21 criminal sexual assault in the Superior Court of Cook County, Illinois,

22 in case number 07CR2465301. Defendant was convicted under 720 ILCS 5/12-

23 14(A)(1)[1], which reads:

24

25         (a) A person commits aggravated criminal sexual
        assault if that person commits *criminal sexual*

26         *assault* and any of the following aggravating
        circumstances exist during the commission of the

27

---

[1] The statute of conviction has since been recodified as 720 ILCS 5/11-1.30. The terms of the statute remain unchanged.

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*

**ER-36**

23-cr-251-RBM

offense or, for purposes of paragraph (7), occur as part of the same course of conduct as the commission of the offense:

(1) the person displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon;

*Emp. added*. By its plain text, aggravated criminal sexual assault under subsection (a)(1) may be proven if the offender displays, or threatens to use, or uses a dangerous non-firearm weapon, *or* some other object that leads the victim to reasonably believe that the object is a dangerous weapon. Six alternatives are presented: 1) the display of a dangerous non-firearm weapon, the display of some other object, 3) the threatened use of a dangerous weapon, 4) the threatened use of some other object, 5) the use of a dangerous weapon, and 6) the use of some other object. Applying *Rendon*, the inquiry turns to whether the jury must unanimously find that the offense involved a specific combination of use/display/threat and a dangerous non-firearm weapon or some other object.

Although Illinois courts have not explicitly weighed in on unanimity questions for the offense of aggravated criminal sexual assault, the Illinois pattern jury instructions are helpful on this point. There are two Illinois Pattern Jury Instructions which are to be used in aggravated criminal sexual assault cases. They provide, in relevant part:

//

//

//

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*

ER-37

23-cr-251-RBM

11.57
Definition Of Aggravated Criminal Sexual Assault
[a] A person commits the offense of aggravated criminal sexual assault when he commits criminal sexual assault and
[1] [(displays) (threatens to use) (uses)] [(a dangerous weapon other than a firearm) (any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon)].

11.58
Issues In Aggravated Criminal Sexual Assault-- Aggravation By Circumstances
To sustain the charge of aggravated criminal sexual assault, the State must prove the following propositions:
*First Proposition*: That the defendant committed an act of sexual penetration upon ____; and
*Second Proposition*: That the act was committed by the use of force or threat of force[, and that ____ did not consent to the act of sexual penetration]; and
[or]
*Second Proposition*: That the defendant knew that ____ was unable to [(understand the nature of the act) (give knowing consent)]; and
[1] *Third Proposition*: That the defendant [(displayed) (threatened to use) (used)] [(a dangerous weapon other than a firearm) (any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon)].

Illinois Pattern Jury Instructions, Criminal, No 11.57, 11.58 (approved July 18, 2014) (hereinafter IPI Criminal No. 11.57, 11.58)[2].

As seen in IPI Criminal No. 11.58 at the Third Proposition, Illinois requires an election between the three methodologies (display, threat, use) as well as a separate election between the implement (dangerous weapon, other object). Notably, the pattern instruction language does not include any reference to findings in the alternative. Put another way, the jury is not given an option to find that an offender used a

---

[2] Accessible at https://www.illinoiscourts.gov/courts/circuit-court/illinois-pattern-jury-instructions-criminal/

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*
ER-38
23-cr-251-RBM

dangerous weapon *and* displayed a dangerous weapon – the trial court must make an election when instructing.

This Court may rely on more than the guidance offered by Illinois Pattern Jury Instructions – the Illinois Supreme Court has addressed the divisibility issue in an nearly identical statutory context. In *People v. Reveles-Cordova*, 181 N.E.3d 806, 811 (IL 2020), the Illinois Supreme Court took up the issue of whether a defendant's conviction for criminal sexual assault was a lesser-included offense of "home invasion based on criminal sexual assault." Reveles-Cordova had been convicted of home invasion based on the following statutory language:

> (a)  A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in the dwelling place until he or she knows or has reason to know that one or more persons is present or who falsely represents himself or herself, including but not limited to, falsely representing himself or herself to be a representative of any unit of government or a construction, telecommunications, or utility company, for the purpose of gaining entry to the dwelling place of another when he or she knows or has reason to know that one or more persons are present and
>
> …
> (6)  Commits, against any person or persons within that dwelling place, a violation of Section 11-1.20, 11-1.30, 11-1.40, 11-1.50, or 11-1.60 of this Code.

Reveles-Cordova was charged with having committed home invasion by entering a dwelling place and then committing a violation of Section 11-1.20[3] - criminal sexual assault. He was also convicted of criminal sexual

---

[3] As recodified - Reveles-Cordova's original conviction was under 720 ILCS 5/12-13(a)(1).

1  assault. He argued that he could not have been sentenced for both

2  offenses separately due to Illinois' "one act, one-crime" doctrine.

3       As with the instant case, the Illinois Supreme Court was faced with

4  another statute with multiple subsections and alternative methods of

5  charging. The Illinois Supreme Court, applying United States Supreme

6  Court precedent in *Whalen v. United States*, 445 U.S. 684 (1980), held

7  that predicate offenses must be considered separately when determining

8  the elements of an offense. *Reveles-Cordova*, 181 N.E.3d at 811. The

9  Illinois Supreme Court explicitly held: "Here, each of the alternative

10 acts or predicates contained in the six subsections of section [12-

11 11(a)] (recodified now as 11-1.20) of the home invasion statute should

12 be construed as separately proscribed offenses. Additionally, the five

13 sex offenses identified in subsection (a)(6) should be construed as

14 separately proscribed offenses as well." *Id*. The holding's import is

15 clear. Where an Illinois criminal statute specifies alternative acts or

16 predicates, even when those alternatives appear in the same subsection,

17 they are to be construed as *separately proscribed offenses*. In short –

18 divisible crimes.

19      Applying the *Reveles-Cordova* holding to the instant case is

20 straightforward. The aggravated criminal sexual assault statute contains

21 six alternative acts, but under Illinois law, those are to be treated

22 as separate prohibited offenses. This conclusion is supported by the

23 Illinois Pattern Jury Instructions which require factual elections

24 rather than permitting findings in the alternative.

25 //

26 //

27 //

**D.  Criminal Sexual Assault is a Lesser-Included Offense of Aggravated Criminal Sexual Assault**

The plain terms of the aggravated criminal sexual assault (ACSA) statute make clear that criminal sexual assault (CSA) is a less-included offense. ACSA pursuant to 720 ILCS 5/12-14(A)(1)[4], is defined:

> "(a) A person commits aggravated criminal sexual assault if that person commits criminal sexual assault and…"

There is no way to commit ACSA without also committing CSA. This obvious, textual conclusion has been confirmed in Illinois courts. *See People v. Riley*, 219 Ill.App.3d 482, 491 (1991). What follows naturally, is that a jury must find all the elements of CSA in order to find a defendant guilty of ACSA.

What this means for the Defendant in this case, is that if CSA is itself a crime of violence, then ACSA must therefore also be a crime of violence.

**E.  Criminal Sexual Assault is Divisible**

CSA is defined as follows:
Sec. 11-1.20. Criminal sexual assault.
    (a) A person commits criminal sexual assault if that person commits an act of sexual penetration and:
        (1) uses force or threat of force;
        (2) knows that the victim is unable to understand the nature of the act or is unable to give knowing consent;
        (3) is a family member of the victim, and the victim is under 18 years of age; or
        (4) is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim, and the victim is at least 13 years of age but under 18 years of age.

---

[4] The statute of conviction has since been recodified as 720 ILCS 5/11-1.30. The terms of the statute remain unchanged.

The United States incorporates by reference its arguments in Part C above. CSA, like ACSA, sets forth separate offenses which require different elements. This conclusion is supported by both the plain language of the statute as well as the *Reveles-Cordova* holding. Importantly, if this Defendant was convicted of committing ACSA via CSA requiring the use of force or threat of force, then his conviction is a crime of violence and renders him administratively removable as an aggravated felon.

**F.   Application of the Modified Categorical Approach**

Having established that both ACSA and CSA are divisible statutes, we now turn to the third step in the *Descamps* three-step analysis: application of the modified categorical approach. When applying the modified categorical approach, the Court may look to "charging documents jury instructions, plea agreements, colloquies, and other 'equally reliable document[s]'" *United States v. Tagatac*, 36 F.4th 1000, 1004 (9th Cir. 2022); *Romero-Millan*, 46 F.4th at 1043. In this case, the United States asks this Court to examine two additional documents recording Defendant's predicate conviction: Exhibit 7, the transcript of Defendant's plea colloquy on January 8, 2009, and Exhibit 8, the Indictment in Defendant's Illinois case. From this record, the Court must then determine if the additional documents establish whether the statutory alternative Defendant was convicted under is categorically a crime of violence.

**G.   Under the Modified Categorical Approach, Both Aggravated Criminal Sexual Assault and the Lesser-Included Offense of Criminal Sexual Assault Are Crimes of Violence**

1    Beginning with the plain language of the Indictment, Defendant pled

2 guilty and was convicted of attempted aggravated criminal sexual assault

3 in Count 4. Exhibit 8, p. 6 (Bates No. 114). The Indictment language

4 reads:

5    RAMIRO GOMEZ committed the offense of ATTEMPT AGGRAVATED CRIMINAL

6 SEXUAL ASSAULT in that HE, WITH INTENT TO COMMIT THE OFFENSE OF

7 AGGRAVATED CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED TO AN ACT OF

8 SEXUAL PENETRATION UPON [**REDACTED**] TO WIT: CONTACT BETWEEN RAMIRO

9 GOMEZ'S PENIS AND [**REDACTED**] VAGINA, BY THE USE OF FORCE OR THREAT OF

10 FORCE, AND HE DISPLAYED A DANGEROUS WEAPON, OTHER THAN A FIREARM, TO

11 WIT: A KNIFE, WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARD THE COMMISSION

12 OF THE OFFFENSE OF AGGRAVATED CRIMINAL SEXUAL ASSAULT…

13    Already, just by looking at the plain language of the Indictment,

14 it is clear that Defendant was convicted of a crime of violence.

15 Defendant was charged with, and pled guilty to, attempting an act of

16 sexual penetration *by the use of force or threat of force*. As discussed

17 above, CSA may be committed several different ways, including some

18 alternative which might traditional be termed "statutory rape." However,

19 the language in Defendant's Indictment makes clear that he was not

20 convicted of an age-related CSA subsection – he was convicted of

21 attempting sexual penetration through the use or threat of force.

22    The Indictment language also makes clear that the Defendant did not

23 use some object fashioned in such a way as to make the victim reasonably

24 believe it was a weapon. Instead, he used a knife. By any definition, a

25 knife is a dangerous weapon. Even setting aside the necessity of the

26 element of force in the lesser-included offense of CSA, Defendant's

27

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*

ER-43

23-cr-251-RBM

1  enhanced felony conduct in the ACSA statute also necessarily involved

2  the use or threat of force.

3       Defendant's plea colloquy, as seen in Exhibit 7, further reinforces

4  the conclusion that he was convicted of a crime of violence. Beginning

5  on page 8 line 23 (Bates 99), the prosecutor in the underlying case

6  recites the factual basis for the Defendant's guilty plea. The Defendant

7  stipulated to having threatened the victim with a knife, pulling down

8  the victim's garments, and attempting to place his penis in her vagina

9  twice. To be clear: the United States does not argue that the obviously

10 violent nature of Defendant's physical conduct renders his offense of

11 conviction a crime of violence. Rather, the information in the record

12 supports a finding that the Defendant was convicted under subsections

13 of the ACSA and CSA statutes which have, as an element, the attempted

14 use or threatened use of physical force against the person or property

15 of another – as defines a crime of violence under Title 18 U.S.C. §

16 16(a).

17      **H.   The Prejudice Analysis Remains the Same – Defendant Cannot**

18          **Establish Actual Prejudice**

19      Whether the Court applies the categorical approach or proceeds to

20 the modified categorical approach, the prejudice analysis remains the

21 same. For the reasons stated in the Government's original Response in

22 Opposition, the Defendant cannot establish prejudice in this case nor

23 should this Court presume prejudice. The United States notes that the

24 additional information now available in the record shows that the

25 Defendant pled guilty to and was convicted of armed robbery on the same

26 date as his ACSA conviction. See Exhibit 7, p. 3, 5. Without belaboring

27 the point further and proceeding through a categorical approach analysis

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*        ER-44                23-cr-251-RBM
*under 8 U.S.C. §1326(d)*

1  on an entirely separate statute of conviction, the United States will

2  simply submit that Defendant's conviction for this separate aggravated

3  felony would render him removable from the United States and ineligible

4  for discretionary relief on an wholly separate basis from his ACSA

5  conviction.

**II.**

**CONCLUSION**

8      As one judge of the Ninth Circuit has commented, categorical

9  approach jurisprudence is particularly convoluted and can lead to

10 seemingly absurd results – to the point that a jurist could feel as

11 though they are "taking crazy pills."

12 *United States v. Begay*, 934 F.3d 1033, 1042 (9th Cir. 2019), *reh'g en*

13 *banc granted, opinion vacated,* 15 F.4th 1254 (9th Cir. 2021), and *on*

14 *reh'g en banc,* 33 F.4th 1081 (9th Cir. 2022). But fortunately in this

15 case, the facts, law, and common sense all point to the same conclusion:

16 the Defendant committed a crime of violence when he attempted to rape a

17 woman at knifepoint. Because Defendant was convicted of a crime of

18 violence, he was properly deemed an aggravated felon and removed via an

19 administrative deportation. Even if there were any procedural

20 irregularities in his administrative removal process, no prejudice can

21 result because Defendant is in fact an aggravated felon with no lawful

22 status in the United States, for whom there is little to no discretionary

23 relief available. For the foregoing reasons, the United States

24 respectfully requests that the Court deny Defendant's Motion to Dismiss

25 the Information Under § 1326(d).

26

27

*Supplemental Briefing in Opposition*
*to Defendant's Motion to Dismiss*
*under 8 U.S.C. §1326(d)*                     ER-45                          23-cr-251-RBM

DATE: May 2, 2023

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s/ James Miao
JAMES MIAO
Assistant United States Attorney

Supplemental Briefing in Opposition
to Defendant's Motion to Dismiss
under 8 U.S.C. §1326(d)

ER-46

23-cr-251-RBM

```
 1    STATE OF ILLINOIS  )
                         )  SS:
 2    COUNTY OF C O O K  )

 3                IN THE CIRCUIT COURT OF COOK COUNTY
                  COUNTY DEPARTMENT - CRIMINAL DIVISION
 4


 5
      THE PEOPLE OF THE STATE      )
 6    OF ILLINOIS,                 )
                                   )
 7                   Plaintiff,    )
                                   )
 8       vs.                       )  No.  07-CR-24653-01
                                   )
 9    RAMIRO GOMEZ,                )
                                   )
10                   Defendant.    )

11

12                REPORT OF PROCEEDINGS had at the

13    hearing in the above-entitled cause before the

14    HONORABLE NICHOLAS R. FORD, Judge of said court, on

15    the 8th day of January, 2009.

16         PRESENT:
           HONORABLE ANITA ALVAREZ,
17         State's Attorney of Cook County, by:
           MR. George Canellis,
18         Assistant State's Attorney,
               appeared on behalf of the People;
19
           MR. ABISHI C. CUNNINGHAM, JR.,
20         Public Defender of Cook County, by:
           MR. Alfredo Maldonado,
21         Assistant Public Defender,
               appeared on behalf of the Defendant.
22

23    Patrick J. Flannery
      Official Court Reporter
24    License No. 084-001220
```

ER-47

1

2                          I N D E X

3

4          DIRECT   CROSS   REDIRECT   RECROSS

5

6      ADMONISHMENT OF RIGHTS;   Pg. 4

7      FACTUAL BASES;   Pg. 7

8      AGGRAVATION;   Pg. 11

9      MITIGATION;   Pg. 11

10     SENTENCING;   Pg. 11

11     APPEAL RIGHTS;   Pg. 13

12

13

14

15

16

17

18

19

20

21

22

23

24

# ER-48

```
 1                THE COURT:  Ramiro Gomez.

 2                          (Interpreter sworn.)

 3                THE COURT:  This is Mr. Ramiro Gomez.

 4                    Mr. Gomez, there were previously

 5      conferences in your case.  At those conferences I

 6      indicated that in exchange for a plea of guilty in

 7      your case for the offense of armed robbery, I would

 8      sentence you to a period of 18 years Illinois

 9      Department of Corrections.  That is 50 percent, armed

10      robbery.

11                    On the second case -- the first case

12      is 07-CR-16248 -- 07-CR-24653, on that case in

13      exchange for your plea of guilty, I would sentence

14      you to ten and a half years in the Illinois

15      Department of Corrections for the offense of

16      aggravated kidnapping.

17                    You will do 85 percent of that case.

18      Meaning the net result is 9 years on that case.  That

19      will be concurrent with the second count on the case,

20      the 50 percent count.  That will be a sentence of

21      18 years on that also.

22                    The net result on all this is you

23      will be looking at 9 years, minus the time you have

24      been in.
```

ER-49

1                    Do you understand that?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  Are you pleading guilty on

4       those two cases, those two offenses?

5                    THE DEFENDANT:  Yes.

6                    THE COURT:  Do you understand the rights I

7       am going to give you right now exist on both cases?

8       Do you understand that?

9                    THE DEFENDANT:  Yes.

10                   THE COURT:  The sentence on the first case

11      is 18 years Illinois Department of Corrections,

12      528 days credit.

13                        The sentence on the second case is

14      ten and a half years 85 percent time, 528 days credit

15      on that.

16                        When you plead guilty you give up

17      certain rights.  Pre-eminent among those rights is

18      the right to a jury trial.

19                        A jury trial is where 12 individuals

20      on your jury decide guilt or innocence based on their

21      review of the evidence beyond a reasonable doubt.

22                        And any decision they make would have

23      to be unanimous.  Do you understand that?

24                   THE DEFENDANT:  Yes.

1           THE COURT:  You are not only giving up your

2    right to a jury trial in both cases, you are giving

3    up your right to a bench trial where I would decide

4    your guilt or innocence based on my review of the

5    evidence beyond a reasonable doubt.

6                Do you understand that?

7           THE DEFENDANT:  Yes.

8           THE COURT:  You are giving up your right to

9    confront and cross-examine the witnesses, present

10   evidence in your own behalf or just remain silent and

11   rely on the State's inability to prove you guilty.

12               Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  All these cases are Class X

15   offenses.  Attempt aggravated criminal sexual assault

16   is a Class 1 offense for which the sentence is 4 to

17   15 years in the Illinois Department of Corrections, 2

18   years mandatory supervised release and a fine of up

19   to $25,000.

20               The first case, 07-CR-16248, which is

21   an armed robbery case, is a Class X offense.  That

22   sentence is 6 to 30 years Illinois Department of

23   Corrections, 3 years mandatory supervised release and

24   a fine of up to $25,000.

1     And the attempt criminal sexual

2 assault is a Class 1 offense.  Also that is 4 to

3 15 years in the Illinois Department of Corrections, 2

4 years mandatory supervised release, and a fine of up

5 to $25,000.

6     Do you understand that?

7    THE DEFENDANT:  Yes.

8    THE COURT:  On both cases you have got an

9 absolute right to what is called a pre-sentence

10 investigation which is a report prepared by the Adult

11 Probation Department.

12     The maximum amount on the attempt

13 criminal sexual assault is 4 to 15 years Illinois

14 Department of Corrections, 2 years mandatory

15 supervised release and fine of up to $25,000.

16     I think I said that was the minimum

17 sentence.

18    MR. CANELLIS:  Judge, the order is --

19    THE COURT:  Eighteen.  Right.  It is

20 15 years and a little bit of change, but it inures to

21 your benefit.

22     The sentence you are receiving on the

23 attempt aggravated criminal sexual assault is

24 15 years Illinois Department of Corrections, not 18.

ER-52

1    It is not going to change the 9 years you have to do

2    on both case.

3                    Do you understand that?

4              THE DEFENDANT:  Yes.  Yes.

5              THE COURT:  When you pled guilty you give

6    up your right to a jury trial and you are giving up

7    your right to a bench trial.

8                    And you are also giving up your right

9    under the law to what is called a pre-sentence

10   investigation.

11                   By signing the documents before you

12   now, when you sign those you are waiving your right

13   to that pre-sentence investigation and jury trial we

14   just talked about on both cases.

15                   And by signing them, he is in the

16   process of signing them right now, he is waiving a

17   jury trial and a pre-sentence investigation.

18                   State, may I get a factual basis on

19   both cases?

20             MR. CANELLIS:  Judge, case number

21   07-CR-16248, if this case went to trial, the State

22   would call ███████████████████████████████████

23   who would state that on July 29th, 2007, at about

24   10:20 in the evening she had just gotten off the bus

```
 1    and was walking home, which was in the area 3411 West

 2    Olcott.

 3                    She would state she was walking

 4    westbound when the defendant approached, whom she

 5    would identify in open court.  She would state he

 6    grabbed her and put a knife toward her neck and

 7    attempted to hit her.

 8                    She would further state that the

 9    defendant also attempted to cover her mouth as she

10    was screaming.

11                    She would further state that the

12    defendant asked for money.  And she subsequently

13    related she gave him $20 from her bag.

14                    She would then state the defendant

15    fled.  She subsequently identified him as the

16    individual that did that.

17                    So stipulated as to that?

18            MR. MALDONADO:  So stipulated.

19            THE COURT:  I find from the evidence

20    offered that that is sufficient to prove the

21    defendant guilty beyond a reasonable doubt for the

22    offense charged in case 07-CR-16248.

23            MR. CANELLIS:  On case number 07-CR-24653,

24    first the State would call ██████████ who would
```

ER-54

1    state that on June 10th, 2007 at approximately 11:00

2    o'clock she was walking home in the area of 3127

3    North Spaulding in Chicago.

4              She was approached by the defendant

5    near Sawyer Avenue, whom she would identify in open

6    court, and state the defendant displayed a knife

7    stating to her in Spanish to keep quiet, just give it

8    up and nothing would happen to her.

9              She would further state that the

10   defendant placed a knife to her stomach after she

11   told him she was pregnant.

12             She would further state that the

13   defendant then relocated to the alley what the victim

14   and pulled the victim's shorts and underwear down.

15             She would further state that the

16   defendant removed his penis from his pants and

17   attempted to place his penis in her vagina.

18             She would further state that she

19   pushed the defendant away and attempted to run and

20   fell to the ground.

21             She would state the defendant pursued

22   her again and pulled her shorts and underwear down

23   and once again attempted to place his penis into her

24   vagina.

```
1              She would then testify she broke free

2    a second time and fled to a witness by the name of

3    ██████████████

4              The State would call ████████████ who

5    would state that he observed the defendant, whom he

6    would identify in open court, walking the victim to

7    the alley with one armed around the victim's shoulder

8    and the other around her stomach.

9              He would further state he passed the

10   victim on two occasions at the alley.  And after

11   passing a third time he observed her to push the

12   defendant and run toward him.

13             He would further state that he noted

14   that the victim, ███████████  was bleeding and her

15   shirt was torn.

16             So stipulated?

17        MR. MALDANADO:  Stipulated.

18        THE COURT:  The Court finds the facts

19   offered in that case are also sufficient to prove the

20   defendant's guilt beyond a reasonable doubt for the

21   offense charged in the second case, 07-CR-24653.

22             I am going to enter a conviction on

23   both findings, both cases.

24             The Court also find that he
```

1    understands the nature of the charges against him,

2    and possible penalties, his right under the law.

3    That the plea is made freely and voluntarily.  And

4    that a factual basis exists for the plea.

5                   Anything further by way of

6    aggravation or mitigation?

7                   MR. CANELLIS:  No, Judge.

8                   MR. MALDONADO:  No, Judge.

9                   THE COURT:  Do you have anything to add,

10   Mr. Gomez?

11                  THE DEFENDANT:  No.

12                  THE COURT:  The sentence for case

13   07-CR-16248, Count 1, is 18 years Illinois Department

14   of Corrections.  Credit 528 days.

15                  Fees, fines and costs are consumed by

16   the period of incarceration before trial.  That is

17   concurrent with case 07-CR-24653.

18                  On the second case, that case is

19   24653, count one offense aggravated kidnapping

20   inflicting harm, a sentence for which you will have

21   to serve 85 percent of the time, the sentence is ten

22   and a half years Illinois Department of Corrections,

23   528 days credit, concurrent with the other case

24   number also with Count 4.  On that Count 4 the

1    sentence will be 15 years Illinois Department of

2    Corrections, a 50 percent case.   Both counts

3    concurrent with case 16248.

4                     Stay of mitt to January 22nd.   Fees,

5    fines and costs satisfied by the time served in jail.

6                     Mr. Gomez, even though you plead

7    guilty here today you still have a right to appeal.

8                     In order to appeal, you must first

9    within 30 days file with in this court a written

10   motion asking to have the judgment vacated and for

11   leave to withdraw your plea of guilty.

12                    In that motion you must set forth the

13   grounds, the reasons why you feel it should be

14   granted in writing.

15                    If it is filed within 30 days, if it

16   is granted, the plea of guilty, sentence and judgment

17   will be vacated and a trial date will be set down on

18   all charges once pending against you.

19                    If it is denied, you have 30 days to

20   appeal that denial.   You have to file that notice of

21   appeal within Cook County.

22                    Under that circumstance you are

23   entitled to a free attorney, free transcript of

24   today's pleas, but any issue or claim of error not

1    raised in the motion to withdraw your plea of guilty

2    will be deemed waived and given up on appeal.

3              Do you understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Do you have any other

6    questions?

7              THE DEFENDANT:  No.

8              THE COURT:  One thing I don't know, that is

9    whether or not you are a United States citizen.  You

10   have a right now I will give you the opportunity, if

11   you choose to not accept the offer, I don't have any

12   idea what the United States Government is going to do

13   if you are an undocumented alien.

14              Whether they ask to have you removed,

15   understanding they may ask to have you removed from

16   the United States, to place a detainer upon you,

17   remove you.

18              Do you still wish to move forward and

19   accept the plea as it has been articulated here

20   today?

21              THE DEFENDANT:  Yes.

22              THE COURT:  Okay.

23              MR. CANELLIS:  Also make a motion for the

24   defendant to undergo medical testing for sexually

1    transmitted diseases as well as Buccol swab.

2              THE COURT:  I will be signing an order

3    today that both should occur.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

14

```
 1    STATE OF ILLINOIS   )
                          )
 2    COUNTY OF C O O K   )

 3

 4              IN THE CIRCUIT COURT OF COOK COUNTY
          CIRCUIT COURT OF COOK COUNTY CRIMINAL DIVISION
 5

 6

 7                   I, Patrick J. Flannery, an Official

 8    Court Reporter for the Circuit Court of Cook County,

 9    County Department-Criminal Division, do hereby

10    certify that I reported in shorthand the proceedings

11    had at the hearing of the above-entitled cause; that

12    I thereafter caused the foregoing to be transcribed

13    into typewriting, which I hereby certify to be a true

14    and accurate transcript of the proceedings before the

15    Honorable NICHOLAS R. FORD, Judge of said court.

16

17

18                        _____
                          Official Court Reporter
19                        License No. 084-001220

20

21

22    Dated this 21st

23    of April, 2023.

24
```

15



** INFORMATION INDICTMENT RETURN SHEET **

| CASE NO. | IR | DEFENDANT | NO. | ARRAIGNMENT DATE |
|---|---|---|---|---|
| 07CR-24653 | 1870833 | RAMIRO GOMEZ | ▮ | RPL 12/17/2007 |

GJ- 2324   FBI-▮          Sex: M  Race: H  DOB: ▮
           ISB-▮          Add: ▮
           CB-▮                                07-1123548
           RD/AR: ▮        Arrest Agy: C P D Area 5 Dist 25
                          Arrest Date: 11/07/2007
Hgt: 5'03"    Wgt: 125    Hair: BLK   Eyes: BRO
DIRECT INDICTMENT                    11/26/2007
ASA: Margaret O'Sullivan        Unit: Child Advo Prot
Chg:  1   Agg Kidnapping/Inflict Harm
               720-5\10-2(A)(3)2    0000011389 Class: X
Chg:  2   Agg Kidnapping/Inflict Harm
               720-5\10-2(A)(3)2    0000011389 Class: X
Chg:  3   Armed Violence/Category II
               720-5\33A-2(A)(2)    0000012375 Class: X
Chg:  4   Attempt Agg Crim Sex Assault/Weapon
               720-5\8-4(12-14(A)1) 000A996000 Class: 1
Chg:  5   Attempt Agg Crim Sex Assault/Weapon
               720-5\8-4(12-14(A)1) 000A996000 Class: 1
Chg:  6   Attempt Agg Crim Sex Assault/Bodily Harm
               720-5\8-4(12-14(A)2) 000A996100 Class: 1
Chg:  7   Attempt Agg Crim Sex Assault/Threat Life
               720-5\8-4(12-14(A)3) 000A996200 Class: 1
Chg:  8   Attempt Agg Crim Sex Assault/Felony
               720-5\8-4(12-14(A)4) 000A996300 Class: 1
Chg:  9   Attempt Agg Crim Sex Assault/Felony
               720-5\8-4(12-14(A)4) 000A996300 Class: 1
Chg: 10   Attempt Crim Sex Assault
               720-5\8-4(12-13(A)1) 000A995500 Class: 2
Chg: 11   Kidnapping/Force Or Threat
               720-5\10-1(A)(2)     0000765200 Class: 2
Chg: 12   Aggravated Unlawful Restraint
               720-5\10-3.1         0000775100 Class: 3
Chg: 13   Unlawful Restraint
               720-5\10-3           0000775000 Class: 4

RE: BAIL PREVIOUSLY SET ▶

I hereby certify that the document to which this
certification is affixed is a true copy.
Date April 28, 2023
IRIS Y. MARTINEZ
Clerk of the Circuit Court
of Cook County, IL

ER-62

G.J. No. 2324
GENERAL NO. 07 CR- 24653

------------------------------
CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT
CRIMINAL DIVISION
November, 2007
------------------------------

The People of the State of
Illinois
v.
Ramiro Gomez

*******************
* INDICTMENT FOR *
*******************

AGG KIDNAPING
------------------------------

A TRUE BILL

_Victorian Harvey_

Foreman of the Grand Jury

==============================
WITNESSES
P.O. BARRETT

_____
_____
_____
_____
_____
_____
_____

==============================
Filed _December 0_ 20 _07_
_Dorothy Brown_, Clerk
Bail $ _11_
==============================

ORIGINAL
FILE COPY
DO NOT REMOVE

I hereby certify that the document to which this
certification is affixed is a true copy.
Date _April 28, 2023_
IRIS Y. MARTINEZ
Clerk of the Circuit Court
of Cook County, IL

ER-63

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF ILLINOIS    )
                     )      SS.
COUNTY OF COOK )

                         The NOVEMBER, 2007 Grand Jury of the
                         Circuit Court of Cook County.

     The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook


                         RAMIRO GOMEZ


committed the offense of        AGGRAVATED KIDNAPING


in that HE, BY FORCE OR THREAT OF IMMINENT FORCE CARRIED ▬▬▬▬▬▬

▬▬▬▬▬ FROM ONE PLACE TO ANOTHER WITH INTENT SECRETLY TO CONFINE HER

AGAINST HER WILL, AND HE COMMITTED ANOTHER FELONY UPON ▬▬▬▬▬

▬▬▬ *Attempt* TO WIT: AGGRAVATED CRIMINAL SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 10-2(a)(3)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

                                        *Amended*
                                        *3/24/08 cgalvin*


contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

                              CHARGE ID CODE: 11389
                              CASE NO: 07CR-24653
                              COUNT NO: 1


ER-64                                                   111

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of       AGGRAVATED KIDNAPING


in that HE, BY FORCE OR THREAT OF IMMINENT FORCE CARRIED ▓▓▓▓▓

▓▓▓ FROM ONE PLACE TO ANOTHER WITH INTENT SECRETLY TO CONFINE HER

AGAINST HER WILL AND HE COMMITTED ANOTHER FELONY UPON ▓▓▓▓▓

▓▓▓ _Attempt_ TO WIT: CRIMINAL SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 10-2(a)(3)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND


Amended
3/24/08
C. gahan


contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: 11389
CASE NO: 07CR-24653
COUNT NO: 2

# ER-65

**************************************************************************

The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of     ARMED VIOLENCE


in that HE, WHILE ARMED WITH A DANGEROUS WEAPON, TO WIT: A KNIFE,

AND COMMITTED A FELONY DEFINED BY ILLINOIS LAW, TO WIT: ATTEMPT

AGGRAVATED CRIMINAL SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 33A-2(A)/II/8-4\12-14(a),

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND


contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: 12375
CASE NO. 07CR-24653
COUNT NO. 3

# ER-66

113

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of          ATTEMPT AGGRAVATED CRIMINAL SEXUAL
ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ███████████████ TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ██████████████ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND HE DISPLAYED A DANGEROUS WEAPON, OTHER THAN A

FIREARM, TO WIT: A KNIFE, WHICH CONSTITUTED A SUBSTANTIAL STEP

TOWARD THE COMMISSION OF THE OFFENSE OF AGGRAVATED CRIMINAL SEXUAL

ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: A996000
CASE NO. 07CR-24653
COUNT NO. 4

ER-67                                                              114

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of            ATTEMPT AGGRAVATED CRIMINAL SEXUAL
ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ███████████████ TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ███████████████ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND HE THREATENED TO USE A DANGEROUS WEAPON, OTHER

THAN A FIREARM, TO WIT: A KNIFE, WHICH CONSTITUTED A SUBSTANTIAL

STEP TOWARD THE COMMISSION OF THE OFFENSE OF AGGRAVATED CRIMINAL

SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)(1)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: A996000
CASE NO. 07CR-24653
COUNT NO. 5

ER-68                                                    115

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of          ATTEMPT AGGRAVATED CRIMINAL SEXUAL
                                  ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ▮▮▮▮▮▮▮▮▮▮ TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ▮▮▮▮▮▮▮▮▮▮ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND HE CAUSED BODILY HARM T▮▮▮▮▮▮▮▮▮, TO

WIT: ABRASIONS ABOUT THE BODY AND A SORE ABDOMEN, WHICH CONSTITUTED

A SUBSTANTIAL STEP TOWARD THE COMMISSION OF THE OFFENSE OF

AGGRAVATED CRIMINAL SEXUAL ASSAULT;

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)(2)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: A996100
CASE NO. 07CR-24653
COUNT NO. 6

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the Circuit Court of Cook County, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about JUNE 10, 2007 at and within the County of Cook

RAMIRO GOMEZ

committed the offense of      ATTEMPT AGGRAVATED CRIMINAL SEXUAL ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ████████████     TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ████████████ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND HE ACTED IN SUCH A MANNER AS TO THREATEN OR

ENDANGER THE LIFE OF ███████████, WHICH CONSTITUTED A

SUBSTANTIAL STEP TOWARD THE COMMISSION OF THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)(3)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

CHARGE ID CODE: A996200
CASE NO. 07CR-24653
COUNT NO. 7

ER-70                                117

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of          ATTEMPT AGGRAVATED CRIMINAL SEXUAL
                                          ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ████████████████ TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ████████████████ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND THE CRIMINAL SEXUAL ASSAULT WAS PERPETRATED

DURING THE COURSE OF THE COMMISSION OF ANY OTHER FELONY, TO WIT:

AGGRAVATED KIDNAPING, WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARD

THE COMMISSION OF THE OFFENSE OF AGGRAVATED CRIMINAL SEXUAL

ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)(4)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

                              CHARGE ID CODE: A996300
                              CASE NO. 07CR-24653
                              COUNT NO. 8

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of          ATTEMPT AGGRAVATED CRIMINAL SEXUAL
                                       ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF AGGRAVATED

CRIMINAL SEXUAL ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL

PENETRATION UPON ██████████████ TO WIT: CONTACT BETWEEN RAMIRO

GOMEZ'S PENIS AND ████████████ VAGINA, BY THE USE OF FORCE OR

THREAT OF FORCE, AND THE CRIMINAL SEXUAL ASSAULT WAS PERPETRATED

DURING THE COURSE OF THE COMMISSION OF ANY OTHER FELONY, TO WIT:

KIDNAPING, WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARD THE

COMMISSION OF THE OFFENSE OF AGGRAVATED CRIMINAL SEXUAL ASSAULT,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 8-4\12-14(a)(4)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: A996300
CASE NO. 07CR-24653
COUNT NO. 9

ER-72                                      119

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the Circuit Court of Cook County, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about JUNE 10, 2007 at and within the County of Cook

RAMIRO GOMEZ

committed the offense of        ATTEMPT CRIMINAL SEXUAL ASSAULT

in that HE, WITH INTENT TO COMMIT THE OFFENSE OF CRIMINAL SEXUAL

ASSAULT, KNOWINGLY ATTEMPTED AN ACT OF SEXUAL PENETRATION UPON

▬▬▬▬▬▬▬ TO WIT: CONTACT BETWEEN RAMIRO GOMEZ'S PENIS AND

▬▬▬▬▬▬▬ VAGINA, BY THE USE OF FORCE OR THREAT OF FORCE,

WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARD THE COMMISSION OF THE

OFFENSE OF CRIMINAL SEXUAL ASSAULT

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 12-13(a)(1)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

CHARGE ID CODE: A995500
CASE NO. 07CR-24653
COUNT NO. 10

ER-73

120

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the
Circuit Court of Cook County, in the State of Illinois, in the name
and by the authority of the People of the State of Illinois, upon
their oaths present that on or about JUNE 10, 2007 at and within
the County of Cook

RAMIRO GOMEZ

committed the offense of          KIDNAPPING

in that HE, KNOWINGLY BY FORCE OR THREAT OF IMMINENT FORCE CARRIED

████████████ FROM ONE PLACE TO ANOTHER WITH INTENT TO SECRETLY

CONFINE HER AGAINST HER WILL,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 10-1(a)(2)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the
same People of the State of Illinois.

CHARGE ID CODE: 765200
COUNT NO. 07CR-24653
CASE NO. 11

ER-74                                    121

*********************************************************************

The Grand Jurors chosen, selected and sworn, in and for
the Circuit Court of Cook County, in the State of Illinois, in the
name and by the authority of the People of the State of Illinois,
upon their oaths present that on or about JUNE 10, 2007 at and
within the County of Cook

RAMIRO GOMEZ

committed the offense of        AGGRAVATED UNLAWFUL RESTRAINT

in that HE, KNOWINGLY WITHOUT LEGAL AUTHORITY DETAINED 

WHILE USING A DEADLY WEAPON, TO WIT: A KNIFE,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 10-3.1(A)

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

CHARGE ID CODE: 775100
CASE NO. 07CR-24653
COUNT NO. 12

ER-75

122

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected and sworn, in and for the Circuit Court of Cook County, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about JUNE 10, 2007 at and within the County of Cook

RAMIRO GOMEZ

committed the offense of        UNLAWFUL RESTRAINT

in that HE, KNOWINGLY WITHOUT LEGAL AUTHORITY DETAINED ▬▬▬▬▬▬

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 10-3

OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

CHARGE ID CODE: 775000
CASE NO. 07CR-24653
COUNT NO. 13

ER-76

1 | **NINA B. PAPACHRISTOU**
California State Bar No. 345688
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5030
Telephone: (619) 234-8467
4 | Facsimile: (619) 687-2666
Nina_Papachristou@fd.org
5 |
Attorneys for RAMIRO GOMEZ-REYES
6 |

7 | UNITED STATES DISTRICT COURT

8 | SOUTHERN DISTRICT OF CALIFORNIA

9 |

| UNITED STATES OF AMERICA, | CASE NO.:   23CR0251-RBM |
|---|---|
| Plaintiff, | Hon. Ruth B. Montenegro<br>Date: May 5, 2023<br>Time: 1:30 PM |
| v. | |
| RAMIRO GOMEZ-REYES, | **MR. GOMEZ-REYES' REPLY IN RESPONSE TO THE UNITED STATES' OPPOSITION TO HIS MOTION TO DISMISS THE INFORMATION UNDER § 1326(D)** |
| Defendant. | |

## I.   Introduction

The government asserts that Mr. Gomez's single 2017 deportation is a valid predicate for the § 1326 charge because: (1) the sexual assault conviction charged in the removal is a categorical crime of violence; (2) the lack of proper notice and other procedural defects in the removal does not render it fundamentally unfair; and (3) Mr. Gomez did not suffer prejudice even if his charged conviction were not a categorical crime of violence. The government is wrong on each of these issues.

## II.   Mr. Gomez was not removable as charged because Illinois ACSA is not a categorical crime of violence.

<u>First</u>, the government errs in asserting that ACSA's final clause falls within the crime of violence definition. ACSA's final clause allows for conviction where the defendant uses any object which the victim "under the circumstances, reasonably [] believe[s]" is dangerous. 720 Ill. Comp. Stat. Ann. § 5/11-1.30(a)(1).

The government claims that there are no circumstances under which the victim could reasonably believe an object is dangerous—but the defendant did not use or threaten force. Gov. Br. at 7–8. But according to the plain text of ACSA, a defendant can be convicted for non-consensual-but-non-forcible sex in which he uses a cell phone to film the act. If the victim reasonably misperceives that phone as a weapon, the defendant would be guilty—even though he never intended to use or threaten violence.

The government fundamentally misunderstands this argument. Tellingly, it characterizes the defendant in the above scenario as "pretending [the phone] is a weapon[.]" Gov. Br. at 8. To "pretend" as much would certainly entail a "threatened use of physical force" under 18 U.S.C. § 16(a). But ACSA simply does not require that the defendant "pretend" to use a weapon. Instead, it criminalizes defendants who have no desire to strike fear into their victims or otherwise employ violence, so long as the victim's mental state is reasonable. To be convicted under the statute's plain language, a person need only use an object in such a way that *under those specific conditions* leads a victim to believe the object is dangerous. For this reason, ACSA is not a categorical crime of violence.

## III. **Mr. Gomez's removal was fundamentally unfair because the government failed to provide him with proper notice and an opportunity to challenge his removability.**

The government argues that even though Mr. Gomez did not receive legal notice of his removal until the removal was already executed—*see* Def. Br. at 5, Ex. B–D—the removal was not unfair because Mr. Gomez "wanted" to be deported. Gov. Br. at 12. Moreover, the government argues that the procedural violations did not render the removal invalid because Mr. Gomez understood the proceedings. Gov. Br. at 11.

First, the government offers an insufficient basis to conclude that Mr. Gomez

1   "wanted to be deported." The government's evidence consists of a September 2016
2   letter from Mr. Gomez to United States Immigration and Customs Enforcement.
3   Gov. Br. at Ex. 4. In that letter, Mr. Gomez writes that he "would like to know when
4   I [sic] be deported back to Mexico or will I be allowed to stay in the United States
5   of America?" *Id.* He also asks, "I was also wondering if I could just be deported
6   instead of doing my parole time in prison? Any information you could give me on
7   these issues will be greatly appreciated." *Id.*

8       The government contends that these questions reveal Mr. Gomez's "true
9   aim" of getting deported so that he could avoid more time in prison. However, the
10  letter merely shows that Mr. Gomez was confused as to whether he was going to
11  be deported. Mr. Gomez was obviously interested in possibly avoiding deportation,
12  specifically asking whether he would be allowed to stay in the United States. *Id.* In
13  September 2016, Mr. Gomez had yet to receive any correspondence indicating that
14  the United States planned to place him in removal proceedings.

15      <u>Second</u>, the government claims that because the 2016 letter is written in
16  English, Mr. Gomez's statements about struggling to understand his removal
17  proceedings are not credible. Gov. Br. at 11. However, it is common for non-
18  English speaking people in prison to ask others to draft letters on their behalf. Mr.
19  Gomez has a sixth-grade education in Mexico and lived in the United States only a
20  few years before his removal. Def. Br. at 2 & Ex. A (Mr. Gomez's Decl.). The fact
21  that Mr. Gomez sent an English-language letter to the government from prison in
22  September 2016 does not itself support the government's conclusion that he reads
23  English, let alone fluently enough to read dense legal documents like the Notice of
24  Intent.

25      <u>Finally</u>, even if it were true that in March 2017, Mr. Gomez "wanted" to be
26  deported and *did* understand the proceedings, the removal would still be invalid
27  because Mr. Gomez was not removable as charged. *See infra* II. If Mr. Gomez
28  "wanted" to be deported because he was under the mistaken belief that his removal

ER-79

1  charged him with a deportable conviction, that does not help establish that his
2  removal was valid. As discussed at greater length in Mr. Gomez's motion, the
3  administrative removal process provided no way for him to challenge the
4  government's conclusion that Illinois ACSA is a categorical crime of violence. Def.
5  Br. at 12–13. It is the government's responsibility to properly determine whether a
6  conviction is a categorical aggravated felony, and properly notice noncitizens of
7  that determination. Here, the government fell short of its responsibilities to properly
8  notice and charge Mr. Gomez, so his removal cannot support a § 1326 prosecution.

9  **IV.  Mr. Gomez was prejudiced because he was administratively removed
10       based on a conviction for a crime that is not a categorical aggravated
       felony.**

11        A. Valdivia-Flores *Controls the Prejudice Analysis*

12        The government argues that *Valdivia-Flores* does not govern Mr. Gomez's
13  prejudice analysis because (1) it is "no longer good law," Gov. Br. at 18; and (2)
14  Mr. Valdivia was a Legal Permanent Resident prior to his removal, unlike Mr.
15  Gomez, so *Valdivia-Flores* "has nothing to say" about the prejudice issues here. *Id.*
16  The government is incorrect on both counts.

17        First, the government is mistaken that *Valdivia-Flores* "is no longer good
18  law" based on the Ninth Circuit's holding in *Alfred v. Garland*, --- F. 3d ---, 2023
19  WL 2703236 at *3 (9th Cir. 2023) (en banc). Gov. Br. at 18. The court in *Alfred*
20  "overruled" the *Valdivia* holding only as concerns the applicability of the
21  categorical analysis to Washington accomplice liability doctrine. *Id.* at *7. The
22  *Alfred* opinion reviewed a Board of Immigration Appeals determination that a
23  Washington statute was an aggravated felony. *Id.* at *3. The case was not an appeal
24  on a § 1326(d) issue, so it did not address, let alone overturn, *Valdivia*'s prejudice
25  holding. *See United States v. Valdivia-Flores*, 876 F. 3d 1201, 1210 (9th Cir. 2017).
26  Consequently, *Alfred* does not impact § 1326(d)'s procedural requirements.
27  Moreover, the Ninth Circuit reaffirmed in March 2022 that *Valdivia-Flores* governs
28  the prejudice inquiry. *United States v. Mangas*, No. 19-50319, 2022 WL 898594,

at *2 (9th Cir. Mar. 28, 2022) (unpublished).

Second, the government mistakenly characterizes LPR status as dispositive of the prejudice inquiry. Gov. Br. at 17–18. Specifically, the government maintains that *Ochoa-Oregel*—yet another Ninth Circuit case where a removal on improper grounds was found prejudicial—does not control Mr. Gomez's prejudice argument because that defendant was an LPR. *See Ochoa-Oregel v. United States*, 904 F. 3d 682, 685–86 (9th Cir. 2018). But that case specifically holds that where noncitizens are improperly removed for convictions that are not aggravated felonies under immigration law, the removal itself is enough to show prejudice. *Id.*

The government argues that the Ninth Circuit limited the applicability of this rule in *United States v. Martinez-Hernandez*, finding no prejudice where the noncitizens were not removable as charged. 932 F. 3d 1198, 1204–05 (9th Cir. 2019). But the *Martinez* court actually just applied the same *Ochoa-Oregel* rule, but to distinct facts—Mr. Martinez was properly charged as deportable for an robbery conviction, but the notice incorrectly characterized that conviction as a categorical crime of violence under 8 U.S.C. § 1101(a)(43)(F), rather than theft offense under § (43)(G). *Id.* at 1205. The court explained that because California robbery was a categorical theft offense and therefore still an aggravated felony, listing subsection (F) rather than (G) on the removal notice did not prejudice Mr. Martinez. In short, Mr. Martinez *was* removed for a categorical aggravated felony, while Mr. Gomez was not.

Here, the government offers no "alternative justification for [Mr. Gomez's] removal" other than asserting that ACSA is a categorical crime of violence. As laid out *supra*, ACSA encompasses more conduct than § 16(a) envisions, so it is not a categorical match. Because Mr. Gomez was not charged with an aggravated felony on any other basis—unlike the defendant in *Martinez-Hernandez*—Mr. Gomez was removed on "illegitimate grounds" and suffered prejudice. *Ochoa-Oregel*, 904 F. 3d at 685–86.

B. *Mr. Gomez Has Shown Actual Prejudice*

Mr. Gomez has established that he was not removable for the crime charged in his removal documents. The government contends that even were Mr. Gomez not removable as charged, he did not suffer actual prejudice. Gov. Br. at 13. As explained in Mr. Gomez's motion to dismiss, Def. Br. at 11, actual prejudice is where "the outcome of the proceeding may have been affected by the alleged violation." *See* Mr. Gomez's Motion to Dismiss Under § 1326(d), ECF No. 24 at 11 (citing *Zolotukhin v. Gonzales*, 417 F. 3d 1073, 1076 (9th Cir. 2005) "The [prejudice] standard does not demand absolute certainty…")).

Here, Mr. Gomez has shown actual prejudice because the outcome of his proceedings was affected by the due process violations in his removal. Were it not for the government's incorrect determination that Illinois ACSA is a categorical aggravated felony, the removal order here simply could not have issued. The ICE agents executing the administrative removal would have had no choice but to terminate the proceedings. No other ground for removal was charged in his Notice of Intent. *See* Def. Br., Ex. C. The government's brief discussion of actual prejudice in its response misstates the requirement under binding Ninth Circuit precedent: Mr. Gomez does *not* have to establish that he "plausibly would have received relief from removal" to demonstrate that he was prejudiced. Gov. Br. at 13. Rather, Mr. Gomez must establish that his conviction was not a categorical aggravated felony, and so could not "support the asserted basis for [his]…removal." *Valdivia-Flores*, 876 F. 3d at 1210. Mr. Gomez has met that burden here.

V.   **CONCLUSION**

Mr. Gomez has met all the statutory requirements for a collateral attack under § 1326(d). First, as the government does not dispute, the administrative removal process itself satisfies (d)(1) and (2). Second, Mr. Gomez's removal was fundamentally unfair because he was not removable as charged and did not receive

1 proper notice. Mr. Gomez was prejudiced because he was "removed when he
2 should not have been…" *United States v. Camacho-Lopez*, 450 F. 3d 928, 930 (9th
3 Cir. 2008).

4      Simply put, the government cannot order removals based on convictions
5 under statutes which do not correspond to any categorical aggravated felony, and
6 then later use those removals to bring additional criminal charges.

7      The Court should dismiss the information.

8                               Respectfully submitted,

9

10 Dated:  April 28, 2023                  *s/ Nina B. Papachristou*

11                             Nina B. Papachristou
Federal Defenders of San Diego, Inc.

12                             Attorneys for Mr. Gomez-Reyes
Email:  Nina_Papachristou@fd.org

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY BRIEF IN SUPPORT OF MR. GOMEZ-REYES'S
MOTION TO DISMISS THE INFORMATION UNDER § 1326(D)

ER-83

1 | RANDY S. GROSSMAN
United States Attorney
2 | JAMES MIAO
Assistant United States Attorney
3 | California Bar No. 326477
Office of the United States Attorney
4 | 880 Front Street, Room 6293
San Diego, CA 92101
5 | Tel. Nos.: (619) 546-9057
E-mail: james.miao@usdoj.gov
6
7 | Attorneys for the United States

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10 | UNITED STATES OF AMERICA, | Case No.: 23-CR-251-RBM

11 |      Plaintiff, | DATE: May 5, 2023
TIME: 1:30 p.m.
12 |      v.

13 | RAMIRO GOMEZ-REYES, | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S**

14 |      Defendant | **MOTION TO DISMISS THE INFORMATION PURSUANT TO 8**

15 | | **U.S.C. § 1326(D); MOTION FOR LEAVE TO FILE SUPPLEMENTAL**

16 | | **BRIEFING**

17

18 |     Defendant Ramiro Gomez-Reyes, a citizen of Mexico who does not and

19 | has never had the lawful right to remain in the United States, was

20 | convicted of aggravated kidnapping and attempted aggravated criminal

21 | sexual assault in the State of Illinois on January 8, 2009. For his

22 | criminal conduct, he was sentenced to prison for fifteen years. Despite

23 | contacting Immigration and Customs Enforcement in 2016 to inquire about

24 | whether he could be deported to Mexico rather than serve additional

25 | time in prison, the Defendant now claims, for the first time, that his

26 | deportation was procedurally and substantively flawed. His arguments

27 | are unavailing because his conviction for attempted aggravated criminal

28

1  sexual assault pursuant to 720 Ill. Comp. Stat. Ann. 5/(8-4)12-14(A)(1)

2  was a crime of violence, rendering it an aggravated felony. Nor can

3  Defendant demonstrate that he was prejudiced in any way.

**I**

## STATEMENT OF THE CASE

6  On January 18, 2023, Defendant Ramiro Gomez-Reyes was charged in a

7  one-count complaint with attempted entry after deportation, in violation

8  of Title 8, U.S.C. § 1326. On February 16, 2023, Defendant waived

9  indictment and was arraigned on the Information charging attempted

10 reentry of removed alien in violation of Title 8 U.S.C. § 1326(a) and

11 (b). On March 31, 2023, Defendant filed his motion to dismiss the

12 information pursuant to Title 8 U.S.C. § 1326(d). On April 12, this

13 Court previously granted an extension of time for the United States to

14 file its response. As explained in the United States' Motion for Leave

15 to File Supplemental Briefing at the end of this Response, the United

16 States is still awaiting conviction documentation from the State of

17 Illinois. Nevertheless, because the record as currently established is

18 already dispositive of Defendant's Motion, and in light of this Court's

19 April 12 order, the United States submits this Response in Opposition

20 to Defendant's Motion to Dismiss.

**II**

## STATEMENT OF FACTS

23 **A. INSTANT OFFENSE**

24 On January 17, 2023, Border Patrol Agent Stephen Cooley, responding

25 to a radio alert calling out several individuals running north in the

26 brush near the US-Mexico border, encountered five individuals hiding

27 behind small bushes. The encounter area was approximately 625 yards

1  north of the international border, and 1.5 miles east of the Tecate Port

2  of Entry. BPA Cooley identified himself as Border Patrol in the Spanish

3  language. BPA Cooley then queried the entire group as to their country

4  of citizenship. All five, including the individual later identified as

5  the Defendant, Ramiro Gomez-Reyes, responded "Mexico." BPA Cooley

6  queried the group whether anyone had documents permitting them to be in

7  the United States legally, to which all five responded in the negative.

8  All five also admitted to entering the United States illegally. BPA

9  Cooley placed all five under arrest and they were transported to the

10 Campo Border Patrol Station for processing.

11     At the station, checks of Department of Homeland Security

12 immigration records revealed that Defendant was most recently removed

13 to Mexico on March 31, 2017, and has not applied for permission from the

14 Attorney General of the United States or his designated successor, the

15 Secretary of the Department of Homeland Security, to return to the United

16 States after being removed.

17     **B. <u>DEFENDANT'S CRIMINAL HISTORY</u>**

18     Defendant has the following convictions:

| <u>Date</u> | <u>Court</u> | <u>Charge</u> | <u>Term of Imprisonment</u> |
|---|---|---|---|
| January 8, 2009 | Circuit Court of Cook County, IL | **Count 1:** 720 ILCS 5/10-2(A)(3) Aggravated Kidnapping/Inflict Bodily Harm<br>**Count 4:** 720 ILCS 5/(8-4)12-14(A)(1) Attempted Aggravated Criminal Sexual Assault [now codified at 720 ILCS 5/(8-4)11-1.30] | **Count 1:** 10 years, 6 months<br><br>**Count 4:** 15 years |

27 Defendant concedes that he has sustained this conviction. Exh. B to Def. Mtn.

*Opposition to Defendant's Motion to*
*Dismiss under 8 U.S.C. §1326(d)*

ER-86

23-cr-251-RBM

C. **DEFENDANT'S IMMIGRATION HISTORY**

Defendant is a 36-year old citizen of Mexico who has never held legal status in the United States. He was previously ordered deported on March 31, 2017, after being released from his prison term on the above-listed convictions. This case is the first time Defendant has been encountered by immigration officials since his deportation in 2017.

**III**

**ARGUMENT**

Defendant's attacks upon his deportation must fail because Defendant was removable as charged, and he cannot establish any due process violations or prejudice. Fundamentally, Defendant's motion must be denied because his conviction for attempted aggravated criminal sexual assault is a crime of violence rendering him an aggravated felon. Therefore, he cannot show that he was prejudiced by any defects in his administrative removal proceedings, assuming any existed. This Court should therefore deny Defendant's motion.

**A. Legal Standard**

An individual charged with illegal re-entry under 8 U.S.C. § 1326 may contest the validity of a prior deportation removal order pursuant to 8 U.S.C. § 1326(d). See *United States v. Melendez-Castro*, 671 F.3d 950, 953 (9th Cir. 2012). Under § 1326(d), a noncitizen must satisfy three requirements in order to successfully challenge a removal order. The individual must show (1) that he exhausted administrative remedies that may have been available to seek relief against the order; (2) that the removal proceedings improperly deprived him of the opportunity for judicial review; and (3) that the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d). Establishing the third prong, fundamental

1  unfairness, requires a showing that (1) Defendant's due process rights

2  were violated and (2) that Defendant "suffered prejudice as a result of

3  those defects." *Id.* citing *United States v. Ubaldo-Figueroa*, 364 F.3d

4  1042, 1048 (9th Cir. 2004). To establish prejudice, a defendant must

5  establish that there were "plausible grounds for relief" from the

6  underlying removal order. *United States v. Reyes-Bonilla*, 671 F.3d

7  1036, 1049 (9th Cir. 2012).

8       **B. Defendant's 2017 Administrative Removal is Valid because**

9           **Defendant was Removable as Charged**

10      Undocumented individuals who are not lawful permanent residents

11  and who have been convicted of an aggravated felony may be removed

12  pursuant to "expedited" administrative removal proceedings under 8

13  U.S.C. § 1228 in lieu of removal proceedings before an immigration

14  judge. See 8 U.S.C. § 1228(b) (prescribing this sort of removal process

15  for individuals who: (1) have been convicted of an "aggravated felony";

16  and (2) are "not lawfully admitted for permanent resident status" or

17  have "permanent resident status on a conditional basis"). Title 8 U.S.C.

18  § 1101(a)(43) defines what offenses qualify as an aggravated felony.

19  Subsection (F) provides that aggravated felonies include "a crime of

20  violence (as defined in section 16 of Title 18, but not a purely

21  political offense) for which the term of imprisonment at least one

22  year." Title 18 U.S.C. § 16(a) defines a crime of violence as "an

23  offense that has as an element the use, attempted use, or threatened

24  use of physical force against the person or property of another." The

25  United States concurs with the Defendant that 18 U.S.C. § 16(b) no

26  longer applies, given the Supreme Court's holding in *Sessions v. Dimaya*,

27

1  138 S. Ct. 1204 (2018). Therefore, the analysis in this case is
2  controlled by 16(a).

3      Defendant challenges his 2017 administrative removal by alleging
4  that his conviction for attempted aggravated criminal sexual assault is
5  not an aggravated felony. He also alleged that the removal procedures
6  he was subject to violated his due process rights. Defendant's challenge
7  is not supported by the available documentation of the administrative
8  removal, nor is it supported by the plain language of the statue of
9  conviction.

10      **a. Illinois Attempted Aggravated Criminal Sexual Assault is a**
11          **Crime of Violence**

12      "Aggravated criminal sexual assault," (hereinafter ACSA) pursuant
13  to 720 ILCS 5/12-14(A)(1)[1], is defined:

15      (a) A person commits aggravated criminal sexual
        assault if that person commits criminal sexual
16      assault and any of the following aggravating
        circumstances exist during the commission of the
17      offense or, for purposes of paragraph (7), occur as
        part of the same course of conduct as the commission
18      of the offense:
19      1) the person displays, threatens to use, or uses a
           dangerous weapon, other than a firearm, or any
20         other object fashioned or used in a manner that
           leads the victim, under the circumstances,
21         reasonably to believe that the object is a
           dangerous weapon

23      In determining whether ACSA qualifies as a crime of violence, courts
24  should apply the categorical approach and compare whether the state
25  offense (ACSA) necessarily involves the defendant's "use, attempted use,
26  or threatened use of physical force against the person of another." *See*

---

[1] The statute of conviction has since been recodified as 720 ILCS 5/11-1.30. The terms of the statute remain unchanged.

*Borden v. United States*, 141 S. Ct. 1817, 1822 (2021) (applying categorical approach to functionally analogous "crime of violence" definition in 18 U.S.C. § 924(e)(2)(B)(i)). "If any – even the least culpable – of the acts criminalized do not entail that kind of force, the statute of conviction does not categorically match the federal standard." *Id*.

Defendant asserts that ACSA "includes no such element" requiring the use, attempted use, or threatened use of physical force. Def. Mtn. at 7. This claim belies the plain language of ACSA. ACSA explicitly requires proof that the offender displays, threatens to use, or actually uses a dangerous weapon. The Defendant does not seriously contest that these requirements do not constitute use, attempted use, or threatened use of physical force. This is simply common sense. If using or brandishing a dangerous weapon is *not* a use or threatened use of force, it is difficult to conceive of what *would* be. Defendant latches on to the final clause in 720 ILCS 5/11-1.30(a)(1): "*or* any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon."

Defendant contends that the final clause renders ACSA overbroad because it "situates the inquiry squarely on the defendant's subjective intent – not on the (mis)perceptions of the victim." Def. Mtn. at 8. However, Defendant improperly grafts a subjective intent element onto ACSA that does not exist in the text. First, the final clause of 720 ILCS 5/11-1.30(a)(1) specifically identifies that the victim's belief *must be reasonable*. ACSA requires no proof of any subjective state of mind on the part of the victim, only a reasonableness inquiry. Defendant

argues that "[t]he Illinois statute captures circumstances where the defendant employed an object that was *not* a dangerous weapon, and the defendant didn't subjectively intend for the victim to perceive it as dangerous." Def. Mtn. at 8. This argument applies the wrong analysis – a crime of violence within the meaning of 8 U.S.C. § 1101(a)(43)(F) does not require the use of a dangerous weapon. The key inquiry is whether or not the offense incorporates an element of the use (or attempted or threatened) of *force*.

A straightforward application of *Borden* resolves this case. ACSA, even when applying the final clause of 720 ILCS 5/11-1.30(a)(1), necessarily requires proof of, *at minimum*, a threatened use of force. What illogical situation exists such that an offender could commit sexual assault against another while using an object that causes their victim to reasonably believe it is a dangerous weapon – that is not violent? If a defendant sexually assaults a victim, and in the course of doing so brandishes their cell phone covered in a shirt pocket, pretending it is a weapon, how can that not be a threat of force against the person of another? Even the least culpable conduct encompassed by ACSA necessarily requires proof of the use, attempted use, or threatened use of force. Defendant's final argument regarding overbreadth alleges that "the Illinois statute is overinclusive of the types of threats that make an offense a crime of violence under immigration law." Def. Mtn. at 8. But once again, the argument is unpersuasive. The Illinois statute is *more narrow* than the federal definition of a crime of violence. ACSA specifically focuses on conduct using, attempting to use, or threatening the use of a weapon – or an object used in a manner consistent with a weapon. This is a narrower subset of conduct which might constitute a

1   use of force. A threat of force may be communicated orally without using

2   a weapon at all. One might use force merely by striking another with

3   one's fists – again, conduct not requiring a weapon at all. Plainly,

4   using a weapon (or an equivalent reasonably believed to be a weapon)

5   requires the use, attempted use, or threatened use of physical force.

6   But use of force encompasses additional violent conduct that does no

7   require the presence of a weapon. If a statute sweeps more narrowly than

8   the federal requirement, the crime is a categorical match. *Descamps v.*

9   *United States*, 133 S. Ct. 2276, 2283 (2013).

10      The Defendant next alleges that ACSA is not a crime of violence

11  because it may be committed recklessly, rather than knowingly or

12  intentionally. Def. Mtn. at 8, citing *Borden* 141 S. Ct. at 1827. First,

13  Defendant's argument fails because Illinois Supreme Court precedent has

14  held that ACSA requires a mental state of intent or knowledge (as

15  required by *Borden*). Second, Defendant ignores the plain fact that

16  Defendant was convicted of *attempted* ACSA, which plainly requires proof

17  of specific intent, not recklessness.

18      First, in *People v. Terrell*, 132 Ill.2d 178 (1989), the Supreme

19  Court of Illinois directly addressed the issue of what *mens rea* applies

20  to ACSA. *Terrell* held that "a mental state of either intent or knowledge

21  implicitly is required for sexual penetration to occur…both aggravated

22  criminal sexual assault and the lesser offense of aggravated criminal

23  sexual abuse require an intentional or knowing act by the accused." The

24  United States recognizes that Illinois precedent is not completely clear

25  on whether recklessness may also apply to ACSA. *See People v. Simms*, 192

26  Ill.2d 348, 375 (2000) (citing *Terrell*, a mental state of intent,

27  knowledge or recklessness must be implied).

1    Even if ACSA may be proven with evidence of reckless *mens rea*,
2 Defendant's conviction still qualifies as a crime of violence because
3 he was convicted of *attempted* ACSA. Attempt inherently requires the
4 specific intent to commit the underlying offense – which in this case
5 is criminal sexual assault while displaying, threatening to use, or
6 actually using a dangerous weapon or object.

7    Defendant's conviction for attempted ACSA constitutes a crime of
8 violence. For the above reasons, Defendant was removable as charged in
9 his administrative removal proceedings.

10          **b. The Record Refutes Defendant's Allegation that He Did Not**
11              **Receive Due Process in His Administrative Removal**

12    By Defendant's telling, Immigration and Customs Enforcement
13 engaged in a litany of procedural violations during his removal process:
14 not explaining Defendant's right to counsel, threatening him with
15 another year in jail, telling him he was going to be voluntarily
16 deported, not advising Defendant of his rights, failing to translate
17 forms. Def. Mtn. at 10. However, records from Defendant's A-file paint
18 a very different picture – that of a man who was ready to leave the
19 United States rather than spend more time in the Illinois Department of
20 Corrections.

21    Beginning with standard immigration questioning, the Defendant
22 declined to waive his rights and make a statement regarding his
23 immigration status under oath. See Exhibit 5 p. 4, I-831 Report of
24 Deportation Officer Bernson. This is confirmed by the Record of Sworn
25 Statement in Defendant's A-file, which only shows a diagonal slash mark
26 through the pre-written questions on the form. Exhibit 1 p. 1-2.
27 Defendant's initials, R-G, do appear on the bottom left hand corner of

the Record of Sworn Statement pages – the questions also appear in both English and Spanish. On the final page of the Sworn Statement, the Defendant signed his name to the acknowledgment. Notably, the acknowledgment appears on the page in both English and Spanish. Defendant claims that he cannot read English, and only speaks a small amount of English. Exhibit A to Def. Mtn. Even assuming that is true, Defendant would have been able to understand what he was signing because of the Spanish acknowledgment. Consequently, this Court should infer that the Defendant was proceeding knowingly.

Defendant claims broadly that none of the forms were translated to him. This cannot be the case for Defendant's Statement of Rights. The Statement of Rights appears in both English and Spanish. Exhibit 2. This is consistent with Officer Bernson's report documenting that the Defendant declined to waive his rights (as he was entitled to). Exhibit 5. But this is further evidence which calls into question the veracity of the Defendant's Declaration submitted in support of his motion to dismiss.

Defendant next claims that he was never advised that he could hire counsel. Yet, his initials appear on the bottom left-hand corner of a list of pro bono legal service providers. Exhibit 3 p. 1. In the Defendant's telling, Officer Bernson never explained the legal service provider list to him at all, and never told him that he could retain counsel. What, then, would even be the purpose of providing Defendant with the list? Once again, the records within Defendant's A-file belie his claims of being railroaded during his deportation.

Finally, this Court need not speculate as to why the Defendant declined to make a statement, declined to make a phone when offered

1  (Exhibit 5 at p. 4), and checked the box indicating he did not wish to

2  contest his removal (Exhibit C to Def. Mtn.): in 2017, he wanted to be

3  deported. Exhibit 4 contains a scanned image of a letter sent to ICE's

4  by the Defendant in September, 2016 from the state penitentiary in which

5  he was continuing to serve his sentence for ACSA and aggravated

6  kidnapping. In his letter, the Defendant specifically asks whether he

7  can "just be deported instead of doing my parole in prison?" Exhibit 4

8  at p. 3. This statement reveals Defendant's true aim – to get out of

9  state custody as soon as possible. Notably, Defendant's letter appears

10 to be written in perfectly understandable English, with few spelling or

11 grammatical errors, and in the same style of handwriting as his

12 signature appears on the Record of Sworn Statement in Exhibit 1. This

13 undermines the claim in his declaration that he does not read English.

14     Six years later, now that the Defendant is facing criminal

15 consequences for his reentry into the United States, he claims that his

16 deportation proceeding was a sham process where he understood nothing.

17 But the records documenting the process, including the Defendant's own

18 statements, do not change with the passage of time. Those records cast

19 serious doubt on the Defendant's claims, and this Court should find his

20 claims not credible.

21     **C. Even Assuming a Due Process Violation Occurred, Defendant**

22        **Suffered No Prejudice**

23     To show that Defendant was prejudiced, he must make a showing that

24 he had plausible grounds for relief. *United States v. Barajas-Alvarado*,

25 655 F.3d 1077, 1089 (9th Cir. 2015). Where the relevant form of relief

26 is discretionary, the defendant must make a "plausible" showing that

27 the facts presented would cause the Attorney General to exercise

1  discretion in his favor. *Id.* (citing *Arce-Hernandez*, 163 F.3d at 563).

2  Plausibility requires more than a showing that relief was merely

3  possible or conceivable. *Barajas-Alvarado*, 655 F.3d at 1089; see also

4  *United States v. Valdez-Novoa*, 780 F.3d 906, 914 (9th Cir. 2014).

5  In this case, however, no discretionary relief was available to

6  the Defendant because he is an aggravated felon. The Ninth Circuit has

7  held that "as a general matter, a defendant who has been convicted of

8  an aggravated felony cannot show that he was prejudiced by defects in

9  his underlying proceedings." *United States v. Alvarado-Pineda*, 774 F.3d

10  1198, 1201 (9th Cir. 2014). The court reasoned that because an

11  aggravated felony renders a defendant removable on that basis, they are

12  ineligible for relief that the Attorney General may grant in his/her

13  discretion. *Id.*, citing Title 8 U.S.C. § 1228(b)(5). Put simply: if

14  this Court agrees that the Defendant is an aggravated felon, the

15  prejudice inquiry ends there – he suffered no prejudice even if there

16  were defects in his administrative removal process.

17  ### a. Defendant Cannot Demonstrate Actual Prejudice

18  Defendant resists the conclusion that he is an aggravated felon.

19  But regardless of his contested status as an aggravated felon, he cannot

20  demonstrate that he was actually prejudiced by any alleged defects in

21  his administrative removal proceeding.

22  Defendant is a native-born citizen of Mexico, born in Guerrero. He

23  has admitted to entering the United States without inspection in

24  approximately the year 2001. He has admitted that both of his parents

25  are citizens of Mexico with no citizenship or lawful permanent resident

26  status in the United States. Exhibit 5 at p. 1. Importantly, Defendant

27  does not contest any of these facts in his motion or declaration in

support. Thus, if Defendant was not removable under 8 U.S.C. § 1227(a)(2)(A)(iii), he was certainly removable under § 1182(a)(6)(A)(i). That law states that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." Since Defendant would have been removable under that provision, to show prejudice he would need to "carr[y] his burden of showing that 'aliens with similar circumstances received relief'" from removal. *United States v. Gonzalez-Flores*, 804 F.3d 920, 928 (9th Cir. 2015). Here, the Defendant proffers no facts whatsoever to support any claim that he plausibly would have received relief from removal. The record is clear that he sustained two serious felony convictions for aggravated kidnapping and attempted ACSA, yet is devoid of any positive equities that might support the exercise of discretion in his favor. Defendant has failed to show that he suffered any actual prejudice.

### b. This Court Should Not Presume Prejudice

In the absence of actual prejudice, Defendant urges this Court to presume that he suffered prejudice and claims that Ninth Circuit precedent compels this finding. He is mistaken.

To presume prejudice simply due to the fact that Defendant may have been removed on the wrong basis is inconsistent with the text of § 1326(d) and precedent. The law says that "an alien may not challenge the validity of" his removal order "unless" he shows three things: (1) he "exhausted any administrative remedies," (2) he was deprived "of the opportunity for judicial review," and (3) "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). "The requirements are

1  connected by the conjunctive 'and,' meaning defendants must meet all
2  three." *Palomar-Santiago*, 141 S. Ct. 1615, 1620-21 (2021). That is,
3  "each of the statutory requirements of § 1326(d) is mandatory." *Id.* at
4  1622; *see also United States v. Alvarez*, 60 F.4th 554, 557, 566 n.9 (9th
5  Cir. 2023) (defendant "must satisfy all three requirements"). Thus, "§
6  1326(d) makes clear that [a defendant] 'may not challenge the validity
7  of the deportation order' unless he first demonstrates that 'the entry
8  of the order was fundamentally unfair.'" *United States v. Castillo-
9  Martinez*, 16 F.4th 906, 922 (1st Cir. 2021). Finding prejudice based on
10 the removal order's invalidity itself would "read[] out" and render
11 "meaningless" that requirement. *Id.* at 922-23.

12      The weight of precedent supports the same conclusion. As the Ninth
13 Circuit has stated, on § 1326(d) review the "question is whether a
14 defendant 'was removed when he should not have been.'" *United States v.
15 Martinez-Hernandez*, 932 F.3d 1198, 1204 (9th Cir. 2019). Applying that
16 rule, the Ninth Circuit has held in several subsequent unpublished
17 opinions that no prejudice resulted when defendants were removed on the
18 wrong basis or with the wrong procedures but would have been removed
19 anyway. *See United States v. Reyes-Ruiz*, 747 F. App'x 496, 498 (9th Cir.
20 2018) (unpublished); *United States v. Lizarraga-Espinoza*, 583 F. App'x
21 731, 732 (9th Cir. 2014) (unpublished); *United States v. Quintanilla-
22 Gonzalez*, 450 F. App'x 612, 614 (9th Cir. 2011) (unpublished). Other
23 courts have held the same. *See United States v. Castillo-Martinez*, 16
24 F.4th 906, 920-23 & n.10 (1st Circuit 2021); *United States v. Sanchez-
25 Porras*, 842 F. App'x 185, 189 & n.2 (10th Cir. 2021) (unpublished);
26 *United States v. Ramirez-Cortinas*, 945 F.3d 286, 291-93 (5th Cir. 2019);
27 *United States v. Almanza-Vigil*, 912 F.3d 1310, 1316, 1323-24 & n.3 (10th

1   Cir. 2019). The Supreme Court's decision in *Palomar-Santiago* also cuts

2   against a presumption of prejudice. In *Palomar-Santiago*, the Court held

3   that "§ 1326(d)'s first two procedural requirements are not satisfied

4   just because a noncitizen was removed for an offense that did not in

5   fact render him removable." 141 S. Ct. at 1621. To be sure, the Court

6   did not reach the specific question of whether § 1326(d)'s prejudice

7   requirement also remained unsatisfied. However, its core holding

8   logically applies to the prejudice analysis as well. *See Miller v.*

9   *Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (courts are "bound

10  not only by the holdings of higher courts' decisions but also by their

11  'mode of analysis'"). Notably, the Court read *all* of the § 1326(d) prongs

12  to be mandatory given the language and conjunctive modifier in the

13  statute. *See Palomar-Santiago*, 141 S. Ct. at 1621-22. That reasoning

14  dictates that the prejudice requirement cannot be excused by an invalid

15  removal. Any other conclusion would contradict the Supreme Court's

16  unanimous holding.

17      To support his claim that this Court should presume prejudice,

18  Defendant relies upon *United States v. Ochoa-Oregel*, 904 F.3d 682 (9th

19  Cir. 2018). *Cf. Castillo-Martinez*, 16 F.4th at 920-923 n. 10 (reaching

20  opposite conclusion; *United States v. Sanchez-Porras*, 842 F.App'x 185,

21  189 (10th Cir. 2021). His reliance is misplaced. In *Ochoa-Oregel*, the

22  Ninth Circuit did rule that the defendant had suffered prejudice from a

23  flawed removal, despite his aggravated felon status. However, *Ochoa-*

24  *Oregel* is readily distinguishable from this case. First, *Ochoa-Oregel*

25  dealt with a removal *in absentia*. *Ochoa-Oregel* 904 F.3d at 684. The

26  defendant in *Ochoa-Oregel* never even received notice of the removal

27  proceedings. *Id*. Moreover, the *Ochoa-Oregel* court's holding turned on

the defendant's LPR status. The court stressed that status again and again, noting LPRs' "'broad constitutional protections,'" "important legal entitlements," and "important legal protections." *Id.* at 685-86; *see also Castro v. DHS*, 835 F.3d 422, 446 (3d Cir. 2016) ("lawful permanent resident[s]" are "a category of aliens (unlike recent clandestine entrants) whose entitlement to broad constitutional protections is undisputed"). Among those entitlements is "the *right* to be in the United States" in the first place, which this Defendant has never possessed. *United States v. Aguilera-Rios*, 769 F.3d 626, 633 (9th Cir. 2014). Thus, "*Ochoa-Oregel* was 'fundamentally different' because the defendant in [that case] was a legal permanent resident." *United States v. Mangas*, 2022 WL 898594, at *3 n.1 (9th Cir. 2022) (unpublished) (Lee, J., concurring); *see also Reyes-Ruiz*, 747 F. App'x at 498 (distinguishing LPR cases).

The Ninth Circuit also limited *Ochoa-Oregel* in *Martinez-Hernandez*. In *Martinez-Hernandez*, the court held that an LPR could not show prejudice when he was removed as an aggravated felon based on a crime that turned out not to be a crime of violence, as it was charged in the removal documents, but could have been charged as a theft offense. *See Martinez-Hernandez*, 932 F.3d at 1204-05. In reaching that conclusion, the court noted that some of *Ochoa-Oregel*'s language "in isolation" might suggest a different outcome. *Id.* at 1204. But the court stressed *Ochoa-Oregel*'s peculiar facts and declined to read it as foreclosing the conclusion that no prejudice results when "the same convictions require removal under a different section of the same statute previously invoked." *Id.* The court also distinguished *Ochoa-Oregel* because the Government in *Ochoa-Oregel* had never previously served that defendant

1   with a notice alleging removability on the basis of being an aggravated

2   felon. *Id.* at 1205. Conversely, in *Martinez-Hernandez*, the Government's

3   reliance on the same underlying convictions never changed. This case is

4   more like *Martinez-Hernandez* since the Defendant lacked status and did

5   not enter at a port, and was subject to removal under 8 U.S.C. §

6   1182(a)(6)(A)(i) even if 8 U.S.C. § 1227(a)(2)(A)(iii), the provision

7   cited in the removal documents, did not apply.

8       Finally, to the extent the Defendant relies upon *United States v.*

9   *Valdivia-Flores*, 876 F.3d 1201 (9th Cir. 2017) to support his argument

10  for presumed prejudice, that reliance is again misplaced. First, it is

11  no longer good law. *See Alfred v. Garland*, --- F.3d ----, 203 WL 2703236,

12  at *3 (9th Cir. 2023) (en banc) ("we now overrule *Valdivia-Flores*").

13  Second, even if *Valdivia-Flores* still governed, in that case the court

14  did not address the claim that a non-LPR who is wrongly removed on one

15  ground but would have been removed anyway suffers no prejudice. Instead,

16  the arguments focused solely on whether the defendant's removal was

17  invalid. Thus, *Valdivia-Flores* has nothing to say about the prejudice

18  issues here. *See Martinez-Hernandez*, 932 F.3d at 1205 n.2 (9th Cir.

19  2019) (declining to read *Valdivia-Flores* as foreclosing a lack-of-

20  prejudice argument not raised in the case); *see also Brecht v.*

21  *Abrahamson*, 507 U.S. 619, 631 (1993) (case has no precedential value on

22  question "never squarely addressed").

23      For the reasons described above, this Court should decline to

24  presume prejudice as doing so would undermine the plain text of 8 U.S.C.

25  § 1326(d) and contravene the Supreme Court's holding in *Palomar-*

26  *Santiago*. Additionally, the Defendant has failed to allege any facts to

27  support a finding that he suffered any actual prejudice as a result of

any alleged errors in his deportation. As a result, the Court should find that his removal was not "fundamentally unfair" and deny his motion to dismiss.

IV

**MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEFING**

The United States previously filed an unopposed motion for extension of time to file a response to Defendant's motion to dismiss, on the basis that undersigned counsel is still awaiting records from the Cook County Circuit Clerk's Office pertaining to Defendant's underlying convictions. Unfortunately, the Clerk's Office has been delayed in obtaining the physical case file, wherein the records are stored. See Exhibit 6 – Illinois Records Request email. Counsel for the United States will continue to work diligently to acquire these records, which are not currently in the care, custody, or control of the United States.

The United States respectfully requests leave to file supplemental briefing pertaining to Defendant's motion to dismiss pursuant to 8 U.S.C. § 1326(d) once the requested Illinois records are received. The United States has no objection to reply briefing from the Defendant. Although the United States submits that Defendant's motion may be properly resolved with application of the categorical approach analysis applied in both this Response and the Defendant's motion, at least one federal court has applied the modified categorical approach to ACSA in determining whether it is a crime of violence. *Garecht v. United States*, No. 16-CV-3161, 2016 WL 3581994, at *3 (C.D. Ill. June 28, 2016) citing *Descamps*, 133 S. Ct. at 2281 (2013). When the underlying complete underlying documents for Defendant's ACSA conviction are received, the

1 United States will supplement the record and its briefing to address any

2 potential application of the modified categorical approach.

3 **V**

4 **CONCLUSION**

5 Defendant was convicted of aggravated criminal sexual assault and

6 served over eight years in custody for that crime. He was, and is an

7 aggravated felon – and was removable on that basis. Although he claims

8 all manner of flawed process in his administrative removal, the record

9 before the Court reveals that the Defendant's assertions are not

10 credible, and that he in fact wished to be deported to avoid spending

11 a longer period of time in Illinois state custody. Defendant suffered

12 no prejudice, and his removal was not fundamentally unfair. For the

13 foregoing reasons, the United States respectfully requests that the

14 Court deny Defendant's Motion to Dismiss the Information Under §

15 1326(d).

16

17 DATE: April 21, 2023

18                                        Respectfully submitted,

19                                        RANDY S. GROSSMAN

20                                        United States Attorney

21                                        */s/ James Miao*
                                          JAMES MIAO

22                                        Assistant United States Attorney

23

24

25

26

27

*If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.*

Si usted desea contestar preguntas sin un abogado presente, usted tiene el derecho de dejar de contestar las preguntas en cualquier momento. Usted también tiene el derecho de dejar de contestar las preguntas hasta que usted hable con un abogado.

*Q. Do you understand what I have just read to you?*
¿ Usted ha entendido lo que yo le he dicho?

*Q. Do you wish to have a lawyer or any other person present to advise you?*
¿ Usted desea tener un abogado o cualquier otra persona presente para que le aconseje?

*Q. Are you willing to answer my questions at this time?*
¿Usted esta dispuesto ha contestar mis preguntas en este momento?

*Q. Do you swear that all the statements you are about to make will be the truth, the whole truth and nothing but the truth, so help you God?*
¿Usted jura en esta declaración que dirás la verdad y nada mas que la verdad, que dios le ayude?

*1. What is your true and correct name?*
¿Cuál es su verdadero nombre y correcto?

*2. Have you used any other names and if so, what names have you used?*
¿Usted ha usado otro nombre, y si cual ha usado?

*3. When and where were you born?*
¿Cuándo y donde usted nació?

*4. Of what country are you a citizen?*
¿De que país usted es ciudadano?

*5. Of what country are your parents citizens?*
¿De que país son sus padres?

*6. Have you ever been admitted into the United States as a legal permanent resident?*
¿Asido usted admitido como un residente legar permanente en los estado unidos?

*7. Where, when, and how did you last enter the United States?*
¿Dónde cuando y como usted entro en los estados unidos?

*8. Were you inspected and admitted by an Immigration Officer?*
¿Fue inspeccionado y admitido por un oficial de inmigración?



Page 2 of 4

# ER-104

079

*9.  Do you have any document that permits you to legally reside in the United States?*
¿Usted tiene algún documento que le permite a usted legalmente residir en los estados unidos?


*10.  Have you ever been deported, excluded or removed from the United States?*
¿Asido usted deportado, excluido o removido de los estados unidos?


*11.  When and where was the last time you were deported from the United States?*
¿Dónde y cuando fue la ultima vez que usted fue deportado de los estados unidos?


*12.  Did you obtain permission from the Secretary of Department of Homeland Security or the United States*
*Attorney General to re-enter the United States after your deportation?*
¿Usted he obtenido permiso del Secretaria del Departamento de Seguridad Interna de los estados unidos
o del procurador general de los estados unidos para poder volver ha los estados unidos después que fue
deportado?


*13.  Have you ever been convicted of a serious criminal offense?  If so, when and where?*
¿Fue usted alguna ve convicto de una seria ofensa criminal?  ¿Sí es, donde y cuando?


*14.  Do you have any fear of persecution or torture should you be removed from the United States?*
¿Usted tiene algún temor de persecución o tortura en su país si va hacer removido de los estados
unidos?


*15.  Do you have anything else you would like to say?*
¿Tienes alguna otra cosa para comentar?



# ER-105



080

*I have read (or have had read to me) the foregoing statement, consisting*

*of _____four_____ pages. I state that the answers made therein by me are*

*true and correct to the best of my knowledge and belief and that this*

*statement is a full, true, and correct record of my interrogation on the date*

*indicated by the above-named Agent of U.S. Immigration and Customs*

*Enforcement. I have initialed each page of this statement (and the*

*correction(s) noted on page(s) _four_).*

Yo he leído (o me han leído) el testamento anterior conteniendo <u>cuatro</u> numero de paginas. Yo atesto que mis contestas son verdad y correctas hasta lo mejor de mi conocimiento y este testimonio es completo, verdad y correcto de expediente de mi interrogación en la fecha indicada arriba, nombre del de enfuerza de inmigración y aduana de los estados unidos. Yo he iniciado cada pagina de este testamento (con corrección(es) notadas en pagina(s) <u>4</u> ).

*Signature:* RAMIRO GOMEZ

*Subscribed and sworn to before me at:* Chicago, IL *on*

_____
*Deportation Officer, United States Immigration and Customs Enforcement*

*Witnessed:* _____

*RECORD OF SWORN STATEMENT*
*United States Department of Homeland Security*
*Immigration and Customs Enforcement*

# ER-106

081



**U.S. Immigration
and Customs
Enforcement**

## STATEMENT OF RIGHTS

Before we ask you any questions, it is my duty to advise you of your rights.

You have the right to remain silent.

Anything you say can be used against you in court, or other proceedings.

You have the right to consult an attorney before making any statement or answering any questions.

You have the right to have an attorney present with you during questioning.

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

---

## WAIVER

I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at _____ (time), on _____ (date), and have signed this document at _____ (time), on _____ (date).

_____          _____
Print Name                                Signature

WITNESS: _____          DATE:_____

WITNESS: _____          DATE:_____

*Refused*

ER-107



**U.S. Immigration
and Customs
Enforcement**

## DECLARACIÓN DE DERECHOS

Antes de que le hagamos cualquier pregunta, Ud. debe conocer sus derechos.

Ud. tiene derecho a permanecer callado(a).

Cualquier cosa que Ud. diga puede usarse en su contra en un tribunal o en cualquier otro procedimiento.

Ud. tiene derecho a consultar un abogado antes de que Ud. haga cualquier declaración o conteste cualquier pregunta.

Ud. tiene derecho a tener un abogado presente con Ud. durante el interrogatorio.

Si no puede pagar un abogado, se le proporcionará uno antes de que le hagamos cualquier pregunta, si Ud. lo desea.

Si decide responder a nuestras preguntas ahora, Ud. aún retiene el derecho de detener el interrogatorio en cualquier momento, o de detener el interrogatorio para el propósito de consultar con un abogado.

## RENUNCIA A LOS DERECHOS

Me han leído y explicado esta declaración de mis derechos y entiendo completamente estos derechos. Renuncio a ellos libre y voluntariamente, sin ser amenazado(a) ni intimidado(a), y sin promesa de compensación o inmunidad. Fui detenido(a) a la(s) _____ (hora), en el _____ (fecha), y he firmado este documento a la(s) _____ (hora), en el _____ (fecha).

_____          _____
Nombre                                              Firma

Testigo: _____          Fecha: _____

Testigo: _____          Fecha: _____

_Refused_

# ER-108

083

* Non Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated October 2016

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Chicago Immigration Court

**Chicago, Illinois**

| | |
|---|---|
| **National Immigrant Justice Center (A Heartland Alliance Affiliated Partner)\*** <br><br> 208 S. LaSalle St., Ste. 1300 <br> Chicago, IL 60604 <br> Tel: (312) 660-1370 <br> Fax: (312) 660-1505 <br> Tel: (312) 263-0901 (Detainees) <br> Tel: (773) 672-6599 (Family members calling about a detainee) <br> www.immigrantjustice.org <br> • Also provides in-court help desk services in the Chicago Court | **Latinos Progresando\*** <br><br> 1624 W. 18th St., 2nd Floor <br> Chicago, IL 60608 <br> Tel: (312) 850-0572 <br> Fax: (312) 850-0576 <br><br> • Charges nominal fees. <br><br> • Will not represent aliens in detention. <br><br> • Will represent aliens seeking asylum. <br><br> • Will also represent aliens in naturalization, family-based immigration, cancellation of removal, self-petitioning aliens under VAWA, relief under NACARA, TPS, waivers of inadmissibility, asylee adjustment, I-751 joint and waiver applications. <br><br> • Languages: Spanish |
| **Legal Assistance Foundation of Metropolitan Chicago\*** <br><br> 120 S. LaSalle Street, Suite 900 <br> Chicago, IL 60603-3425 <br> 312-341-1070 | **Marsh Immigrant Law Center NFP\*** <br><br> 5433 S East View Park <br> Chicago, IL 60615 <br> (773) 684-4740 <br> immcl@emarshlaw.com <br> emarshlaw.com <br><br> • By appointment only |



**Disclaimer:** As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of the Director, Office of Legal Access Programs maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on this list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of these organizations or attorneys.

# ER-109

084



# READ THIS
## *BEFORE* YOU TAKE LEGAL ADVICE

If you have a case in immigration court, only take legal advice from:

♦   a licensed attorney

An "attorney" is a person who has a valid license from a state to practice law.

♦   an accredited representative

An "accredited representative" is an individual who works with a recognized organization and has been given permission by the United States Government to help people in immigration court. A "recognized organization" is a nonprofit, religious, charitable, social service, or similar organization that has been given permission by the United States Government to help people in immigration court.

If someone claims to be an attorney and you want to know if that person is allowed to represent you in immigration court:

♦   Ask in what state(s) he or she is licensed to practice law.

♦   Call the office that licenses attorneys in that state (this is usually the "state bar association" or the supreme court of that state) and ask that office if the attorney has a bar number and is in "good standing."

♦   Go to the EOIR Web site at www.justice.gov/eoir/discipline.htm to find out who is *not* permitted to represent you in immigration court.

If someone claims to be an accredited representative and you want to know if that person is allowed to represent you in immigration court, go to the EOIR Web site at www.justice.gov/eoir/ra.html and select "Accredited Representatives List" or call (703) 305-9029 for information.

If you think you have been a victim of immigration fraud, contact the EOIR Fraud and Abuse Prevention Program at: EOIR.Fraud.Program@usdoj.gov or (703) 305-0470.

Prepared by the Executive Office for Immigration Review (EOIR)



# ER-110

085

Muddy River Corr'c Center
51·N·ILLinois Hwy. 3
NA IL 62846

LEGAL CORRESPONDENCE
THIS IS FROM AN INMATE OF
THE ILLINOIS
DEPARTMENT·RECEIVED
CORRECTIONS USCIS
CHICAGO, ILLINOIS

2016 SEP 26  A 11: 51

evo →

DHS-US-immigration & customs
Enforcement office of Deportation
Detention Removal
101 west congress parkway
chicago IL 60605



UNITED
1M
4266687    SEP 21 2016
MAILED FROM ZIP CODE 62846
$ 00.000
FOREVER
USA

ER-111

© USPS 2012

THIS ENVELOPE IS RECYCLABLE AND MADE WITH 30% POST CONSUMER CONTENT



To whom this May concern. 9-20-2016
Hello. my name is Ramiro-Gomez
my inmate number is #M01962
I am a inmate in the illinois Department
of corrections  I am currently
incarcerated at the Big Muddy River
correctional center. I am originally
From MEXico and presently have
an immigration hold.
my time was up in July 20th 2016
I would Like to know when
I be deported back to MEXico
or will I be allowed to stay in
the united states of AMErica?
I was also Wandering iF I could
Just be deported instead of doing
my parole time in Prison?
Any information you could give me
on these issues will be greatly
Appreciated.

Thank you so much For your time
and patience.
                    Sencerely
                    Ramiro Gomez

ER-113                              090

RECEIVED
USCIS
CHICAGO, ILLINOIS
2016 SEP 26  A 11:54 |

| U.S. Department of Homeland Security | Subject ID : ▮▮▮▮▮ | | Record of Deportable/Inadmissible Alien |
|---|---|---|---|

| Family Name (CAPS)  First  Middle | Sex | Hair | Eyes | Cmplxn |
|---|---|---|---|---|
| GOMEZ-REYES, RAMIRO | M | BLK | BRO | MED |

| Country of Citizenship | Passport Number and Country of issue | File Number | Height | Weight | Occupation |
|---|---|---|---|---|---|
| MEXICO | | ▮▮▮▮▮ | 63 | 140 | |

| U.S. Address | Scars and Marks |
|---|---|
| DHS-ICE 101 West Congress Parkway Chicago, ILLINOIS, 60605 | |

| Date, Place, Time, and Manner of Last Entry | Passenger Boarded at | F.B.I. Number | ☐ Single  ☐ Divorced ☐ Married  ☐ Widower ☐ Separated |
|---|---|---|---|
| Unknown Date, UNK, WI - Without Inspection | | | |

| Number, Street, City, Province (State) and Country of Permanent Residence | Method of Location/Apprehension |
|---|---|
| | CST 520.3 |

| Date of Birth ▮▮▮▮  Age: ▮▮ | Date of Action | Location Code | At/Near | Date/Hour |
|---|---|---|---|---|
| | 02/06/2017 | CHI/CHI | See I-831 | 03/30/2017 09:54 |

| City, Province (State) and Country of Birth | AR ☒ Form : (Type and No.) Lifted ☐ Not Lifted ☐ | By |
|---|---|---|
| GUERRERO, MEXICO | | J 7286 BERNSON |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry | Status When Found |
|---|---|---|---|

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. |
|---|---|---|

| Immigration Record | Criminal Record |
|---|---|
| NEGATIVE | See Narrative |

| Name , Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children |
|---|---|
| | None |

| Father's Name, Nationality, and Address, if Known | Mother's Present and Maiden Names, Nationality, and Address, if Known |
|---|---|
| SIMON  NATIONALITY: MEXICO | QUINTINA NATIONALITY: MEXICO |

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? ☒ Yes ☐ No | Systems Checks See Narrative | Charge Code Word(s) See Narrative |
|---|---|---|---|
| None Claimed | | | |

| Name and Address of (Last)(Current) U.S. Employer | Type of Employment | Salary Hr | Employed from/to |
|---|---|---|---|

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

FIN: ▮▮▮▮▮                    Left Index fingerprint          | Right Index fingerprint

Subject Health Status
----------------
The subject claims good health.


Current Administrative Charges
------------------------------
02/02/2017 - 237a2Aiii - Aggravated Felony: 101(a)(43)(U) Attempt or Conspiracy to Commit an Offense Described in Section 101(a)(43)


...(CONTINUED ON I-831)

| Alien has been advised of communication privileges  3/30/17  JT3  (Date/Initials) | J 7286 BERNSON Deportation Officer  (Signature and Title of Immigration Officer) |
|---|---|

| Distribution: | Received: (Subject and Documents) (Report of Interview) |
|---|---|
| | Officer: J 7286 BERNSON |
| | on: February 6, 2017          (time) |
| | Disposition: ADMINISTRATIVE DEPORTATION I-851/I-851A |
| | Examinee Officer: PAULY, J 2327 |

ER-115

U.S. Department of Homeland Security        Continuation .ge for Form I-213

| Alien's Name<br>GOMEZ-REYES, RAMIRO | File Number<br><br>Event No: | Date<br>02/03/2017 |
|---|---|---|

Previous Criminal History
---------------------------------------
On 11/07/2007, the subject was arrested for the crime of "Sex Assault" which resulted in a
conviction on 01/08/2009. The subject was sentenced to 15 year(s).

On 11/07/2007, the subject was arrested for the crime of "Kidnapping" which resulted in a
conviction on 01/08/2009. The subject was sentenced to 10 year(s), 6 month(s).


Records Checked
----------------
CIS Neg
CLAIM Neg
TECS Pos
NCIC Neg


At/Near
---------------------------------------
Chicago, IL


Record of Deportable/Excludable Alien:
METHOD OF LOCATION/ APPREHENSION:

United States (US) Immigration and Customs Enforcement (ICE), Enforcement and Removal
Operations (ERO), Criminal Alien Processing (CAP) agents encountered GOMEZ-Reyes, Ramiro,
hereinafter referred to as "subject", on 01/28/2009 at the Stateville Correctional Center
Illinois Department of Corrections following his conviction for aggravated
kidnapping/inflict harm and attempted aggravated criminal sex assault/weapon, for which he
was sentenced to ten years six months and fifteen years imprisonment respectively.

Alienage and removability was determined via interview by CAP officers.

A detainer was placed on 01/28/2009.


ALIENAGE AND REMOVABILITY/INADMISSIBILITY:

The subject voluntarily stated he is not a citizen or national of the United States.

Subject claimed that he is a native born citizen of Mexico, born in the state of Guerrero.

Subject stated he entered the United States without inspection or admission by an
Immigration Officer in approximately 2001 at an unknown location on the United States/Mexico
border.

Subject stated and record checks confirm that the subject does not possess any type of
immigration documents or permissions allowing him to reside or work in the US legally.

Subject claims that both his parents are Mexican citizens and neither has made any claims
for LPR or USC status.

| Signature<br><br>J 7286 BERNSON | Title<br><br>Deportation Officer |
|---|---|

2 of 4 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

ER-116

0067

U.S. Department of Homeland Security        Continuation ..ge for Form $\underline{\text{I-213}}$

| Alien's Name<br>GOMEZ-REYES, RAMIRO | File Number<br><br>Event No: ▆▆▆▆ | Date<br>02/03/2017 |
|---|---|---|

Record checks were conducted and there were no pending or approved applications for immigration status or benefits as of 02/03/2017.

CRIMINAL HISTORY:

11/07/2007, Chicago Police Department, IL
1.  Aggravated kidnapping/inflict harm, 720 ILCS 5.0/10-2(A)(3)
2.  Aggravated kidnapping/inflict harm, 720 ILCS 5.0/10-2(A)(3)
3.  Armed violence/Category I, 720 ILCS 5.0/33A-2(A)
4.  Attempted Aggravated Crim Sex Assault/Weapon, 720 ILCS 5.0(8-4)/12-14(A)(1)
5.  Attempted Aggravated Crim Sex Assault/Weapon, 720 ILCS 5.0(8-4)/12-14(A)(1)
6.  Attempted Aggravated Crim Sex Assault/Bodily Harm, 720 ILCS 5.0(8-4)/12-14(A)(2)
7.  Attempted Aggravated Crim Sex Assault/Threat, 720 ILCS 5.0(8-4)/12-14(A)(3)
8.  Attempted Aggravated Crim Sex Assault/Felony, 720 ILCS 5.0(8-4)/12-14(A)(4)
9.  Attempted Aggravated Crim Sex Assault/Felony, 720 ILCS 5.0(8-4)/12-14(A)(4)
10. Attempted Aggravated Crim Sex Assault/Felony, 720 ILCS 5.0(8-4)/12-13(A)(1)
11. Kidnapping/Force or Threat, 720 ILCS 5.0/10-1(A)(2)
12. Aggravated Unlawful Restraint, 720 ILCS 5.0/10-3.1(A)
13. Unlawful Restraint, 720 ILCS 5.0/10-3

Disposition:
Counts 1 and 4: Guilty 01/08/2009. Cook County, IL Circuit Court
Counts 2, and 5-13: Nolle Prosequi 01/08/2009. Cook County, IL Circuit Court.
Sentence for Counts 1 and 4: Ten years and 6 months for count 1/ Fifteen years for count 4.
Case number: 07CR2465301

NOTHING FURTHER LISTED.

INTELLIGENCE INFORMATION:

Subject claims that he is not married and does not have any children.

Subject claims to have no gang or military affiliation.

Subject claims to be in good health and does not take any medication as of 01/28/2009.

RECOMMENDATIONS:

Subject is amenable to removal under section:

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(U) of the Act, as a crime relating to Section 101(a)(43)(F) of the Act, a crime of violence (as defined in section 16 of Title 18, United States Code, but not including a purely political offense) for which the term of imprisonment ordered is at least one year.

Upon release from the Illinois Department of Corrections subject will be served and provided with the following documents: I-851, Notice of Intent to Issue a Final Administrative Removal Order; I-200, Warrant of Arrest; a List of Legal Services; Attorney Warning Fact Sheet; and Online Detainee Locator System Privacy Notice (English and Spanish).

| Signature<br><br>    J 7286 BERNSON | Title<br><br>Deportation Officer |
|---|---|

$\underline{\quad 3 \quad}$ of $\underline{\quad 4 \quad}$ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

ER-117

U.S. Department of Homeland Security | Continuation Page for Form <u>I-213</u>

| Alien's Name<br>GOMEZ-REYES, RAMIRO | File Number<br><br>Event No: | Date<br>02/03/2017 |
|---|---|---|

The subject is currently in custody at Big Muddy Correctional Center-IDOC located at 251 IL-37, Ina, IL 62846. Subject's last parole date was 07/20/2016 and his projected discharge date is 06/14/2019. Subject is listed under inmate number ▇▇▇▇.

******03/30/2017 UPDATE******

On 03/30/2017 Subject was turned over to ICE from IDOC. Subject was transported to the Chicago Field office for processing. Subject was processed and served with an Administrative Removal Order (I-851) and Warrant for Arrest of Alien (I-200). Subject was provided with a copy of the privacy statement for the on-line detainee locator and a list of legal services, the original forms are included in the file.

Subject states that he has no petitions pending and claims to be in good health. Subject did not wish to wave his rights and make a statement under oath; a sworn statement was not administered on the subject, original is included in the file. Subject was asked if he had fear of persecution or torture if removed to Mexico to which he stated no. At around 1330 subject was given the opportunity to utilize the phone but declined.

Subject is scheduled for ICE Charter on 03/31/2017. See EARM for comments regarding removal.

******END OF UPDATE******


Other Identifying Numbers
------------------------------------
ALIEN-▇▇▇
Inmate Number - State Prison-▇▇▇ (ILLINOIS UNITED STATES)
State Criminal Number/State Bureau Number-▇▇▇▇ (ILLINOIS UNITED STATES)

| Signature<br><br>J 7286 BERNSON | Title<br><br>Deportation Officer |
|---|---|

<u>4</u> of <u>4</u> Pages

Form I-831 Continuation Page (Rev. 08/01/07)

ER-118

0069

| | |
|---|---|
| **From:** | Miao, James (USACAS) |
| **To:** | Gloria Castellano (Circuit Court) |
| **Cc:** | White, Jeannette (USACAS) |
| **Subject:** | RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez |
| **Date:** | Friday, April 21, 2023 9:39:00 AM |

Thank you, I appreciate the update. I will check in next week.

Have a great weekend,

James Miao
Assistant United States Attorney
Southern District of California
Ph: (619) 546-9057
C: (619) 366-5647

---

**From:** Gloria Castellano (Circuit Court) <███████████████████>
**Sent:** Friday, April 21, 2023 9:37 AM
**To:** Miao, James (USACAS) <JMiao@usa.doj.gov>
**Subject:** [EXTERNAL] RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez
**Importance:** High

James

I apologize for the delay.  The Case File has not Come in from the Warehouse.

Gloria Castellano
Cook County Clerk of the Circuit Court
Correspondence Department
2650 S. California Avenue, RM 526
Chicago, IL  60608
████████████
████████████████

---

**From:** Miao, James (USACAS) <James.Miao@usdoj.gov>
**Sent:** Thursday, April 20, 2023 8:05 PM
**To:** Gloria Castellano (Circuit Court) ████████████████████
**Subject:** RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez

ER-119

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Good evening,

I'd like to check on the status of this request. If the file will not be available tomorrow April 21, can you please let me know? Alternatively, if it is ready, I'd appreciate knowing asap. Thank you kindly.

Best,

James Miao
Assistant United States Attorney
Southern District of California
Ph: (619) 546-9057
C: (619) 366-5647

---

**From:** Gloria Castellano (Circuit Court) <███████████████████>
**Sent:** Wednesday, April 19, 2023 10:51 AM
**To:** Miao, James (USACAS) <JMiao@usa.doj.gov>
**Subject:** [EXTERNAL] RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez

I will keep you posted.  I apologize for the delay.

Thank you

Gloria Castellano
Cook County Clerk of the Circuit Court
Correspondence Department
2650 S. California Avenue, RM 526
Chicago, IL  60608
███████████
██████████████████

---

**From:** Miao, James (USACAS) <James.Miao@usdoj.gov>
**Sent:** Wednesday, April 19, 2023 11:33 AM
**To:** Gloria Castellano (Circuit Court) <███████████████████>
**Cc:** White, Jeannette (USACAS) <Jeannette.White@usdoj.gov>
**Subject:** RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez

<table>
<tr><td><strong>External Message Disclaimer</strong></td></tr>
<tr><td>This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.</td></tr>
</table>

Thank you – do you have an estimate as to when the file will arrive? I have a court filings due pertaining to these documents on Friday, I just want to get an idea whether the file will be available by then.

Best,

James Miao
Assistant United States Attorney
Southern District of California
Ph: (619) 546-9057
C: (619) 366-5647

---

**From:** Gloria Castellano (Circuit Court) ██████████████████████████
**Sent:** Wednesday, April 19, 2023 9:29 AM
**To:** Miao, James (USACAS) <JMiao@usa.doj.gov>
**Subject:** [EXTERNAL] RE: Request for Records re: 07CR2465301, People v. Ramiro Gomez
**Importance:** High

James – I am still waiting for the Case File to arrive.   Please see attached Case Summary for Ramiro Gomez.

Sorry, for the delay.  Once case file arrives I will notify you.

Thank you,


Gloria Castellano
Cook County Clerk of the Circuit Court
Correspondence Department
2650 S. California Avenue, RM 526
Chicago, IL  60608
████████████
████████████████████████

ER-121

RANDY S. GROSSMAN
United States Attorney
JAMES MIAO
Assistant United States Attorney
California Bar No. 326477
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-9057
Email: James.Miao@usdoj.gov
Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMIRO GOMEZ-REYES,<br><br>Defendant. | Case No.: 23-CR-251-RBM<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO *ARLINGTON HEIGHTS***<br><br>Date:  May 5, 2023<br>Time:  1:30 PM<br><br>Hon. Ruth Bermudez Montenegro |

The Defendant, who was lawfully deported from the United States after being convicted of serious, aggravated felonies, now alleges that the United States is wholly without power to prosecute him for his unlawful reentry. He alleges that he cannot be prosecuted because the Congress in session in 1929, nearly a century ago, had discriminatory intent. Defendant urges this Court to find that a subsequent reenactment of a statute may never cleanse the taint of earlier Constitutional infirmities, and asks this Court to ignore long-standing precedent that Congress has plenary power in the field of immigration. Like every federal court to address this issue, save one, this Court should deny Defendant's motion.

# I

## <u>INTRODUCTION</u>

Defendant is charged in a one-count Information with violating 8 U.S.C. § 1326(a) and (b). ECF No. 14. Relying on *Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977), and *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021), he now claims that the Information must be dismissed because § 1326 violates the Equal Protection Clause of the Fifth Amendment. ECF No. 23. Defendant contends that § 1326 violates the Equal Protection Clause because it does not meet the heightened scrutiny called for by *Arlington Heights*, which allows courts to consider legislative intent when resolving an equal protection challenge. *See id.* His reliance on *Arlington Heights*, however, is misplaced.

Supreme Court and Ninth Circuit case law have established that rational basis scrutiny applies to equal protection challenges to Federal immigration laws, and § 1326 easily meets this standard. But even were the Court to apply *Arlington Heights*, Defendant has failed to come forward with a persuasive argument to dismiss the Indictment. The Immigration and Naturalization Act of 1952 (1952 INA) contained the law that was later codified as § 1326. But rather than rely on the legislative history for the 1952 INA to attempt to make his point concerning racial animus, Defendant urges the Court to deem § 1326 unconstitutional based on only a portion of the legislative history for the Undesirable Aliens Act of 1929 (1929 UAA), which the 1952 INA replaced, and on another court's findings of fact concerning the 1952 INA. Defendant's argument to find § 1326 unconstitutional and dismiss the Information is logically flawed, and cites multiple cases for propositions that distort the precedents far beyond any plausible meaning of the text. Consequently, his Motion must be denied.

ER-123

A.  <u>**Statement of the Case**</u>

On or about January 17, 2023, Defendant was arrested and subsequently charged by Complaint with Attempted Entry After Deportation, in violation of 8 U.S.C. § 1326. ECF No. 1. On February 16, 2023, Defendant was arraigned on an Information charging him with Attempted Reentry of Removed Alien, in violation of 8 U.S.C. § 1326(a) and (b). ECF No. 14. On March 31, 2023, Defendant filed the instant Motion. ECF No. 23. The Motion Hearing/Trial Setting is set for May 5, 2023.

B.  <u>**Statement of Facts**</u>

On January 17, 2023, at approximately 7:00 AM, a Border Patrol agent observed several individuals running north in an area approximately 600 yards north of the US-Mexico border. An agent responded to the area on foot and located five individuals attempting to hide themselves beneath some bushes. One of those individuals was identified as defendant Ramiro Gomez-Reyes. The Defendant stated that he was a citizen of Mexico without immigration documents permitting him to enter of remain in the United States.

Subsequently, after Defendant's identity was confirmed via his fingerprints, an inspection of Department of Homeland Security records revealed that Defendant had previously been convicted of aggravated kidnapping and attempted criminal sexual assault in the state of Illinois. Defendant was previously ordered deported after administrative removal proceedings and physically removed to Mexico on or about March 31, 2017.

**II**

<u>**ARGUMENT**</u>

Defendant's Motion should be denied because Defendant's challenge to § 1326 and his reliance on *Arlington Heights* is misplaced. According to 9th Circuit precedent, rational

basis scrutiny applies to immigration laws - § 1326 easily satisfies this lower standard. Moreover, even if the *Arlington Heights* test applied, Defendant's arguments are meritless and do not warrant dismissal of this case.

**A.**   **The Court Should Deny Defendant's Motion Because § 1326 Survives Rational Basis Scrutiny**

Defendant argues that the Information must be dismissed because § 1326 is unconstitutional for failure to meet the level of the scrutiny set forth in *Arlington Heights*. ECF No. 23. This contention is flawed because rational basis scrutiny is the proper standard of review, and § 1326 easily meets this standard.

**1.**   **Rational Basis Scrutiny Applies**

It is well-settled that Congress has "plenary power" over immigration matters. *Kleindeinst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. I.N.S.*, 387 U.S. 118, 123 (1967)); *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) ("Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks and citation omitted))). Because Congress's actions regarding "the power to expel or exclude aliens" is "largely immune from judicial control," *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953), only "narrow judicial review" is permitted in the immigration context. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *accord. Fiallo*, 430 U.S. at 792; *Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976).

The scope of this judicial review was discussed in *Mandel*. 408 U.S. at 769. In addressing a constitutional challenge to the denial of a visa to a proposed speaker at a conference, the Supreme Court limited its review to whether any "facially legitimate and bona fide" reasons existed for the denial. *Id.* The Court instructed that when such a reason

is found, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against [constitutional] interests [of citizens]." *Id.* at 770; *accord Fiallo*, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision."). For decades, the Supreme Court's "opinions have reaffirmed and applied [*Mandel's*] deferential standard of review across different contexts and constitutional claims" concerning Federal immigration law. *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018). This standard of review is the equivalent of rational basis review. *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (*en banc*) (citations omitted).

In fact, the Ninth Circuit's *en banc* decision in *Ledezma-Cosino* confirmed that rational basis scrutiny applies specifically to equal protection challenges to Federal immigration laws. The Court stated that "we have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context[,]" and to support this statement, the appeals court quoted the portion of *Hernandez-Mancilla v. Holder* in which the court stated, "***We review equal protection challenges to federal immigration laws under the rational basis standard***[.]" 633 F.3d 1182, 1185 (9th Cir. 2011) (emphasis added), *quoted in Ledezma-Cosino*, 857 F.3d at 1049.

The Ninth Circuit has also specifically applied rational basis scrutiny in the criminal context. In *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit applied rational basis review to USSG § 2L1.2, the illegal reentry sentencing guideline, which applies certain enhancements specifically for illegal reentrants. The Ninth Circuit upheld the guidelines using a straightforward application of rational basis scrutiny,

concluding that "§ 1326 is a legitimate exercise of Congress's immigration power" *Id*, citing *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).[1]

### 2. *Arlington Heights* Does Not Apply

A review of *Arlington Heights* jurisprudence further shows that it has no applicability to a challenge to a Federal immigration law. Defendant argues that a law may violate the Equal Protection Clause of the Fifth Amendment if a legislature enacts "a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group." ECF No. 23 at 2 (citing *Arlington Heights*, 429 U.S. 252). However, and as an initial matter, the nature of the cases applying *Arlington Heights* that Defendant cites is completely different from a criminal immigration statute like § 1326. As shown in the bulleted summaries below, none of the cases on which Defendant relies to argue for the application of *Arlington Heights* involved challenges to any Federal immigration statutes.

- *Arlington Heights* resolved a challenge brought under the Equal Protection Clause of the Fourteenth Amendment to the denial of a rezoning request was found to be racially discriminatory. 429 U.S. at 254–60.

---

[1] Section 1326 implicates only rational-basis review for the additional reason that aliens who have reentered the United States illegally are not a suspect class. "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). And when a class "'do[es] not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the [class] differently from [non-class members] need only be 'rationally related to legitimate legislative goals' to pass constitutional muster." *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) (quoting *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002). Thus, classifications that apply to aliens illegally present in the United States are subject to only rational-basis review. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1065 n.4 (9th Cir. 2014); *United States v. Mendoza-Hinojosa*, 216 F.3d 1085, 2000 WL 429701, at *2 (Table) (9th Cir. 2000) (unpublished).

- *Arce v. Douglas* referred to *Arlington Heights* in considering First and Fourteenth Amendment claims regarding an Arizona law that eliminated a Mexican-American Studies program in Tucson public schools. 793 F.3d 968, 973, 977–81 (9th Cir. 2015), *cited in* ECF No. 23 at 7.

- *Hunter v. Underwood* applied *Arlington Heights* to a Fourteenth Amendment equal protection challenge to a provision of the Alabama state constitution that was enacted in 1901 and that disenfranchised individuals convicted of misdemeanors involving moral turpitude. 471 U.S. 222, 225–33 (1985), *cited in* ECF No. 23 at 22.

Defendant also cites *Democratic National Committee v. Hobbs*, which deal with an Arizona law that allegedly violated the Voting Rights Act of 1965 and the First, Fourteenth, and Fifteenth Amendments. 948 F.3d 989, 998, 1038-42 (9th Cir. 2020) (*en banc*), *cited in* ECF No. 23 at 7–8, 25. The Ninth Circuit struck down the law after applying *Arlington Heights*. *Hobbs*, 948 F.3d at 1038–42. However, Defendant's citation to *Hobbs*, and his specific reference to the Ninth Circuit's adoption of the "cat's paw" doctrine, is troubling. The Supreme Court reversed the Ninth Circuit's *en banc* decision in *Hobbs*, and specifically addressed the "cat's paw" doctrine. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). The Supreme Court stated that the "'cat's paw' theory has no application to legislative bodies," going so far as to state that "[i]t is insulting to suggest that they (legislators) are mere dupes or tools." *Id.* Defendant's citation to clearly overruled precedent is indicative of the lack of support for his positions.

In any event, it is not surprising that Defendant has failed to come forward with any Supreme Court or Ninth Circuit decisions in which *Arlington Heights* was applied to a Federal immigration law. As shown in the previous section, before *Arlington Heights* was

decided, the Supreme Court established that rational basis is the level of scrutiny that applies to constitutional challenges in the immigration context. *Mandel*, 408 U.S. at 769. And since *Arlington Heights* was decided, the Supreme Court and the Ninth Circuit both have reiterated that rational basis scrutiny applies to challenges to immigration laws, including equal protection challenges. *E.g.*, *Trump*, 138 S. Ct. at 2419; *Ledezma-Cosino*, 857 F.3d at 1049. The fact that both before and after *Arlington Heights* was decided, the Supreme Court and Ninth Circuit were consistent in stating that rational basis scrutiny applies in the immigration context is a strong indicator that *Arlington Heights* does not apply in this case.

Another strong indicator that *Arlington Heights* is inapt for resolving Defendant's challenge is that the Supreme Court made clear both before and after it decided *Arlington Heights* that courts are not permitted to inquire into Congress's motives for enacting immigration laws. *Fiallo*, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision [concerning immigration].");  *Trump*, 138 S. Ct. at 2419 ("the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of United States citizens (citing *Mandel*, 408 U.S. at 770)). In contrast to the bright-line rule that inquiry into Congress's motives is not permitted when resolving constitutional challenges to immigration statutes, *Arlington Heights* demands this type of far-reaching inquiry. 429 U.S. at 266–67. Again, the consistent treatment of the scope of judicial review of Federal immigration laws both before and after *Arlington Heights* was decided shows that it is not appropriate to use it to resolve Defendant's equal protection challenge.

Finally, it is acceptable that "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 81–82. In other words, Congress

8

can push the boundaries further in laws directed to illegal aliens than it can push them in laws directed to citizens. *Soskin v. Reinertson*, 353 F.3d 1242, 1254 (10th Cir. 2004) (citing *Mathews*, 426 U.S. at 78–83, for the principle that "Supreme Court precedent establish[es that] . . . the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis."). When considering this principle in combination with Congress's plenary power over immigration, it makes sense that the standard for evaluating equal protection challenges to Federal immigration statutes is more deferential than the standard that applies to equal protection challenges to laws brought by United States citizens.[2]

The Government now addresses *United States v. Carrillo-Lopez*, 555 F.Supp.3d 996 (D. Nev. 2021), the case from Nevada on which Defendant heavily relies and which is the only case of which we are aware has stricken down § 1326 based on *Arlington Heights*. *Carrillo-Lopez* is an "outlier" decision that has been "widely criticized" in the year since its publication. *United States v. Santos-Reynoso*, WL 2274470, at *2 (S.D.N.Y. June 23, 2022). To date, more than three dozen other district courts, as well as every other judge in this district, have affirmed the continued constitutionality of §1326 in response to similar challenges.

Nonetheless, turning to *Carrillo-Lopez*, like Defendant, Mr. Carrillo-Lopez was charged with felony reentry in violation of 8 U.S.C. § 1326. *Carrillo-Lopez*, 555 F. Supp. 3d 996. And like Defendant has done, Mr. Carrillo-Lopez requested that the court dismiss the indictment on the theory that § 1326 violates the Equal Protection Clause under the

---

[2] States, by contrast, must provide a compelling reason to treat aliens differently from citizens. *E.g., Graham v. Richardson*, 403 U.S. 365, 370-71 (1971). Accordingly, perhaps *Arlington Heights* would be appropriate to rely upon to challenge a state law that is perceived to discriminate against aliens, given that the Supreme Court has instructed that heightened scrutiny applies to such a challenge. But, as we have shown, the heightened scrutiny of *Arlington Heights* is not compatible with controlling precedent that judicial review of equal protection challenges to Federal immigration statutes proceeds under the rational basis standard.

1   standard articulated in *Arlington Heights*. *Id*. Indeed, the arguments in the two cases are

2   identical. The Nevada court agreed with Mr. Carrillo-Lopez that *Arlington Heights* applied,

3   and in doing so, it rejected the Government's arguments that rational basis scrutiny was

4   the governing standard of review. *Id*. at *1001–2. Based on the materials Mr. Carrillo-

5   Lopez provided concerning the legislative history of immigration laws from the 1920s, as

6   well as testimony and documents offered at a hearing that addressed the 1952 INA, the

7   court ruled that § 1326 is unconstitutional. *Id*. at 1027. Defendant contends that this Court

8   should follow the findings of fact made by *Carrillo-Lopez* concerning the 1952 INA, which

9   are based on evidence that is not before this Court. ECF No. 23 at 4–5.

10      The fundamental flaw in *Carrillo-Lopez* is that the Nevada court failed to mention

11  either *Ledezma-Cosino*, 857 F.3d at 1049, or *Hernandez-Mancilla*, 633 F.3d at 1185, in

12  which the Ninth Circuit, whose precedent controls in the District of Nevada, stated that

13  rational basis review applies specifically to equal protection challenges of immigration

14  laws. The Nevada court also gave short shrift to some of the Supreme Court precedents

15  discussed above, namely: *Mandel*, 408 U.S. at 765, *Fiallo*, 430 U.S. at 792, and *Trump*,

16  138 S. Ct. at 2392. *See Carrillo-Lopez*, 555 F. Supp. 3d at 1001. Rather, the Nevada court

17  relied upon cases that address far different circumstances than those before it to justify its

18  decision to rely on *Arlington Heights*.[3]  *Id*.

19

20

---

21  [3] We recognize that this Court sometimes has applied *Arlington Heights* to the same equal protection challenge Defendant brings in this case. *United States v. Gallegos-Aparicio*, 2020 WL 7318124 at *1 (S.D. Cal. Dec. 11,

22  2020) (citing *Rios-Montano*, 2020 WL 7226441 at *1–2 (S.D. Cal. Dec. 8, 2020)). However, for the reasons stated in this section, we respectfully disagree with the Court's analysis in those cases. On the other hand, this Court has recently addressed virtually identical arguments based on *Arlington Heights* in other § 1326 cases, and summarily

23  rejected it. *See United States v. Rodrigues-Barios*, Case No. 20-cr-1684-Lab (S.D. Cal. Oct. 21, 2020); *United States v. Navarrete-Castro*, 19-cr-2717-CAB (S.D. Cal. Nov. 19, 2020); *United States v. Vasquez Perez*, Case No. 20-cr-

24  3445-LAB (S.D. Cal. Mar. 17, 2021); *United States v. Sanchez-Rodriguez*, 21-cr-2351-TWR (S.D. Cal. Sept. 20, 2021); *United States v. Orozco-Orozco*, 21-cr-2349-TWR (S.D. Cal. Sept. 20, 2021); *United States v. Ramirez-Aleman*, 21-cr-3403-BEN (S.D. Cal. Apr. 27, 2022).

Two examples are illustrative. Quoting *Wong Wing v. United States*, the Nevada court determined that the "Supreme Court has held that greater protections under the Fifth Amendment necessarily apply when the government seeks to 'punish[] by deprivation of liberty and property.'" *Carrillo-Lopez*, 555 F. Supp. 3d at 1001 (quoting 163 U.S. 228, 237 (1896)). But *Wong Wing* resolved a claim by Chinese nationals that their imprisonment without a trial before a judge violated their due process rights, not an equal protection challenge to an immigration statute. 163 U.S. at 229. The Nevada court also relied on *Regents of the University of California v. U.S. Department of Homeland Security*, 908 F.3d 476, 518-20 (9th Cir. 2018), which involved an equal protection challenge to the recission of the Deferred Action for Childhood Arrivals (DACA) program, and some of the parties to that suit were persons who had been allowed to remain legally in the United States while that program was in effect. *Carrillo-Lopez*, 555 F. Supp. at 1001. The circumstances in *Wong Wing* and *Regents*, therefore, are very different than the circumstances in a case like this one, where an alien entering the United States illegally seeks to challenge the constitutionality of the illegal reentry statute. The Nevada court's reliance on *Regents* is particularly unavailing because the Ninth Circuit itself acknowledged that the Supreme Court had already applied rational basis review in a similar circumstance. *Regents*, 908 F.3d at 519-520, citing *Trump*, 138 S. Ct. at 2420. The Nevada court also glosses over the fact that when the Supreme Court took up review of the *Regents* case, it did not hold that *Arlington Heights* review applied. Rather, the Supreme Court held that "[we] need not resolve this debate because, even if the claim is cognizable the allegations here are insufficient." *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1915 (2020). The Supreme Court then went on to state that *as a matter of law*, the plaintiff's allegations in *Regents* – in which the plaintiffs raised claims of disparate

impacts upon Latino people and race-related statements by then-President Trump – the plaintiffs' allegations were insufficient to make out a claim under the *Arlington Heights* standard. In short – the Supreme Court explicitly declined to decide the issue of whether *Arlington Heights* review applies because it did not need to. The Supreme Court had already held that rational basis review applies to immigration matters, and conducted an analysis of the *Arlington Heights* to illustrate that the plaintiffs had failed to even allege a legally cognizable claim.

For these reasons, the Court should not apply *Arlington Heights*. The Ninth Circuit has repeatedly stated that rational basis scrutiny applies. Defendant's brief does not address this authority. And in the only case Defendant cites that applied *Arlington Heights*, the court failed to recognize that there is controlling law that is directly on point. *Carrillo-Lopez*, therefore, should not be followed. Rather, the Court should apply rational basis scrutiny and uphold § 1326 for the reasons stated in the next section.

**3.      Section 1326 Meets the Standard of Rational Basis Scrutiny**

When applying rational basis scrutiny, the Court must uphold a Federal law if it is "rationally related to a legitimate government purpose." *Hernandez-Mancilla*, 633 F.3d at 1185. The statute is presumed constitutional, and the party challenging it has the burden "to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The Government has no obligation to produce evidence supporting the statutory classification. *Heller*, 509 U.S. at 320; *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). As a threshold matter, Defendant's Motion contains no analysis of the rational basis standard; thus, if the Court agrees with the Government that this is the proper standard of review, it may deny the Motion without conducting any further analysis. *Heller*, 509 U.S. at 320; *Aleman*, 217 F.3d at 1201.

In any event, there can be no logical dispute that § 1326 is rationally related to a legitimate government interest. Section 1326 operates as a regulatory statute to further the Government's legitimate interests in enforcing the immigration laws and controlling unlawful alien immigration. *Hernandez-Guerrero*, 147 F.3d at 1078 ("'§ 1326 is designed to effectively enforce the immigration laws.' It 'is a regulatory statute enacted to assist in the control of unlawful immigration by aliens.'") (citations omitted) (quoting *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991), and *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968), *abrogation on other grounds recognized by United States v. Castillo-Mendez*, 868 F.3d 830, 835-36 (9th Cir. 2017)). "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Id.* Indeed, a Virginia federal district court considered and rejected the same *Arlington Heights* equal-protection arguments that Defendant raises here and concluded that § 1326 satisfies rational basis review because

> The government undoubtedly has a legitimate interest in deterring illegal reentry into the United States. Doing so increases the likelihood of compliance with deportation orders and promotes respect for the country's legal immigration process. Moreover, the illegal reentry statute rationally relates to that interest by sanctioning those who disregard a previous deportation order.

Order at 4, *Palacios-Arias*, No. 3:20-CR-62-JAG, Dkt. No. 37. As noted above, courts in this District also have rejected equal-protection challenges to § 1325, concluding that that statute passes the rational-basis test. *See, e.g.*, *United States v. Lucas-Hernandez*, No. 19-MJ-24522-LL, 2020 WL 6161150 at *4 (S.D. Cal. Oct. 21, 2020); *United States*

1  *v. Ruiz-Rivera*, No. 20-MJ-20306-AHG, 2020 WL 5230519, at *4[4] (S.D. Cal. Sept. 2,

2  2020).

3         Because § 1326 meets the rational basis standard, the Motion should be denied.

4  **B.    Defendant's Motion Must Still Be Denied Even If *Arlington Heights* Applies**

5         Even if the Court were to examine § 1326 under *Arlington Heights*, Defendant fails

6  to meet his burden to show discriminatory purpose underlying this law because, among

7  other reason, he focuses on immigration laws from the 1920s while offering no argument

8  or evidence to the specific legislative action he challenges: the 1952 INA, which brought

9  § 1326 into law.

10        According to Defendant, "Congress enacted illegal entry with a discriminatory

11 purpose" because "racism and eugenics" were a motivating factor in the criminalization of

12 illegal entry that occurred when Congress passed the 1929 UAA. ECF No. 23 at 8. To

13 support his argument, Defendant describes the following: some of the background of the

14 passage of the 1929 UAA, some of the sequence of events leading up to its passage,

15 portions of the legislative history of the 1929 UAA that contain provocative comments by

16 a few lawmakers concerning race, departures from normal procedures or substantive

17 conclusions that he perceives occurred during the passage of the 1929 UAA , and his belief

18 that the current § 1326 disparately impacts persons from Mexico and Latin America. *Id.* at

19 6–25. Defendant further contends that the "taint" of the 1929 UAA infects the current

20

21 ────────────────

[4] In two cases, a different court in this District has declined to apply rational-basis review
in cases involving equal-protection claims against § 1325. *Gallegos-Aparicio*, No. 19-
22 CR-2637-GPC, at *2-*3; *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at
*1-*2.  For at least the reasons set forth in this Response, rational-basis review should
23 have been applied there.  In any event, and as discussed below, the court in *Gallegos-
Aparicio* and *Rios-Montano* concluded that the defendants failed to meet their burden
under *Arlington Heights* and thus denied their motions to dismiss indictments for
24 violation of § 1325.  *Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *2-*4; *Rios-Montano*,
No. 19-CR-2123-GPC, 2020 WL 7226441, at *2-*8.

illegal entry law he is charged with violating, a contention which is based in part on factual findings in *Carrillo-Lopez*. *Id.* at 22.

Defendant's argument lacks merit. First, the "challenged action" is the 1952 INA because it contains the law that was codified as 8 U.S.C. § 1326. However, Defendant has not identified any legislative history of the 1952 INA for the Court to consider; therefore, there is no basis to draw the inference that racial animus was a motivating factor in its passage. Second, if the Court nonetheless were to consider the legislative history of the 1929 UAA, the additional context we provide casts serious doubt as to the veracity of Defendant's conclusion that racism and eugenics were a motivating factor in its passage. Third, there is no disparate impact; rather, the fact that more Mexican and Latinx persons are prosecuted under § 1326 is purely a function of the fact that the United States shares a 1,954-mile land border with Mexico.

### 1.   Racial Animus Was Not a Motivating Factor for the Passage of the "Challenged Action"—the 1952 INA

Step one in the *Arlington Heights* analysis is to identify the "challenged action." 429 U.S. at 261-62, 265. The Parties here dispute what that action is. Defendant contends that it is the 1929 UAA and focuses his argument on the legislative history of the 1929 UAA. Contrarily, the 1952 INA contains the law that was codified as § 1326, which is the statute Defendant is charged with violating and is the statute that would be stricken down were the Court to agree with Defendant. Further, there is no evidence before the Court that racial animus was a motivating factor in the passage of the 1952 INA.

### a.   Summary of the Passage of the 1952 INA

The Immigration Act of 1917 established that an alien who, within three years after entry, entered the United States at any time or place other than as designated by

immigration officials, or who entered without inspection, shall be deported. Pub. L. No. 64-301, § 19, 39 Stat. 874, 889, Ch. 29. Deportation was the only penalty for reentry.

When it passed the 1929 UAA, the 70th Congress made reentry after deportation a felony offense punishable by up to two years in prison and up to a $1,000 fine. Pub. L. No. 70-1018, 45 Stat. 1551, Ch. 690. This was done to strengthen the deterrent effect of the immigration laws. S. Rep. No. 70-1456 at 1 (Jan. 17, 1929) (noting that there was no law providing any penalty other than deportation for unlawful reentry, explaining that this legislation would make illegal reentry a felony offense punishable by up to two years' imprisonment and a $1,000 fine, which "is believed . . . would be of material aid in enforcing our immigration laws"). The Secretary of the Department of Labor—who was charged at that time with enforcing the country's immigration laws—agreed. In a letter incorporated into the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws[,]" explaining that "no prohibitive law can successfully be enforced without a deterrent penalty," and "[t]he fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions." *Id.* at 2.

Over 20 years later, the 82nd Congress passed the 1952 INA. Pub. L. 82-414, 66 Stat. 163, Ch. 477. The 1952 INA "revise[d] the laws relating to immigration, naturalization, and nationality" and expressly repealed the 1929 Act. Pub. L. 82-414, Introduction, 66 Stat. 163, § 403(a)(30), 66 Stat. 279. The passage of the 1952 INA was "the final product of a most intensive and searching investigation and study over a three-year period." *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968),

*abrogation on other grounds recognized by United States v. Castillo-Mendez*, 868 F.3d 830, 835-36 (9th Cir. 2017); *see also*, *e.g.*, Oscar M. Trelles, II and James F. Bailey, III, 1 Immigration and Nationality Acts:  Legislative Histories and Related Documents at iii (Introduction) (1979).

In recommending that the House pass H.R. 5678, the bill that became the 1952 INA, the report of the House Judiciary Committee mentioned only the following with respect to illegal reentry:

> As in existing law, both administrative fines and civil and criminal penalties are provided as an aid in the enforcement of the provisions of the bill.
>
> ***
>
> [C]riminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes.

H. Rep. 82-1365 at 67, 68. This shows that the fundamental purpose of the penalties in § 1326 was to assist the enforcement of immigration laws. *See Hernandez-Guerrero*, 147 F.3d at 1078. And this is the same purpose expressed for the illegal-reentry penalties adopted in the 1929 UAA. *See* S. Rep. No. 70-1456 at 1–2 (Jan. 17, 1929).

The 1952 INA also removed all racial bars to immigration and naturalization. *See* Pub. L. 82-414, §§ 201, 202, 311, 66 Stat. 163, 175-78; H. Rep. 82-1365 at 28. Further, like under the Immigration Act of 1924, *see* Pub. L. No. 68-139, § 4, 43 Stat. 153, 155, the 1952 INA provided that individuals born in the Republic of Mexico—as well as those born in Canada and several other countries—were *not* subject to immigration quotas. *See* Pub. L. 82-414, § 101, 66 Stat. 163, 169 ("The term 'nonquota immigrant' means— . . . an immigrant who was born in Canada, the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, or an independent country of

Central or South America, and the spouse or the child of any such immigrant, if accompanying or following to join him[.]").

Section 276 of the 1952 INA was codified at 8 U.S.C. § 1326 and established the following felony offense for reentry of a deported alien—also punishable by up to two years in prison and a $1,000 fine:

Any alien who—

(1) has been arrested and deported or excluded and deported, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

Pub. L. 82-414, § 276, 66 Stat. 229, codified at 8 U.S.C. § 1326; *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (discussing history of immigration laws and the 1952 INA).

Congress has amended § 1326 several times since the 1952 INA was enacted, and lawmakers have increased its deterrent value with each amendment. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress adding a subsection (b) to § 1326 and creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471; *see also* Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 4978, 5059 (increasing the fine levels; amending the fine provision so that a defendant convicted shall be fined under 18 U.S.C.); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023

(amending and increasing penalties under subsection (b)); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 507(c), 438(b), 441 110 Stat. 1214, 1267-68, 1276, 1279 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 241(b), 244(d)(3)(J), 334, 110 Stat. 3009-606, -618, -635 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

### b.    The 1952 INA Is the Challenged Action

*Arlington Heights* requires proof of discriminatory intent as to "the challenged action." 429 U.S. at 261-62, 265. Logic dictates that the 1952 INA is the challenged action here—Defendant is charged with violating § 1326, which was codified when the 1952 INA was passed, and § 1326 would be stricken down were the Court to agree with Defendant's analysis. Defendant, however, maintains that the 1929 UAA is the challenged action based on a theory that racial animus motivated the passage of the 1929 UAA and the taint of that animus was not cleansed when the 1952 INA was passed. ECF No. 22 at 22. This claim is not supported by fact or law.

Generally, "the starting point in discerning congressional intent is the existing statutory text, not the predecessor statute." *Lamie v. U.S. Trustee*, 540 U.S. 526, 527 (2004) (internal citations omitted). Implicit in this statement is that Congressional intent may not carry over when a statute is amended or replaced. *See United States v. Price,* 361 U.S. 304, 332 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). Several Circuits have declined to infer discriminatory intent from a previous enactment, instead choosing to focus on the law being challenged. *E.g.*, *Hayden v. Paterson*, 594 F.3d 150, 165–69 (2d Cir. 2010); *Johnson v. Governor of Fla.*,

19

405 F.3d 1214, 1223–24 (11th Cir. 2005) (en banc); *Cotton v. Fordice*, 157 F.3d 388, 392 (5th Cir. 1998).

Particularly relevant is the fact that when addressing the similar challenges to § 1325 and § 1326, insofar as we can tell, every district court decision that has addressed the matter (other than the flawed *Carrillo-Lopez* decision) has ignored the 1929 UAA. That has been the case in this District. *See*, *e.g.*, *Gallegos-Aparicio*, 2020 WL 7318124, at *4–7 (rejecting defendant's challenge to § 1325; explaining that "*Arlington Heights* directs the Court to look at the motivation behind the official act being challenged" and "[t]he Court therefore must consider whether [defendant] has shown that Congress's ***1990 enactment of Section 1325*** was motivated at least in part by a discriminatory purpose"; and concluding that "the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for [defendant's] position") (emphasis added); *Rios-Montano*, 2020 WL 7226441 at *7–14 (same); *United States v. Lucas-Hernandez*, 2020 WL 6161150 at *2 (S.D. Cal. Oct. 21, 2020) ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *United States v. Ruiz-Rivera*, 2020 WL 5230519, at *3 ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on the legislative history of the UAA, a law that was enacted decades before."); *see also*, *e.g.*, *Rodrigues-Barios*, Case No. 20-cr-1684-LAB; *Navarrete-Castro*, 19-cr-2717-CAB; *Vasquez Perez*, Case No. 20-cr-3445-LAB; *Sanchez-Rodriguez*, 21-cr-2351-TWR; *Orozco-Orozco*, 21-cr-2349-TWR; *Ramirez-Aleman*, 21-cr-3403-BEN.

That has been the case in other courts as well. The District of New Mexico has stated that the circuit cases cited above "have rejected the notion that prior congressional intent remains operative until a future Congress makes an affirmative contrary showing."

*Novondo-Ceballos*, 2021 WL 3570229, at \*5 (citations omitted) (ruling that § 1326 survives rational basis review after rejecting the same *Arlington Heights* argument raised here). Similarly, the Eastern District of Virginia stated:

> That history [of the 1929 UAA], however, d[oes] little to explain why Congress passed the [INA], the law that replaced the Undesirable Aliens Act of 1929 and that the defendant allegedly violated. To challenge the INA using Arlington Heights, the defendant must provide evidence that a discriminatory purpose motivated Congress to pass that law. He has not done so here.

*United States v. Palacios-Arias*, 3:20-CR-62-JAG, ECF No. 37 at 5 (E.D. Va. Oct. 13, 2020); *see also United States v. Gutierrez-Barba*, No. CR-19-01224-001, 2021 WL 2138801, at \*3–4 (D. Ariz. May 25, 2021) (declining to consider the legislative history of the 1929 UAA and rejecting challenge brought under *Arlington Heights*); *United States v. Medina*, No. CR 20-0057 (C.D. Cal. Jan. 5, 2021) ECF No. 33 at 5–6 (same); *United States v. Hernandez-Lopez*, 583 F.Supp.3d 815, 822 (S.D. TX. 2022).

Defendant nonetheless urges the Court to focus on the provocative portions of the legislative history of the 1929 UAA that he has quoted in his brief. To support this request, he points to two Supreme Court cases that purportedly support his position: *Ramos v. Louisiana*, 140 S. Ct. 1390, 1392–1402, 1408 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2251–53, 2254–63 (2020). ECF No. 22 at 20–21. According to Defendant, these cases confirm not only "must courts examine the racial motivations of the law at the time of its passage, but that later reenactments do not cleanse the law of its original taint." *Id*. In other words, Defendant contends that the taint of the lawmakers' racist comments made when passing the 1929 UAA was not cleansed when the 1952 INA was passed because those comments were not addressed by the 80th Congress. *Id*.

Defendant, however, mischaracterizes these cases. As an initial matter, neither case cites *Arlington Heights*, which is not surprising given that neither resolved a challenge brought under an Equal Protection Clause. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring in part); *Espinoza*, 140 S. Ct. at 2263 n.5. In *Ramos*, the Supreme Court held that the Sixth Amendment requires unanimous jury verdicts to convict in federal and state cases, and accordingly, it invalidated Louisiana and Oregon laws that allowed convictions by non-unanimous juries. 140 S. Ct. at 1392–1402, 1408. The Court acknowledged the undisputed evidence that "race was a motivating factor in the adoption" of these states' laws. *Id.* at 1394. But the Court performed a textual analysis of the Sixth Amendment and overruled an earlier Supreme Court decision that had permitted Oregon and Louisiana to convict by non-unanimous juries; the Court did not delve into or rely on legislators' motivations for enacting these laws. *Id.* at 1395–1402.

In *Espinoza*, the Court concluded that applying a "no aid" provision in Montana's constitution to bar the use of state scholarships to attend religious schools violated the Free Exercise Clause of the First Amendment. 140 S. Ct. at 2251–53, 2254–63. The majority did not rely on any "checkered tradition" underlying the no-aid provision—contrary to Defendant's contention on page 21 of his motion; instead, the majority relied on the fundamental point that the provision violated the First Amendment because it "plainly exclude[d] schools from government aid solely because of their religious status." *Espinoza*, 140 S. Ct. at 2255, 2259.

Simply put: these two Supreme Court decisions do not stand for what Defendant says they do. It is not surprising, then, that this Court and others have disregarded these cases when resolving the same equal protection challenge Defendant brings here.

1 Defendant failed to provide any basis for the Court to reach a different conclusion than the
2 one reached in these decisions.

3     Moreover, in all the cases Defendant cited in which *Arlington Heights* was applied
4 to strike down a law—the courts limited their review to the history of the statute or ruling
5 being challenged. That is to say: Defendant has not identified a case that applied *Arlington*
6 *Heights* the same way he urges the Court to do here, which is to strike down a law based
7 on its predecessor statute's legislative history that may support an inference that the earlier
8 law was passed in part due to discriminatory intent.

9     Finally, in a last ditch effort to elide the distinction between the 1929 UAA and the
10 1952 INA, Defendant claims that Supreme Court precedent states a reenactment of a statute
11 cannot cure discrimination from an earlier passage of a law. ECF No. 23 at 22. Citing
12 *Hunter*, 471 U.S. at 233, Defendant claims that the *Hunter* court held that changes to the
13 challenged statute were irrelevant. Defendant's reading of *Hunter* finds little support in the
14 text of the opinion. The actual language in *Hunter* pertaining to subsequent changes to the
15 statute reads as follows: "Without deciding whether § 182 would be valid if enacted today
16 without any impermissible motivation, we simply observe that its original enactment was
17 motivated by a desire to discriminate against blacks on account of race and the section
18 continues to this day to have that effect. As such, it violates equal protection under
19 *Arlington Heights*." *Id.* The Supreme Court's actual language in *Hunter* is nothing more
20 than a restatement of the fundamental holding in *Arlington Heights*. Defendant's claim that
21 *Hunter* stands for the proposition that changes to a statute are "irrelevant" is a tortured
22 interpretation without basis in the actual text. Defendant then proceeds to claim the
23 Supreme Court's holding in *Abbott v. Perez*, 138 S. Ct. 2305 (2018) somehow reaffirmed
24 the holding that he has conjured from *Hunter*. The facts in *Abbott* are very similar to

22

Defendant's challenge in this case. In *Abbott*, the plaintiffs challenged Texas' 2013 voter districting maps. Previously, Texas had promulgated districting maps in 2011 which were challenged on equal protection grounds, and never used. Plaintiffs raised an equal protection challenge to the 2013 maps and alleged that Texas had failed to establish that its legislature had cleared away the "taint" of the 2011 maps. Based upon Defendant's Motion, one might easily be led to believe that the Supreme Court endorsed the idea that future amendments to a challenged statute "did not alter" underlying discriminatory intent. ECF No. 23 at 23. Once again, Defendant cherrypicks language from the Supreme Court's opinion to suit his purposes, while wholly evading the Supreme Court's core holding. Rather than lending support to Defendant's position, the Supreme Court in *Abbott* reiterated that the court presumes legislative good faith, and the burden of proof lies with the challenger to rebut the presumption. The court stated "[W]e have never suggested that past discrimination flips the evidentiary burden on its head." *Id*. at 2325. In fact, when addressing the relevance of analyzing either the 2011 Texas legislature's intent or that of the 2013 legislature, the Supreme Court went on to state that "Under these circumstances, there can be no doubt about what matters: It is the intent of the 2013 legislature." *Id*.[5]

In sum, the case law dictates that the Court must focus that the legislative history of the law being challenged. Thus, if the Court reaches Defendant's *Arlington Heights* argument, it should conclude that the 1952 INA is the challenged action and should limit its review to the legislative history of that statute.

---

[5] Although not directly relevant to the issue of "taint" or the effects of later changes to a statute, it also bears noting that Defendant clearly misstates the factual discussion in *Abbott*. Defendant claims that the court "refused to consider the legislature's racial motives behind a 2013 redistricting map…" ECF No. 23 at 23. This is the opposite of the truth. In fact, the Supreme Court stated "Not only does the direct evidence suggest that the 2013 Legislature lacked discriminatory intent, but the circumstantial evidence points overwhelmingly to the same conclusion." *Abbott*, 138 S. Ct. at 2328. In total, the opinion dedicated nearly five pages to a discussion of the record developed in the lower courts, completely contradicting Defendant's claim that the Supreme Court "refused to consider" any racial motives.

**c.     The Legislative History of the 1952 INA Shows That There Were Legitimate Reasons for § 1326**

The legislative history of the 1952 INA that we briefly described above shows that racism was not a motivating factor for its passage. Rather, as explained above in section III(A)(1), Congress appears to have been concerned with assisting in the enforcement of immigration laws. In fact, as also noted in section III(A)(1) above, the INA *removed* racial bars to immigration and naturalization for persons from Mexico and other parts of Latin America and their families.[6]

Defendant has not submitted to the Court any legislative history that pertains to the passage of the 1952 INA. Rather, Defendant points only to a transcript of the testimony of Professor Deborah Kang at a January 2022 hearing in an Eastern District of Washington case, *United States v. Munoz- De La O*, to support his contention that the 1952 INA was also compromised by racial animus. See Exhibit P to ECF No. 23. Defendant neglects to mention, however, that the court in *Munoz-De La O* expressly rejected Professor Kang's assumption that "isolated remarks by individual congressmembers provide evidence that the entire congressional sequence of events is replete with discriminatory intent." *United States v. Munoz-De La O*, 586 F.Supp.3d 1032, 1049 (E.D. Wash. 2022). Defendant also fails to mention that the court in *Munoz-De La O* applied the *Arlington Heights* test and rejected the defendant's equal protection claim.

As shown in the previous section, Defendant's argument that the racist comments that were made by some lawmakers during the debate of the 1929 UAA "taints" the passage

---

[6] It is noteworthy that the 82nd Congress that passed the 1952 INA shared only 21 members (less than 4 percent) with the 70th Congress, which passed the 1929 UAA. *See Palacios-Arias*, No. 3:20-CR-62, ECF No. 37 at 7 n.8. By 1952, the individuals Defendant cites in the context of the 1920s legislation were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or dead (Coleman Blease, James Davis, John Box, Harry Laughlin).

of the 1952 INA not only finds no support in the case law he cites, it is contradicted by other case law. Therefore, the legislative history of the 1929 UAA is not relevant to this case.  Because Defendant has presented no persuasive evidence that racial animus appears in the legislative history of the 1952 INA, his *Arlington Heights* argument fails.

**2.  It Is Not Clear That Racial Animus Motivated the Passage of the 1929 UAA**

Even were the Court to assume for the sake of argument that the legislative history relating to the 1929 UAA is relevant, the Court should be dubious about accepting Defendant's characterization of the motivation for its passage. This is so, because Defendant relies on the affronting opinions of fewer than ten of the 531 members of the 70th Congress to argue that racism was the "primary" factor motivating the passage of the 1929 UAA. In making this argument, however, Defendant eschews statements by some of those same lawmakers that show that when the 1920s laws were being debated, Congress had broader concerns about economic issues and was not simply motivated by animus toward Mexican and Latinx persons. Should the Court consider Defendant's arguments concerning racial animus, it should also consider more than just the provocative remarks he has reproduced.

For example, Defendant states that Rep. Thomas Blanton "complained that Mexicans 'come into Texas by hordes[.]'" ECF No. 23 at 17 (quoting Def. Ex. C, 70 Cong. Rec. 3619 (1929)). Defendant's brief fails, however, to mention that a moment later, Rep. Blanton discussed the need to preserve jobs for America citizens, asserting that "They are taking away jobs from American citizens." 70 Cong. Rec. 3619 (1929). Defendant also cites Rep. Blanton as "urg[ing] the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them

1   there.'" ECF No. 22 at 17 (quoting Def. Ex. C, 70 Cong. Rec. 3619 (1929)). Defendant

2   omits the very next sentence, which again is tethered to jobs: "Then you would not have

3   the report coming in here from Austin, Tex., and many other places that many Americans

4   are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

5       As a second example, Defendant writes that Rep. Blanton "challenged others to visit

6   the international ports of entry in Texas to see the 'hordes that come across the bridges

7   with no intention of ever going back.'" ECF No. 23 at 17 (quoting Def. Ex. C, 70 Cong.

8   Rec. 3619 (1929)). The very next words in that quoted passage—which has a comma after

9   "ever going back," not a period—are "coming across to get jobs of Americans[.]" 70 Cong.

10  Rec. 3619 (1929); *see also id.* (stating that "it ought to be stopped, and if we do not do it

11  we are going to have Americans starving to death in the Hoover administration.").

12      The Government agrees that the opinions quoted by Defendant are reprehensible.

13  But those opinions are the only part of the story that Defendant tells. As outlined above,

14  even a shallow dive into the legislative history of the immigration laws from the 1920s

15  reveals a more complicated picture than Defendant has provided, and a closer examination

16  casts doubt on Defendant's assertion that the racial animus expressed by a handful of

17  lawmakers constituted a "motivating factor" for the passage of the 1929 UAA, much less,

18  the primary factor. *Arlington Heights*, 429 U.S. at 265. On this point, *United States v.*

19  *O'Brien* is instructive:

20          Inquiries into congressional motives or purposes are a hazardous matter.
21      When the issue is simply the interpretation of legislation, the Court will look
        to statements by legislators for guidance as to the purpose of the legislature,
        because the benefit to sound decision-making in this circumstance is thought
22      sufficient to risk the possibility of misreading Congress' purpose. ***It is entirely***
        ***a different matter when we are asked to void a statute that is, under well-***
23      ***settled criteria, constitutional on its face, on the basis of what fewer than a***
        ***handful of Congressmen said about it. What motivates one legislator to***
24      ***make a speech about a statute is not necessarily what motivates scores of***

1   *others to enact it, and the stakes are sufficiently high for us to eschew*
    *guesswork.*

2   391 U.S. 367, 383-84 (1968) (emphasis added).

3       In short, Defendant asks the Court to do what the Supreme Court has cautioned

4   should not be done—strike down § 1326 based on the opinions of "fewer than a handful of

5   Congressman" expressed during the debate on a law that is no longer in effect, and also to

6   attribute those affronting opinions to the entire 72nd Congress. *Brnovich*, 141 S. Ct. at 2350;

7   *O'Brien*, 391 U.S. at 383-84. For the reasons stated in this section, the Court should decline

8   to do so.

9       **3.    Defendant Fails to Establish Discriminatory Impact**

10      Finally, Defendant argues that § 1326 has a disparate impact and discriminatory

11  intent based on the high percentage of Border Patrol arrests of Mexican or Latinx

12  individuals and other claimed subset disparities. ECF No. 23 at 27–31. Those, however,

13  numbers do not establish that § 1326 violates his equal protection rights.

14      We provide the latest available figures for context. In Fiscal Year 2020, Customs

15  and Border Protection (which includes the Border Patrol) had 646,822 total encounters,

16  which includes Title 8 apprehensions, Title 8 Inadmissibles, and Title 42 Expulsions. That

17  year, 458,088 of those encounters were on the southwest border of the United States –

18  70.8% of the nationwide total. [78] In Fiscal Year 2021, that percentage increased to 88.6%:

19  1,734,686 encounters at the southwest border versus 1,956,519 for the whole nation. In

20  Fiscal Year 2022, that percentage was 86%. In Fiscal Year 2019, Border Patrol had 859,501

21

22

23  ───────────────
    [7]  U.S. Customs and Border Protection, CBP Enforcement Statistics: Nationwide Encounters,
    https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed April 14, 2023)

24  [8]  U.S. Customs and Border Protection, CBP Enforcement Statistics: Southwest Land Border Encounters,
    https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (accessed April 14, 2023)

total apprehensions, In light of this data, it is unsurprising that a high percentage of apprehensions (and potentially prosecutions) are of Mexican or Latinx individuals.

Data such as these do not show disparate impact or discriminatory intent sufficient to sustain an equal protection challenge. In *DHS v. Regents of the Univ. of Cal.*, for example, the Supreme Court considered and rejected the argument that the rescission of the DACA program disparately impacted Latinx people from Mexico (who were 78 percent of DACA recipients), concluding: "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (citation omitted). But more importantly, this Court in *Gallegos-Aparicio* concluded that defendant's "conten[tion] that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border" did not "show discriminatory motive, given that the disparity is explainable on grounds other than race." No. 19-CR-2637-GPC, at *8 (citing *Arlington Heights*, 429 U.S. at 266); *accord Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *14–16 (reaching same conclusion); Order at 6 n.7, *Palacios-Arias*, No. 3:20-CR-62-JAG, ECF No. 37 (same); *Lucas-Hernandez*, 2020 WL 6161150, at *2–3 (same); *Ruiz-Rivera*, 2020 WL 5230519, at *4 (same). Defendant's brief does not address these common-sense conclusions concerning the impact § 1326 has, and for this additional reason, Defendant fails to show that the statute violates his equal protection rights under *Arlington Heights*.

## C.   **The Court should deny Defendant's request for an evidentiary hearing.**

Finally, because Defendant cannot, as a matter of law, establish his equal protection claim even under *Arlington Heights*, the Court should not hold an evidentiary hearing on

1   his motion to dismiss. ECF No. 23 at 31–32 (requesting hearing); *United States v. Irwin*,

2   612 F.2d 1182, 1187 (9th Cir. 1980) (stating standard for when an evidentiary hearing may

3   be conducted on a motion to dismiss).

### III.

### CONCLUSION

6   By this point, the issues raised in Defendant's Motion are well-trodden ground.

7   Every single court in this District has rejected similar claims under *Arlington Heights*.

8   *See United States v. Ramirez-Aleman*, No. 21cr3403-BEN (S.D. Cal. Apr. 27, 2022);

9   *United States v. Ponce-Galvan*, No. 21cr2227-H (S.D. Cal. Feb. 16, 2022); *United States*

10   *v. De Jesus Bernal-Cota*, No. 21cr2274-TWR (S.D. Cal. Dec. 3, 2021); *United States v.*

11   *Orozco-Orozco*, No. 21cr2349-TWR (S.D. Cal. Sept. 20, 2021); *United States v. Sanchez-*

12   *Rodriguez*, No. 21cr2351-TWR (S.D. Cal. Sept. 20, 2021); *United States v. Gallegos-*

13   *Aparicio*, No. 19cr2637-GPC (S.D. Cal. Dec. 11, 2020); *United States v. Rios-Montano*,

14   No. 19cr2123-GPC (S.D. Cal. Dec. 7, 2020); *United States v. Navarrete-Castro*, No.

15   19cr2717 (S.D. Cal. Nov. 19, 2020); *United States v. Rodrigues-Barios*, No. 20cr1684-

16   LAB (S.D. Cal. Oct. 21, 2020); *United States v. Morales-Roblero*, No. 19mj24442-AHG

17   (S.D. Cal. Sept. 14, 2020); *United States v. Lucas-Hernandez*, No. 19mj24522-LL (S.D.

18   Cal. Oct. 21, 2020). Dozens of other courts across the country have also rejected these

19   claims. *See United States v. Munoz-De La O*, No. 20cr134-RMP (E.D. Wash. Feb. 18,

20   2022); *United States v. Zepeda*, No. CR 20-57 FMO (C.D. Cal. Jan. 5, 2021); *United States*

21   *v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Ore. 2021); *United States v. Gutierrez-Barba*,

22   No. CR-19-1224-001-PHX-DJH (D. Ariz. May 25, 2021); *United States v. Hernandez-*

23   *Lopez*, No. H-21-440 (S.D. Tex. Feb. 2, 2022); *United States v. Sanchez-Felix*, No.

24   21cr310-PAB (D. Colo. Dec. 28, 2021); *United States v. Rivera-Sereno*, No. 2:21cr129

# ER-151

30

1   (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187 (W.D. Okla.

2   Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83 (N.D. Ohio Nov.

3   5, 2021); *United States v. Suquilanda*, No. 21cr63 (VM) (S.D.N.Y. Oct. 20, 2021); *United*

4   *States v. Novondo-Ceballos*, No. 21cr383 RB, 554 F.Supp.3d 1114 (D. N.M. Aug. 12,

5   2021); *United States v. Wence*, No. 3:20cr27 (D. V.I. June 16, 2021); *United States v.*

6   *Palacios-Arias*, No. 3:20cr62-JAG (E.D. Va. Oct. 13, 2020). Defendant's claim is

7   unsupported in Supreme Court and Ninth Circuit precedent, and his factual assertions –

8   even if taken as true – cannot support a challenge under *Arlington Heights* as a matter of

9   law.

10      Racism is a pernicious evil that has plagued our country in many different forms for

11  centuries. The United States does not dispute that there is uncomfortable, even disturbing

12  history in our nation's background pertaining to race, civil rights, and immigration. But as

13  applied to Title 8 § 1326, the Defendant has failed to establish any violation of the Equal

14  Protection Clause. For the foregoing reasons, Defendant's motion should be denied.

15

16      DATED:  April 14, 2023              Respectfully submitted,

17                                          Randy S. Grossman
                                            United States Attorney

18                                          */s/ James Miao*
                                            JAMES MIAO
19                                          Assistant United States Attorney

20

21

22

23

24

1  **NINA B. PAPACHRISTOU**
California State Bar No. 345688
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California 92101-5030
Telephone: (619) 234-8467
4  Facsimile: (619) 687-2666
Nina_Papachristou@fd.org
5
Attorneys for RAMIRO GOMEZ-REYES
6
7                   UNITED STATES DISTRICT COURT

8                 SOUTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10  UNITED STATES OF AMERICA, | CASE NO.:  23CR0251-RBM |
| 11               Plaintiff, | Hon. Ruth B. Montenegro |
| 12       v. | Date: April 14, 2023<br>Time: 1:30 PM |
| 13  RAMIRO GOMEZ-REYES, | **MOTION TO DISMISS THE** |
| 14               Defendant. | **INFORMATION UNDER § 1326(D)**<br>**AND MOTION FOR LEAVE TO FILE**<br>**A REPLY BRIEF** |

15

16

17  **I.    INTRODUCTION**[1]

18        This Court should dismiss the information under 8 U.S.C. § 1326(d) because

19  the only order of removal against Mr. Gomez is invalid. The government deported

20  Mr. Gomez on the mistaken belief that his prior sexual assault conviction was a

21  "crime of violence" under 8 U.S.C. § 1101(a)(43)(F). Because the government

22  generated the removal order before ever meeting Mr. Gomez, he never got the

23  chance to challenge this mistaken belief or present his case before an immigration

24  judge. Instead, he was simply instructed to sign for "voluntary" deportation and he

25

26  _____

27  [1] Unless otherwise noted, the facts discussed herein are based on government-
provided discovery. Mr. Gomez reserves the right to contest these facts at future
28  proceedings, including trial.

was removed a day later.

This process deprived Mr. Gomez of his right to seek administrative or judicial relief. And it was fundamentally unfair because Mr. Gomez was not removable as charged. For these reasons, he meets all three requirements for dismissal under 8 U.S.C. § 1326(d).

## II.   STATEMENT OF FACTS

### a.  Mr. Gomez's Journey to the United States

Mr. Gomez is 35 years old. *See* Ex. A (Declaration of Mr. Gomez). He received a sixth-grade education in Mexico. Mr. Gomez's schooling was in Spanish and he does not speak English. *Id.* He came to the United States in 2005 to work in a Chicago barbecue restaurant alongside his cousins.

In 2007, Mr. Gomez was arrested and charged with violating 720 Ill. Comp. Stat. Ann. §§ 5/11-1.30 (attempted aggravated sexual assault, previously codified as § 5(8-4)) and 5/10-2 (aggravated kidnapping). He pled guilty and was sentenced to 15 years and 10 years and 6 months, respectively. *See* Ex. B (Cook County Judgment).

Mr. Gomez served approximately eight years in Illinois state prison before U.S. Immigration and Customs Enforcement initiated administrative removal proceedings.

### b.  The 2017 Removal Proceedings

Mr. Gomez's removal proceedings began in February 2017, while he was still serving his criminal sentence. ICE issued a Notice of Intent to Issue a Final Administrative Removal Order on February 6, 2017. Ex. C. However, ICE did not serve Mr. Gomez with this Notice until March 30, 2017. *Id.* The Notice alleged that Mr. Gomez was deportable because he was convicted of attempted criminal sexual assault ("ACSA") in violation of 720 Ill. Comp. Stat. Ann. 5.0(8-4) [now codified

ER-154

under 5/11-1.30].[2] *Id.* The Notice further alleged that this was an aggravated felony under 8 U.S.C. § 1101(a)(43)(F) [crime of violence for which the sentence exceeded one year] and § 1101(a)(43)(U) [inchoate crimes]. *Id.*

The Notice provided three check-boxes of options by which Mr. Gomez could "contest [his] deportability": (1) He could assert that he was "a citizen or national of the United States"; (2) he could assert that he was "a lawful permanent resident"; and (3) he could claim that he was "not convicted of the criminal offense described" in the Notice of Intent. *Id*. at 2. There was no check-box, however, to assert that Mr. Gomez's conviction was not an aggravated felony. *Id.*

The ICE agent who conducted his removal did little to clarify what was happening. In broken Spanish, she simply instructed Mr. Gomez to sign for "voluntary" deportation. *See* Ex. A ¶ 12. Otherwise, she said, Mr. Gomez would spend another year or so in jail while his deportation proceedings dragged on. The agent did not mention that Mr. Gomez could contest the aggravated-felony allegation or that he had a right to an attorney. *Id.* ¶¶ 9, 13–14.

So Mr. Gomez did not contest his removal. He instead checked a box acknowledging that he "admit[ted] the allegations" and wished to be removed to Mexico. *Id.* He also checked a box acknowledging his "right to remain in the United States for 14 calendar days in order to apply for judicial review" and that he "waive[d] this right." *Id*.

But, unknown to Mr. Gomez, ICE had already executed a Final Administrative Removal three days *before* providing Mr. Gomez notice of his removal—on March 27, 2017. *See* Ex. D. As a result, Mr. Gomez only received "notice" of his impending removal proceedings three days after their conclusion.

---

[2] The Notice charged Mr. Gomez with removability for his attempted aggravated sexual assault conviction alone, not the kidnapping conviction.

ER-155

Following his removal, Mr. Gomez remained in Mexico without issue for almost six years. His original administrative removal order has never been reinstated and he has no other orders of removal.

## III. THE COURT SHOULD DISMISS THE INFORMATION BECAUSE MR. GOMEZ'S SOLE PRIOR REMOVAL IS INVALID

### A. Summary of the Argument

The government is relying on the 2017 administrative removal to support this § 1326 prosecution because it is Mr. Gomez's only prior deportation. But this removal order was fatally flawed for two reasons. Because Mr. Gomez was not actually convicted of an aggravated felony, he was never removable as charged. And, ICE's failure to follow proper administrative removal procedures under 8 C.F.R. § 238.1 also satisfies the § 1326(d) collateral attack requirements.

<u>First</u>, Mr. Gomez's ACSA conviction was not a categorical crime of violence because it can be committed without using, threatening or attempting to use any physical force. Instead, it requires only that the defendant "displays, threatens to use, or uses a dangerous weapon, other than a firearm, *or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon.*" 720 Ill. Comp. Stat. Ann. § 5/11-1.30(a)(1) (emphasis added). Simply put, a person can be guilty of ACSA in Illinois for "us[ing]" or "fashion[ing]" *any* object that leads the victim to believe they are in danger, even if the defendant did not intend to use the object as a weapon.

The result is overbreadth. For an offense to qualify as a crime of violence, it must require that the perpetrator use, attempt to use, or threaten intentional force. *Borden v. United States*, 141 S. Ct. 1817, 1825 (2021). The victim's mental state cannot substitute for the perpetrator's. The Illinois statute requires neither intentional nor purposeful use of force, nor threat of intentional force. *See People v. Jimenez*, 191 Ill. App. 3d 13, 26 (Ill. App. Ct. 1989) (stating that the mental states

ER-156

of "intent, knowledge, or recklessness are implied" in § 5/11-1.30 and the criminal sexual assault statute); *see also United States v. Taylor*, 142 S. Ct. 2015, 2022–23 (2022) (rejecting the government's argument that a noncommunicated threat satisfies the force definition and explaining that the threat must involve *intentional use* of force) (emphasis added). The plain terms of the statute compel the conclusion that the statute is not a crime of violence. *Taylor*, 142 S. Ct. at 2025 (holding that there is no need to survey state decisional law when the plain text of a state statute is overbroad).

Second, the government violated Mr. Gomez's due process rights by improperly executing his removal order. The government notified Mr. Gomez of its intent to remove him on March 30, 2017, as acknowledged by Mr. Gomez's signature. *See* Ex. B at 2. But the government, acting through a deportation officer, had already issued the final removal order three days before notifying Mr. Gomez of his impending removal. Exs. C, D. This sequence of events violated 8 C.F.R. § 238.1(b)(2), which governs administrative removals carried out by deportation officers rather than immigration judges. The regulations require deportation officers to serve the Notice in order to advise noncitizens of their rights to representation at removal proceedings, inspect the evidence against them, and rebut the charges within ten days of receipt. 8 C.F.R. § 238.1(b)(2). Because the government did not provide Mr. Gomez with proper notice and an opportunity to challenge his removability before ordering him removed, his removal order is invalid.

For all of these reasons, Mr. Gomez was never removable as an aggravated felon. And he had no chance to challenge ICE's conclusion that he was removable, both because the government violated his due process rights to notice and counsel, and because the administrative removal process itself does not offer an opportunity to contest the aggravated felony designation. *United States v.*

ER-157

*Valdivia-Flores*, 876 F.3d 1201, 1210 (9th Cir. 2017) (holding that where a noncitizen was not removable on the sole ground charged, he is prejudiced by his inability to seek judicial review). As a result, Mr. Gomez meets the requirements for dismissal of the information under 8 U.S.C. § 1326(d).

**B.  Argument**

1.  Standards for a Motion to Dismiss under § 1326(d).

A defendant charged with illegal reentry in violation of 8 U.S.C. § 1326 has a due process right to collaterally attack the removal order upon which the charge is predicated. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987). Following *Mendoza-Lopez*, Congress codified the procedure for a collateral attack, requiring that the defendant show: (1) he exhausted the administrative remedies that were available to seek relief from removal; (2) the removal proceedings improperly deprived him of judicial review; and (3) the entry of the order was fundamentally unfair. *See* 8 U.S.C. § 1326(d). The final requirement—fundamental unfairness— is fulfilled where the defendant shows that defects at the removal proceeding deprived him of due process and he suffered prejudice as a result. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011). Mr. Gomez has satisfied all of these requirements; the third requirement is addressed first and the first two requirements are addressed last.

2.  Mr. Gomez's removal was fundamentally unfair because his Illinois sexual assault conviction does not qualify as a crime of violence.

Mr. Gomez satisfies the third prong—fundamental unfairness—because he was not removable as charged in the Notice of Intent. *See United States v. Aguilera-Rios*, 769 F.3d 626, 630 (9th Cir. 2014) (citing *United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006)).

          *a.*    *Aggravated criminal sexual assault under 720 Ill. Comp. Stat. Ann. § 5/11-1.30(a)(1) is not a categorical crime of violence.*

According to Mr. Gomez's Notice of Intent, his ACSA conviction was the sole basis for his removal under the INA. Ex. B. Mr. Gomez was charged with being removable for having "been convicted of an aggravated felony as defined in section 101(a)(43)(F) of the [Immigration and Nationality] Act [("INA")]." *Id.* This subsection of the INA, codified at 8 U.S.C. § 1101(a)(43)(F), states that aggravated felonies include "crime[s] of violence" as defined in 18 U.S.C. § 16. That provision provides: "The term 'crime of violence' means an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another."[3] 18 U.S.C. § 16(a) (punctuation omitted).

ACSA includes no such element. The statute reads: "(a) A person commits aggravated criminal sexual assault if that person commits criminal sexual assault[4] and any of the following aggravating circumstances exist during the commission of the offense or…occur as part of the same course of conduct as the commission of the offense: (1) the person displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that *leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon*." 720 Ill. Comp. Stat. Ann. § 5/11-1.30(a)(1). In other words, the victim's mental state is an element—not the defendant's.

---

[3] The definition also includes a subsection (b), but that subsection is unconstitutionally vague after the Supreme Court's decision in *Johnson. See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (applying *Johnson v. United States*, 135 S. Ct. 2551 (2015)); *see also United States v. Davis*, 139 S. Ct. 2319 (2019). The inquiry must therefore focus solely on § 16(a).

[4] Based on discovery provided by the government thus far, there is no indication that criminal sexual assault must also be formally charged, nor which subsection of the criminal sexual assault statute Mr. Gomez was charged under.

By contrast, the crime of violence definition under 8 U.S.C. § 16(a) requires that the perpetrator (1) threaten to use, (2) attempt to use or (3) use intentional force.

Regarding (1), the Illinois ACSA statute encompasses a broader array of threats than those included within the federal definition. The Supreme Court clarified in *Taylor* that "the word 'threat' and its cognates usually denote a communicated intent to inflict physical or other harm."[5] 142 S. Ct. at 2023 (citing Black's Law Dictionary 1327 (5th ed. 1979). This definition situates the inquiry squarely on the defendant's subjective intent—not on the (mis)perceptions of the victim, as included in the Illinois statute. The Illinois statute captures circumstances where the defendant employed an object that was *not* a dangerous weapon, and the defendant didn't subjectively intend for the victim to perceive it as dangerous. By its plain text, the Illinois statute is overinclusive of the types of threats that make an offense a crime of violence under immigration law. *Taylor*, 142 S. Ct. 2015, at 2022–23.

As concerns (3), the Supreme Court recently reiterated that § 16(a) only captures intentional uses of force—not reckless or negligent ones. *See Borden v. United States*, 141 S. Ct. 1817, 1827 (2021). In rejecting the government's argument that § 16(a) encompasses offenses committed recklessly rather than intentionally, Justice Kagan reflected, "If not to incorporate an intent requirement, what function does [the "against"] phrase serve? *Id.* The court reasoned that the "'against' phrase indeed sets out a mens rea requirement—of purposeful or knowing conduct." *Id.*

According to the Illinois courts, both the ACSA statute and the criminal sexual assault statute "imply" the mental states of "intent, knowledge, or

---

[5] The *Taylor* case interpreted "crime of violence" as discussed in a different federal statute, 18 U.S.C. § 924(c)(1)(A), but the § 16(a) definition is identical.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. GOMEZ-REYES'S
MOTION TO DISMISS THE INFORMATION UNDER § 1326(D)

ER-160

recklessness." *Jimenez*, 191 Ill. App. 3d at 26. By this logic, the ACSA statute could apply to a defendant who recklessly displays a cell phone during the offense, but who lacks the intent to use the cell phone as a weapon or otherwise employ force against the victim. So long as the victim "reasonably believe[s] that the object is a dangerous weapon[,]" the defendant could be convicted. The ACSA statute's mens rea requirement extends wider than purposeful or knowing use of force, so it is overbroad.

Since the Illinois statute is overbroad as concerns (1) threat and (3) use of force, it is also overbroad as concerns (2) attempt to use force. Because § 5/11-1.30(a)(1) covers more conduct than that included in the federal "crime of violence," it is overbroad and does not qualify as an aggravated felony under immigration law. Thus, Mr. Gomez was not deportable as charged.

> b. *Mr. Gomez's 2017 removal violated his due process rights to notice and an opportunity to contest removability.*

Moreover, the ICE officials violated Mr. Gomez's due process rights when they issued his removal order before notifying him that the government intended to undertake administrative removal proceedings. Section 238.1(b)(2) sets out the duties of officials conducting administrative removal proceedings to provide sufficient notice:

> The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intent to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. The Notice of Intent shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the government, by counsel of the alien's choosing, as long as counsel is authorized to practice in removal proceedings; may request withholding of removal to a particular country if he or she fears persecution or torture in that country; may inspect the evidence supporting the Notice of Intent; may rebut the

23CR0251-RBM
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. GOMEZ-REYES'S
MOTION TO DISMISS THE INFORMATION UNDER § 1326(D)

ER-161

charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

Most importantly, the regulations state that the Notice of Intent "*shall constitute the charging document*." In a criminal matter, a judgment of conviction could never issue without an information or an indictment being provided to a defendant. Here, Mr. Gomez's administrative removal order was signed by DHS official "Easterday" on March 27, 2017. Ex. D. But as the date on the certificate of service makes clear, Mr. Gomez did not receive legal notice of his removal until three days later, on March 30. *Id.*

On that day, Mr. Gomez was taken to an ICE building in Chicago. Ex. A ¶ 7. He was told that he was being removed. *Id.* ¶ 8. He asked if he would be seeing a judge. *Id.* ¶ 10. The ICE officials told him that seeing a judge would mean he was fighting his case. *Id.* ¶ 11. They said if he fought his case, he would spend another year in custody. *Id.* At no point did the officers inform Mr. Gomez of his right to counsel. *Id.* ¶ 9. Mr. Gomez—a monolingual Spanish speaker—remembers that Officer Bernson, the ICE official who conducted his removal, did not speak Spanish very well, and did not explain the Notice of Intent in detail. *Id.* ¶¶ 3, 12–15. While the certificate of service on the Notice of Intent states that it was read to Mr. Gomez in Spanish, there is no interpreter listed. Ex. B. at 2. Mr. Gomez remembers that Officer Bernson read it to him in broken Spanish. Ex. A ¶ 12. He understood that if he signed, he would be "voluntarily" deported. *Id.*

> c. *Mr. Gomez was prejudiced by the government's errors in determining that he was an aggravated felon, and depriving him of his rights to notice, counsel, and judicial review.*

Mr. Gomez "was removed when he should not have been and clearly suffered prejudice." *United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006). "Where a prior removal order is premised on the commission of an aggravated felony, a defendant who shows that the crime of which he was previously convicted was not, in fact, an aggravated felony, has established both that his due process

rights were violated and that he suffered prejudice as a result." *United States v. Garcia-Lopez*, 903 F.3d 887, 895 n. 4 (9th Cir. 2018); *see also Valdivia-Flores*, 876 F.3d at 1206, 1210 (holding that where a noncitizen was not removable on the sole ground charged, he is prejudiced by his inability to seek judicial review).

Mr. Gomez's removal was premised solely on the allegation that his ACSA conviction was a crime of violence under INA § 101(a)(43)(F). Because a conviction under that statute can be upheld without proof beyond a reasonable doubt that the defendant used, threatened to use, or attempted to use force, section 5/11-1.30(a)(1) is overbroad as compared to 18 U.S.C. § 16(a). Because Mr. Gomez was not convicted of an aggravated felony under immigration law, he was not removable as charged, and his sole 2017 removal cannot support an illegal re-entry conviction.

Mr. Gomez's lack of legal status does not change this conclusion. The Ninth Circuit has repeatedly held that a noncitizen suffers prejudice from being removed on improper grounds even where he could have been removed on uncharged, different grounds. *See United States v. Ochoa-Oregel*, 904 F. 3d 682, 684–85 (2018) ("And even if the government might have been able to remove him on other grounds through a formal removal proceeding, his removal on illegitimate grounds is enough to show prejudice."); *see also United States v. Mangas*, No. 19-50319, 2022 WL 898594, at *2 (9th Cir. Mar. 28, 2022) (reaffirming that *Valdivia-Flores* controls the prejudice analysis). Any additional but uncharged basis for Mr. Gomez's removal does not expunge the prejudice he suffered from the defect in the charges that actually issued. *See Zolotukhin v. Gonzalez*, 417 F. 3d 1073, 1076 (9th Cir. 2005) (defining actual prejudice where "the outcome of the proceeding may have been affected by the alleged violation").

The regulatory violations also prejudiced Mr. Gomez. Because Mr. Gomez's removal order was executed before he received notice, he did not have an

ER-163

opportunity to consult with counsel or review the evidence against him. Had Mr. Gomez's removal been conducted lawfully, he would have been informed of his right to counsel and provided with a list of free legal services. Federal regulations explicitly state that a person undergoing administrative removal proceedings has the right to be represented at their own expense, 8 C.F.R. § 238.1(b)(4)(B), and require that DHS provide noncitizens with a list of available free legal services programs, 8 C.F.R. § 238.1(b)(2)(iv). Had Mr. Gomez understood those rights, he would have consulted with an immigration attorney. An immigration attorney would have encouraged him to contest the aggravated felon determination in front of an Immigration Judge. Because DHS violated Mr. Gomez's rights under the regulations, Mr. Gomez's waiver of judicial review was invalid. *See United States v. Cisneros-Rodriguez*, 813 F. 3d 748, 759 (9th Cir. 2015) (reasoning that where a noncitizen denied right to counsel in an administrative removal proceeding could have plausibly obtained relief, the prejudice requirement is met).

3.   <u>Mr. Gomez meets the requirements of §§ 1326(d)(1) and (2) because the administrative removal process provided no opportunity for him to challenge his removability.</u>

Mr. Gomez has satisfied the remaining requirements of a collateral attack on a deportation under 8 U.S.C. § 1326(d). A defendant satisfies the first two requirements of a § 1326(d) collateral attack—that he exhausted administrative remedies and was denied judicial review—"if the right to appeal was denied in violation of due process." *United States v. Gomez*, 757 F.3d 885, 893 (9th Cir. 2014).

This principle controls here. Put simply, because Mr. Gomez was subjected to administrative removal instead of removal proceedings before an Immigration Judge, he had no way to challenge the government's assertion that his Illinois conviction was an aggravated felony.

Administrative removal proceedings under 8 U.S.C. § 1228(b) are minimal

ER-164

by design. Unlike removal proceedings before an Immigration Judge, administrative removal proceedings involve no hearing, no neutral decision-maker, no evidentiary findings, and no record apart from the removal documents created by immigration officers. *See* 8 U.S.C. § 1228(b). The decision that an individual has an aggravated felony conviction and is not a legal permanent resident—the two qualifying facts for administrative removal—is made by a DHS officer, not an attorney or judge. 8 C.F.R. § 238.1(a).

Noncitizens then have ten days to review a notice of the charges and the notice's advisal of procedural rights before issuance of a final order.  8 C.F.R. § 238.1(b)(2), (c)(1). A noncitizen may contest his removal in that ten-day window only on three narrow grounds: He may rebut the factual allegations, review the government's evidence, or request withholding of removal. 8 C.F.R. § 238.1(c); *see generally Gomez-Velazco v. Sessions*, 879 F.3d 989, 991–92 (9th Cir. 2018) (describing the administrative removal process under § 1228(b)). Critically, the noncitizen has no ability in administrative removal proceedings to challenge the *legal* basis for DHS's allegation that his conviction was an aggravated felony. Instead, he may only contest whether the conviction exists as a factual matter. *See Etienne v. Lynch*, 813 F.3d 135, 138–42 (4th Cir. 2015). Accordingly, Mr. Gomez had no legal avenue to challenge the overbreadth of his Illinois conviction.

The Ninth Circuit has expressly held that this process satisfies § 1326(d)'s procedural requirements. *Valdivia-Flores*, 876 F.3d at 1206 (finding that a defendant was "deprived of due process and satisfies the first two prongs of 8 U.S.C. § 1326(d)" because the administrative removal forms failed to "inform him that he could refute, through either an administrative or judicial procedure, the legal conclusion underlying his removability").

Moreover, the Supreme Court's decision in *United States v. Palomar-Santiago* does not disturb the holding in *Valdivia-Flores*. 141 S. Ct. 1615 (2021).

ER-165

Before *Palomar-Santiago*, Ninth Circuit precedent excused noncitizens removed by immigration judges "'from proving the first two requirements'" of § 1326(d) if they were "not convicted of an offense that made [them] removable.'" *Id.* at 1620. For Mr. Palomar, the Supreme Court's reversal of that precedent that meant he had to exhaust his administrative and judicial remedies by challenging his removability in front of an immigration judge. *Id.*

However, *Palomar-Santiago* has no effect on the validity of 1326(d) challenges for individuals erroneously removed as aggravated felons through administrative removals. In fact, the plain text of the statute makes clear that a noncitizen must only exhaust administrative remedies "*that may be available*" to succeed in a collateral attack. *See* 8 U.S.C. § 1326(d)(1). Unlike Mr. Palomar, Mr. Gomez had no means available to contest his removability, because the administrative removal process provides no means to contest the legal conclusion that a crime is an aggravated felony.

For all these reasons, Mr. Gomez asks this Court to grant his § 1326(d) motion and prohibit the government from relying on his 2017 Final Order of Administrative Removal to support the § 1326 charge against him. Because that order resulted in his only prior removal, the information should be dismissed.

## IV.   MOTION FOR LEAVE TO FILE A REPLY BRIEF

Mr. Gomez files this Motion to Dismiss based on the information provided in discovery thus far. Mr. Gomez respectfully requests an opportunity to reply to the government's anticipated response in opposition, and would agree to a continuance to facilitate that.

## V.   CONCLUSION

For the foregoing reasons, Mr. Gomez respectfully requests that the Court dismiss the information, and in the alternative that the Court grant leave to file a Reply. He also requests an evidentiary hearing to resolve any material disputes of

14                           23CR0251-RBM

1  fact.

2                                      Respectfully submitted,

3

4  Dated:  March 31, 2023              *s/ Nina B. Papachristou*

5                                      Nina B. Papachristou
                                       Federal Defenders of San Diego, Inc.
6                                      Attorneys for Mr. Gomez-Reyes
                                       Email:  Nina_Papachristou@fd.org

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. GOMEZ-REYES'S
MOTION TO DISMISS THE INFORMATION UNDER § 1326(D)

ER-167

# EXHIBIT A

# Declaration of Ramiro Gomez-Reyes

1. My name is Ramiro Gomez-Reyes. I swear that the contents of this declaration are true and correct to the best of my knowledge.

2. I am 35 years old.

3. I only speak and read Spanish. I can understand only a small amount of spoken English.

4. In 2009, I pled guilty in an assault case in Chicago, IL.

5. I served my criminal sentence from 2009 to March 2017.

6. Once I finished my sentence, an ICE agent met me in the prison in Stateville, IL.

7. The ICE agent took me to the Chicago ICE office.

8. Once we arrived, the ICE agent told me I was being deported. He sat me at a desk in an open office area. There were several other agents in the room, but only one spoke to me.

9. I did not have a lawyer. They did not explain to me that I had the right to have a lawyer.

10. I asked the ICE agent if I was going to see an immigration judge.

11. The ICE agent told me that if I fought my case by seeing a judge, I would spend another year or so in jail.

12. The ICE agent who processed my deportation spoke very bad Spanish. He told me that I was signing for "voluntary" deportation.

13. The ICE agent did not explain that I was being deported because of an "aggravated felony."

14. He did not tell me that I could challenge that I was convicted of an aggravated felony.

15. He did not translate the forms he provided to me. Instead, he simply instructed me to sign them.

16. I signed the forms as he instructed and was deported the next day.

17. If I had known I could fight my deportation, I would have done so. If I had known I could have a lawyer present, I would have gotten one.

I declare under penalty of perjury that the foregoing is true and correct, executed on March 29, 2023 in San Diego, California.


*Ramiro Gomez Reyes*

**RAMIRO GOMEZ-REYES**
Declarant

# EXHIBIT B

THE CIRCUIT COURT OF COOK COUNTY

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS ) | CASE NUMBER | 07CR2465301 |
| V. ) | DATE OF BIRTH | 03/14/87 |
| RAMIRO GOMEZ ) | DATE OF ARREST | 11/07/07 |
| Defendant | IR NUMBER 1870833 | SID NUMBER 061734180 |

ORDER OF COMMITMENT AND SENTENCE TO
ILLINOIS DEPARTMENT OF CORRECTIONS
===================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below
is hereby sentenced to the Illinois Department of Corrections as follows:

| Count | Statutory Citation | Offense | Sentence | Class |
|---|---|---|---|---|
| 001 | 720-5/10-2(A)(3) | AGG KIDNAPING/INFLICT HAR | YRS. 10 MOS. 6 | X |
| | and said sentence shall run concurrent with count(s) 004 | | | |
| 004 | 720-5(8-4)12-14(A)(1) | ATT. AGG CRIM SEX ASSAULT/WEAP | YRS. 15 MOS. | 1 |
| | and said sentence shall run concurrent with count(s) 001 | | | |
| ____ | _____ | _____ | YRS. ____ MOS. ____ | ____ |
| | and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on: | | | |
| ____ | _____ | _____ | YRS. ____ MOS. ____ | ____ |
| | and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on: | | | |
| ____ | _____ | _____ | YRS. ____ MOS. ____ | ____ |
| | and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on: | | | |

On Count ____ defendant having been convicted of a class _ offense is sentenced as
a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ____ defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served
in custody for a total credit of _528 days as of the date of this order

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with
the sentence imposed in case number(s) 07CR1624801 _____
AND: consecutive to the sentence imposed under case number(s)
_____

IT IS FURTHER ORDERED THAT _____
COUNT 1 TO BE SERVED AT 85% AND COUNT 4 TO BE SERVED AT 50%_____
STAY OF MITT TO 1/22/09_____

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff
take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take
him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

DATED ___JANUARY 08, 2009___  ENTERED  ENTER: 01/08/09

CERTIFIED BY  P GLIKIS
            DEPUTY CLERK                    JUDGE: FORD, NICHOLAS R.         1756
GCPF 01/08/09 12:53:10          JUDGE NICHOLAS R. FORD                      CCG N305

# ER-172

# EXHIBIT C

## Notice of Intent to Issue a Final Administrative Removal Order

### In removal proceedings under section 238(b) of the Immigration and Nationality Act

Event No: CHI0901003213

File Number 208 966 351

To: RAMIRO GOMEZ-REYES

Address: DHS-ICE 101 West Congress Parkway Chicago, ILLINOIS, 60605

(Number, Street, City, State and ZIP Code)

Telephone: (312) 347-2400

(Area Code and Phone Number)

Pursuant to section 238(b) of the Immigration and Nationality Act (Act) as amended, 8 U.S.C. 1228(b), the Department of Homeland Security (Department) has determined that you are amenable to administrative removal proceedings. The determination is based on the following allegations:

1. You are not a citizen or national of the United States.

2. You are a native of **MEXICO** and a citizen of **MEXICO**

3. You entered the United States (at)(near) **Unknown Place** on or about **Unknown Date**

4. At that time you entered **without inspection, admission, or parole by an immigration officer.**

5. You are not lawfully admitted for permanent residence.

6. You were, on **January 8, 2009**, convicted in the **Circuit** Court

   **Cook County, IL** for the offense of **Attempted Aggravated Criminal Sexual Ass See I-831**

   in violation of **720 ILCS 5.0(8-4)/12-14(A)(1)**

   for which the term of imprisonment imposed was **fifteen years**.

### Charge:

You are deportable under section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii), as amended, because you have been convicted of an aggravated felony as defined in section 101(a)(43)($U \circ f F$) of the Act, 8 U.S.C. 1101(a)(43)($U \circ f F$).

Based upon section 238(b) of the Act, 8 U.S.C. 1228(b), the Department is serving upon you this NOTICE OF INTENT TO ISSUE A FINAL ADMINISTRATIVE REMOVAL ORDER ("Notice of Intent") without a hearing before an Immigration Judge.

### Your Rights and Responsibilities:

You may be represented (at no expense to the United States government) by counsel, authorized to practice in this proceeding. If you wish legal advice and cannot afford it, you may contact legal counsel from the list of available free legal services provided to you.

You must respond to the above charges in writing to the Department address provided on the other side of this form within 10 calendar days of service of this notice (or 13 calendar days if service is by mail). **The Department must RECEIVE your response within that time period.**

In your response you may: request, for good cause, an extension of time; rebut the charges stated above (with supporting evidence); request an opportunity to review the government's evidence; admit deportability; designate the country to which you choose to be removed in the event that a final order of removal is issued (which designation the Department will honor only to the extent permitted under section 241of the Act, 8 U.S.C. 1231); and/or, if you fear persecution in any specific country or countries on account of race, religion, nationality, membership in a particular social group, or political opinion, or, if you fear torture in any specific country or countries, you may request withholding of removal under section 241(b)(3) of the Act, 8 U.S.C. 1231(b)(3), or withholding/deferral of removal under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture). A grant of withholding or deferral of removal would prohibit your return to a country or countries where you would be persecuted or tortured, but would not prevent your removal to a safe third country.

You have the right to remain in the United States for 14 calendar days so that you may file a petition for review of this order to the appropriate U.S. Circuit Court of Appeals as provided for in section 242 of the Act, 8 U.S.C. 1252. You may waive your right to remain in the United States for this 14-day period. If you do not file a petition for review within this 14-day period, you will still be allowed to file a petition from outside of the United States so long as that petition is filed with the appropriate U.S. Circuit Court of Appeals within 30 calendar days of the date of your final order of removal. *So/U*

| | | |
|---|---|---|
| J 2327 PAULY - SDDO | Chicago, IL | February 6, 2017 10:27 |
| (Signature and Title of Issuing Officer) | (City and State of Issuance) | (Date and Time) |

Form I-851 (Rev. 08/01/07)

ER-174

0062

## Certificate of Service

I served this Notice of Intent. I have determined that the person served with this document is the individual named on the other side of the form

| J 7286 BERNSON    Deportation Officer | March 30, 2017 00:00    In Person |
|---|---|
| (Signature and Title of Officer) | (Date and Manner of Service) |

☑ I explained and/or served this Notice of Intent to the alien in the _____Spanish_____ language.

| (Name of interpreter) | (Signature of interpreter) |
|---|---|

Location/Employer:

**I Acknowledge that I Have Received this Notice of Intent to Issue a Final Administrative Removal Order.**

| RAMIRO GOMEZ | 3/20/17    1120 |
|---|---|
| (Signature of Respondent) | (Date and Time) |

☐ The alien refused to acknowledge receipt of this document.

| _____ | _____ |
|---|---|
| (Signature and Title of Officer) | (Date and Time) |

---

☐ **I Wish to Contest and/or to Request Withholding of Removal**

☐ I contest my deportability because: *(Attach any supporting documentation)*

   ☐ I am a citizen or national of the United States.
   ☐ I am a lawful permanent resident of the United States.
   ☐ I was not convicted of the criminal offense described in allegation number 6 above.
   ☐ I am attaching documents in support of my rebuttal and request for further review.

☐ I request withholding or deferral of removal to _____[Name of Country or Countries]:

   ☐ Under section 241(b)(3) of the Act, 8 U.S.C. 1231(b)(3), because I fear persecution on account of my race, religion, nationality, membership in a particular social group, or political opinion in that country or those countries.
   ☐ Under the Convention Against Torture, because I fear torture in that country or those countries.

| (Signature of Respondent) | (Printed Name of Respondent) | (Date and Time) |
|---|---|---|

---

☑ **I Do Not Wish to Contest and/or to Request Withholding of Removal**

☑ I admit the allegations and charge in this Notice of Intent. I admit that I am deportable and acknowledge that I am not eligible for any form of relief from removal. I waive my right to rebut and contest the above charges. I do not wish to request withholding or deferral of removal. I wish to be removed to

   MEXICO

☑ I understand that I have the right to remain in the United States for 14 calendar days in order to apply for judicial review. I do not wish this opportunity. I waive this right.

| RAMIRO GOMEZ | RAMIRO GOMEZ | 3/30/17    1120 |
|---|---|---|
| (Signature of Respondent) | (Printed Name of Respondent) | (Date and Time) |
| 6870 | Carl Schilling | 3/30/17    1120 |
| (Signature of Witness) | (Printed Name of Witness) | (Date and Time) |

---

### RETURN THIS FORM TO:
### Department Of Homeland Security

DHS-ICE

101 West Congress Parkway

Chicago, IL 60605

**ATTENTION:** The Department office at the above address must **RECEIVE** your response within 10 calendar days from the date of service of this Notice of Intent (13 calendar days if service is by mail).

# ER-175

Form I-851 (Rev. 08/01/07)

# Final Administrative Removal Order

**In removal proceedings under section 238(b) of the Immigration and Nationality Act**

Event No: CHI0901003213

File Number **208 966 351**

Date **February 13, 2017**

To: **RAMIRO GOMEZ-REYES**

Address: **DHS-ICE 101 West Congress Parkway Chicago, ILLINOIS, 60605**
(Number, Street, City, State and ZIP Code)

Telephone: **(312) 347-2400**
(Area Code and Phone Number)

## ORDER

Based upon the allegations set forth in the Notice of Intent to Issue a Final Administrative Removal Order and evidence contained in the administrative record, I, the undersigned Deciding Officer of the Department of Homeland Security, make the following findings of fact and conclusions of law. I find that you are not a citizen or national of the United States and that you are not lawfully admitted for permanent residence. I further find that you have a final conviction for an aggravated felony as defined in section 101(a)(43)(U) of the Immigration and Nationality Act (Act) as amended, 8 U.S.C. 1101(a)(43)(U), and are ineligible for any relief from removal that the Secretary of Homeland Security, may grant in an exercise of discretion. I further find that the administrative record established by clear, convincing, and unequivocal evidence that you are deportable as an alien convicted of an aggravated felony pursuant to section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii). By the power and authority vested in the Secretary of Homeland Security, and in me as the Secretary's delegate under the laws of the United States, I find you deportable as charged and order that you be removed from the United States to:

**Mexico**

or to any alternate country prescribed in section 241 of the Act.

R 1222 EASTERDAY
(Signature of Authorized Official)

SDDO
(Title of Official)

03/27/2017    Chicago, IL
(Date and Office Location)

## Certificate of Service

I served this FINAL ADMINISTRATIVE REMOVAL ORDER upon the above named individual.

3/30/17  1120    Chicago, IL                    In Person
(Date, Time, Place and Manner of Service)

(Signature and Title of Officer)

Form I-851A (Rev. 08/01/07)

ER-176

**NINA B. PAPACHRISTOU**
California State Bar No. 345688
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Nina_Papachristou@fd.org

Attorneys for Defendant
RAMIRO GOMEZ0REYES

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMIRO GOMEZ-REYES,<br><br>Defendant. | CASE NO.:  23-CR-0251-RBM<br><br>Hon. Ruth B. Montenegro<br>Date: April 14, 2022<br>Time: 1:30 p.m.<br><br>**MEMORANDUM OF LAW AND MOTION TO DISMISS PURSUANT TO *ARLINGTON HEIGHTS*** |

## I.    Introduction

Illegal reentry "is the most prosecuted federal offense in America and has imprisoned countless Latinos over the last century."[1] In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect

---

[1] David Gamble Jr., *Opinion: While Nevada Makes anti-racism history, Biden administration pushes back*, Reno Gazette Journal, February 3, 2022 (last accessed February 14, 2022) available at https://www.rgj.com/story/opinion/voices/2022/02/03/opinion-while-nevada-makes-anti-racism-history-biden-administration-pushes-back-gamble/6641501001/.

for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id.* at 1401 n.44.

Like the law in *Ramos*, the laws criminalizing illegal entry and reentry into the United States at 8 U.S.C. §§ 1325 & 1326 have "uncomfortable past[s]" that must be examined. *Id.* Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[2] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[3] They claimed Mexicans were "poisoning the American citizen."[4] They sought to keep the country's blood "white and purely Caucasian."[5] They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[6] Not only did this racism underlie the original versions of §§ 1325 and 1326, the laws have disparately impacted Mexicans and other Hispanic[7] individuals in the century since.

Because the facts and historical evidence presented here show that the original entry and reentry laws were enacted with a discriminatory purpose and still have a disparate impact, § 1326 and § 1325 are presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The

---

[2] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[3] *See infra* at 8, 10, 11, 12, 13, 17.

[4] *See infra* at 15, 17.

[5] *See infra* at 13.

[6] *See infra* at 13–14.

[7] Mr. Gomez-Reyes uses the term "Hispanic," rather than Latino or Latinx, because this term is used by the United States Sentencing Commission to report demographic information. He notes, *supra* n. 1, that in the early 20th century, legislators generally referred to individuals the Sentencing Commission now refers to as "Hispanic" as "Mexican," as a racial category, not nationality.

burden thus shifts to the government to show that Congress would have passed the 1929 laws in the absence of any discriminatory purpose. If the government cannot make this showing, the laws are invalid, and the Court must dismiss the criminal charges against Mr. Gomez-Reyes.

Judge Curiel ruled on a similar issue on December 8, 2020, in *United States v. Rios-Montano*, a § 1325 attempt case. He denied a similar motion in that case because he held that, though the 1929 statute "was enacted with discriminatory intent" the 1990 Congress (who enacted the "attempt" provision in § 1325) did not entertain any discriminatory purpose. 3:19-CR-2123-GPC, Dkt. No. 82, at 2 (emphasis added), *see also* Exhibit O (pdf of the decision for this Court's convenience). Here, however, Mr. Gomez-Reyes is charged with attempted illegal reentry in violation of § 1326. And the 1929 enacted law included attempt language for § 1326. The original language reads:

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony . . . .

Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 1, see Exhibit L (pdf copy of the original law). The reason for Judge Curiel's denial in *Rios-Montano* does not apply to this case as to the felony charge: § 1326, unlike § 1325, is meaningfully the same as it was in 1929 when it "was enacted with discriminatory intent." 3:19-CR-2123-GPC, Dkt. No. 82, at 2. It criminalized, and criminalizes, reentry.

Accordingly:

> The racially discriminatory motives of the legislators who advocated for the original unlawful [re]entry law, which is substantially similar to the provision in force today, as well as the blatant racism that characterized the immigration debate of the early twentieth century more generally, is

relevant to the Court's determination of whether the 101st Congress adopted the current Section 132[6] with a similarly impermissible intent.

*Id.* at 10. So, unlike in *Rios-Montano* before Judge Curiel, here there is a § 1326 charge at issue, and there was no substantive change to § 1326 in 1990 (the adding of attempted entry), like there was in § 1325. Accordingly, even if this Court finds that § 1325 is not tainted, the charge of a violation of 8 U.S.C. § 1326 in the information in this case must be dismissed. And on August 18, 2021, The Honorable Miranda M. Du, Chief District Judge for the District of Nevada, granted a substantially similar motion in *United States v. Carrillo-Lopez*, 20-CR-026-MMD-WGC. 20-CR-026, Dkt. #60; *see also* Exhibit M.

The Court held an evidentiary hearing on February 2, 2021. 20-CR-026, Dkts. ## 48, 49. At the evidentiary hearing in that case:

> The prosecution did not present a single expert to support its position that the law was not motivated by discrimination. In contrast, Gorman [the Federal Public Defender] presented robust evidence in support of her position. Through that evidence Gorman established the racist origins of the 1929 law. She then went further, drawing a through-line linking racism to the 1952 re-codification, showing that the 1929 law and its recodification were motivated by racial animus. Once Gorman had established this, federal prosecutors had to prove that the law would have been passed without racial animus. The government could not do so.[8]

In granting the motion, the Court wrote: "Because Carrillo-Lopez has established that Section 1326 was enacted with a discriminatory purpose and that the law has a disparate impact on Latinx persons, and the government fails to show that Section 1326 would have been enacted absent racial animus . . . the Court will grant the Motion."

---

[8] David Gamble Jr., *Opinion: While Nevada Makes anti-racism history, Biden administration pushes back*, RENO GAZETTE JOURNAL, February 3, 2022 (last accessed February 14, 2022) available at https://www.rgj.com/story/opinion/voices/2022/02/03/opinion-while-nevada-makes-anti-racism-history-biden-administration-pushes-back-gamble/6641501001/.

At a minimum, if the Court believes Mr. Gomez-Reyes has not shown a discriminatory purpose and a disparate impact, it should hold an evidentiary hearing. At this hearing, Mr. Gomez-Reyes will present expert testimony as further evidence of the law's discriminatory origins. The Court should also schedule an evidentiary hearing if the government submits evidence that the Court believes may be sufficient to rebut Mr. Gonzalez-Reyes's evidence. But if the government does not attempt to rebut his evidence, or cannot do so, the law is unconstitutional, and the Court must dismiss the information.

## II.    Argument

### A. Legal framework

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g., Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Gomez-Reyes challenges § 1326 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id.* at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of

relevant factors to consider in this determination, including:

    (1)    the impact of the official action and whether it bears more heavily on one race than another;

    (2)    the historical background of the decision;

    (3)    the specific sequence of events leading to the challenged action;

    (4)    the [legislature's] departures from normal procedures or substantive conclusions; and

    (5)    the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id.* at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471

U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id.* at 231.

Similarly, this Court applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican-American Studies program in the Tucson school district. *See Arce v. Douglas*, 793 F.3d at 981. During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples." *Id.* at 978. Finding that such comments created a genuine issue of material fact as to whether the law was "motivated, at least in part, by an intent to discriminate against [Mexican-American Studies] students," the Court reversed the district court's grant of summary judgment and remanded for a full trial. *Id.* at 981.

Most recently, an en banc panel of the Ninth Circuit applied *Arlington Heights* in the context of the Voting Rights Act to strike down a state law criminalizing third-party ballot collection. *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc). The Court looked to the law's legislative history and the events leading up to its passage, including a "racially tinged" video made by the chairman of the county's Republican party that was widely distributed on social media. *Id.* at 1009. It also considered "unfounded and often farfetched allegations" of ballot collection fraud by a state senator who was "one of the major proponents" of the law and "influential in" its passage. *Id.* at 1009, 1039 (quotations omitted). While the Court found that some

lawmakers had voted in favor of the law due to a "sincere, though mistaken, non-race-based belief" in voting misconduct, it concluded that this belief was "fraudulently created" by the senator's misrepresentations and the "racially tinged" video. *Id.* at 1040. Citing the "'cat's paw' doctrine,"[9]—which holds that even the votes of "well meaning legislators" can contain a discriminatory intent if based on "false and race-based allegations" of other legislators—the Court invalidated the law. *Id.* at 1041.

These cases show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups.[10] As Mr. Gomez-Reyes will show, the same analysis is warranted here.

§ 1326 to an equal (or even greater) degree.

## B. Congress enacted illegal entry and reentry with a discriminatory purpose.

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality.

## C. Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal entry and reentry laws.

A close examination of the political context underlying the criminalization of illegal reentry and entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the *primary* factor.

/ / /

/ / /

---

[9] The "cat's paw" doctrine is "based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey." *Id.* at 1040.

[10] Courts apply strict scrutiny to the question of whether a law was "motivated by a racial purpose or object" under *Arlington Heights. See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

1. **"The historical background of the decision."**

Historians often refer to the 1920s as the "Tribal Twenties"—a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[11] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[12] and "the 'contamination' of Anglo-American society."[13]

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[14] Many politicians, especially those popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Exh. A, Hernández declaration, at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[15] During the remainder of the decade, legislators aimed for "'America [to] cease to be the "melting pot."'"[16] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[17]

---

[11] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[12] *Id.* at 23.

[13] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[14] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).

[15] Emergency Immigration Act of 1921, Pub.L. 67-5, 42 Stat. 5 (1921).

[16] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).

[17] Hernández, *supra*, at 28.

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[18] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[19] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[20] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[21]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[22] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[23] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit B, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4 , pp. 2, 3 (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[24]

---

[18] Yang, *supra*, at 35.

[19] *Id.* at 8.

[20] Okrent, *supra*, at 3.

[21] *Id.* at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[22] Ngai, *supra*, at 24.

[23] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

[24] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).

2. **"The specific sequence of events leading to the challenged action."**

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[25] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska.[26] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[27]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[28] These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Exh. A, Hernández declaration, at 3. As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit C, Representative Box (TX). "Deportation of Aliens."

---

[25] Ngai, *supra*, at 24–25.

[26] *Id.* at 26.

[27] *Id.* at 35.

[28] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

1   *Congressional Record*, (Feb. 16, 1929) p. H3619.

2      So despite passing the most sweeping immigration law in years, legislators were

3 not happy. Representative Madden grumbled that the bill "leaves open the doors for

4 perhaps the worst element that comes into the United States—the Mexican peon."[29]

5 Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants,

6 stating that "the average Italian is as much superior to the average Mexican as a full-

7 blooded Airedale is to a mongrel." Exhibit D, Representative O'Sullivan,

8 "Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900. Legislators

9 "proposed bill after bill" restricting Mexican immigration but none could survive

10 opposition from southwestern growers. Exh. A, Hernández declaration, at 5. To solve

11 this problem, a group of key figures began to strategize a new type of immigration bill

12 that would approach immigration from a criminal—rather than a civil—angle.

13     **3.**     **"The relevant legislative or administrative history."**

14      After passage of the National Origins Act of 1924, the Department of Labor

15 (which governed the Bureau of Immigration) began implementing Congress's new

16 quota system.[30] Then-Secretary of Labor James Davis was a strong advocate of

17 Dr. Laughlin and his eugenics theories—even using them as the basis for policies he

18 had developed and published under the title "Selective Immigration or None."[31] Davis

19 warned that the "rat type" was coming to the United States, and that these "rat men"

20 would jeopardize the American gene pool.[32]

21      Secretary Davis was nevertheless torn between his belief in eugenics and his

22 responsibility to maintain a large labor supply for the railroad and agriculture

23 industries.[33] So together with devout racist (and suspected Ku Klux Klan member)

24

25 [29] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

26 [30] *See* Vought, *supra*, at 174–79.

27 [31] *Id.*

  [32] *Id.* at 174–75.

28 [33] *Id.* at 216.



Senator Coleman Blease,[34] Davis developed a compromise—Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[35] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[36] The southwest growers were in agreement—as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exh. A, Hernández Declaration, at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18. In one speech at an immigration conference, Rep. Box had explained that:

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id.* Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exh. C at H3619.

---

[34] For biographical and historical context about Senator Blease, *see* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206.

[35] Ian MacDougall,, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

[36] *Id.*

23CR0251-RBM

**ER-189**

1    Box was joined by the influential Chairman of the House Immigration and

2    Naturalization Committee, Representative Albert Johnson of Washington. Chairman

3    Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—

4    was an "energetic and vehement racist and nativist."[37]   He headed the Eugenics

5    Research Association, a group that opposed interracial marriage and supported forced

6    sterilizations.[38] He also proudly described his 1924 law as a "bulwark against 'a stream

7    of alien blood, with all its inherited misconceptions respecting the relationships of the

8    governing power to the governed.'"[39] Within two years of the 1924 Act, Chairman

9    Johnson turned to legislation that would exclude the "Mexican race," explaining that

10   while the argument for immigration restriction had previously been economic, now

11   "'the fundamental reason for it is biological.'"[40]

12    Following the lead of these legislators, other lawmakers soon "turned to

13   narratives of racial threat to justify restriction."[41] In 1928, for instance, Representative

14   Robert A. Green of Florida delivered a radio speech (later read into the congressional

15   record by Representative Lankford) that advocated for Western Hemisphere quotas.

16   He asserted that countries south of the United States are "composed of mixture blood

17   of White, Indian, and negro." Exhibit F, Representative Lankford. "Across the

18   Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these

19   countries, he believed, created a "very great penalty upon the society which

20   assimilates," and put it at a disadvantage to countries that have "kept their blood white

21   and purely Caucasian." Exh. F, at H2462.

22

23

24   [37] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43

25   (2002).

     [38] *Id.*

26

     [39] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

27

     [40] Okrent, *supra*, at 3.

28   [41] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

1   Chairman Johnson soon convened hearings on new immigration legislation. *See*
2   Exhibit G, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong.
3   69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter
4   from a constituent in El Paso who urged the legislators to keep out "the scoff and
5   scum, the mongrel, the bootlegger element, from Mexico." Exh. G, at 30. In response
6   to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is
7   right." *Id.* Rep. Box added, "I have some letters, Mr. Chairman, just like that." *Id.*

8   The following month, the same House committee held a hearing on "The
9   Eugenical Aspects of Deportation," where the principal witness was the well-known
10  eugenicist Dr. Laughlin. Exh. B, at 1. Early in the hearing, Chairman Johnson praised
11  Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and
12  fecundity, describing one as a "priceless" resource that would "bear intimately on
13  immigration policy." Exh. B, at 3.

14  Dr. Laughlin testified about his latest eugenics report, the goal of which was to
15  "protect American blood from alien contamination." Exh. B, at 3. When Dr. Laughlin
16  encouraged the committee to conduct future research on the effect of "race crossing
17  within the United States," Chairman Johnson replied that such a study would "be of
18  great use to the committee in its deliberations." Exh. B, at 11.

19  Dr. Laughlin discussed the need for further research into "mate selection,"
20  because "whenever two races come in contact there is always race mixture" even
21  though the "upper levels tend to maintain themselves because of the purity of the
22  women of the upper classes." Exh. B, at 19. The job of any government, Dr. Laughlin
23  explained, was to "demand fit mating and high fertility from the classes who are better
24  endowed physically, mentally, and morally by heredity." Exh. B, at 19. By deporting or
25  excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration
26  control is the greatest instrument which the Federal Government can use in promoting
27  race conservation of the Nation." Exh. B, at 19.

28

1    In response, Chairman Johnson advocated for Congress's use of the "principle

2    of applied eugenics" to "do everything possible" to reduce crime by "debarring and

3    deporting" more people. Exh. B, at 25. Rep. Box agreed, stating, "we will have to

4    control immigration to suit our own needs or we will lose our national character,"

5    which would "spell destruction for the future of America." Exh. B, at 25.

6    Dr. Laughlin even compared the drafters of deportation laws to "successful

7    breeders of thoroughbred horses," who would never consider "acquiring a mare or a

8    stallion not of the top level" for their "stud farm." Exh. B, at 44. One such successful

9    breeder he knew "weeds out from the lower levels and recruits by purchase"—a

10   process that is "analogous to immigration in man." Exh. B, at 44–45. "Man is an

11   animal," Dr. Laughlin explained, "and so far as heredity and future generations are

12   concerned, there is considerable real basis for [this] comparison." Exh. B, at 45.

13   When such racial engineering is not possible, Dr. Laughlin warned, deportation

14   of the "undesirable individual" becomes even more critical; otherwise, "we cannot get

15   rid of his blood no matter how inferior it may be, because we cannot deport his

16   offspring born here." Exh. B, at 45. Dr. Laughlin predicted that so long as the nation's

17   borders remained open to immigrants, "there will always be need for deportation, or

18   the 'final selection.'" Exh. B, at 44. In response to this testimony, Chairman Johnson

19   agreed that "[i]mmigration looks more and more like a biological problem, and if the

20   work of this committee results in establishing this principle in our immigration policy

21   we will be well repaid for our efforts." Exh. B, at 46.

22   Though Chairman Johnson's initial legislation failed, the compromise with the

23   agricultural industry brokered by Secretary Davis and Senator Blease soon made a

24   breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate

25   Committee on Immigration, submitted a report to the full Senate recommending

26   passage of a law that would penalize "aliens who have been expelled from the United

27   States and who reenter the country unlawfully." Exhibit H, S. Rep. No. 1456, at 1

28   (1929). This report was accompanied by a letter from Secretary Davis on behalf of the

1    Department of Labor advocating for passage of the law. Exh. H, at 2.

2         The following week, Senator Blease presented this bill on the Senate floor,

3    where he reported that Chairman Johnson had "asked me to get the measures over to

4    the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC).

5    *Congressional Record* (Jan. 23, 1929) p. S2092. The full Senate passed the bill with almost

6    no discussion or debate. Exh. I, at S2092. Two weeks later, Chairman Johnson

7    submitted a report from the Committee of Immigration and Naturalization to the full

8    House recommending passage of the illegal reentry law. Exhibit J, S. Rep. No. 2397

9    (1929).

10        During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans

11   "come into Texas by hordes" and that "my friend Judge Box has been making a just

12   fight against this situation for years." Exh. C, Cong. Rec. 1929. Rep. Blanton urged the

13   House to "apprehend the thousands of these Mexicans who are in Texas now

14   unlawfully and put them back across the Rio Grande and keep them there." Exh. C,

15   Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929) p. H3619.

16   Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and

17   Rep. Blanton challenged others to visit the international ports of entry in Texas to see

18   the "hordes that come across the bridges with no intention of ever going back." Exh.

19   C, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans

20   were "poisoning the American citizen" because they are "of a class" that is "very

21   undesirable." Exh. C, Representative Fitzgerald, "Deportation of Aliens." *Congressional*

22   *Record* (1929) p. H3620.

23        Minutes later, the bill passed the House of Representatives. Exh. C, H3621. The

24   president signed it into law three days later. Exhibit L, 70th Cong., Sess. II, Chap. 690,

25   Mar. 4, 1929.

26        This legislative history easily clears the low threshold of showing that racism

27   and eugenics were a "motivating factor" under the first three factors. Like other

28   *Arlington Heights* cases, passage of the racially-motivated law followed a predictable

---

pattern. A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. *Compare Democratic National Committee*, 948 F.3d at 1009 (local Republican chair widely shared a "racially tinged" video suggesting Hispanics were involved in ballot fraud). Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare id.* (state senator repeated "unfounded and often farfetched allegations" of ballot fraud); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments. *See id.* And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. *Compare Democratic National Committee*, 948 F.3d at 1041 (invoking the "cat's paw doctrine). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—if not exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

### 4. "The legislature's departures from normal procedures or substantive conclusions."

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g., Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the

zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[42] illegal entry and reentry remain two of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exh. C, at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Exh. C, at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

---

[42] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

ER-195

MOTION TO DISMISS PURSUANT TO ARLINGTON HEIGHTS

5. **"The impact of the official action and whether it bears more heavily on one race than another."**

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[43] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[44] And the number of prosecutions has soared—since 2008, annual prosecutions for § 1325 have typically hovered around 50,000 or 60,000.[45] In the last three years, the number of § 1326 cases has risen by nearly 40% to 22,077,[46] making illegal reentry one of the most common federal felonies today.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

**D. New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's constitutionality.**

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality. In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*).

---

[43] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[44] Hernández, *supra* n. 6, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.

[45] "§ 1325 Defendants Charged (Annual)," Executive Office for United States Attorneys, *available at:* https://www.justice.gov/opa/press-release/file/1210896/download.

[46] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

1   Although Justice Alito argued in his dissent that both states later recodified their non-
2   unanimity rules with no mention of race, the majority rejected the notion that this
3   cured the laws' original animus, holding that if courts must "assess the functional
4   benefits" of a law, they cannot "ignore the very functions those rules were adopted to
5   serve." *Id.* at 1401 n.44. Nor could the justices' "shared respect for rational and civil
6   discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.*
7   (citation and quotations omitted).

8        Two months later, the Supreme Court struck down a Montana law prohibiting
9   families from using state-sponsored scholarships at religious schools. *See Espinoza v.*
10  *Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020). The majority relied on the law's
11  "checkered tradition" of underlying religious discrimination, even though it was
12  reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259.

13       Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that
14  courts cannot examine impermissible motives underlying the original version of a law
15  where states have "readopted their rules under different circumstances in later
16  years." *Id.* at 2268 (quotations omitted). Justice Alito then stated, "But I lost, and *Ramos*
17  is now precedent." *Id.* Justice Alito then provided an extensive history of the anti-
18  Catholic and anti-immigrant motives underlying Montana's law, concluding that
19  "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-
20  aid provision for benign reasons. The provision's 'uncomfortable past' must still be
21  'examined.'" *Id.* at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

22       Here, the original law codified in the Undesirable Aliens Act of 1929
23  criminalizing illegal entry and reentry has been reenacted several times, most notably
24  in the Immigration and Nationality Act of 1952.[47] But *Ramos* and *Espinoza* both

25
26  [47] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a),
27  Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059;
    Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§
28  401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III,
    §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to

ER-197

1  confirm that not only do courts examine the racial motivations of a law at the time of
2  its passage, later reenactments do not cleanse the law of its original taint.

3      The government may also argue that even if racism and eugenics were a
4  "motivating factor" in the original passage of § 1326 and § 1325, the law currently
5  serves other legitimate purposes. But laws enacted with a discriminatory purpose
6  cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See*
7  *Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the
8  succeeding 80 years had legitimated" a racially motivated disenfranchisement
9  provision). Rather, when a court determines that a law's "original enactment was
10  motivated by a desire to discriminate . . . on account of race and the section continues
11  to this day to have that effect," the court must conclude that the law "violates equal
12  protection under *Arlington Heights*." *Id.*

### E. The 1952 Reenactment Could Not Have and Did Not Cure the 1929 Law From its Unconstitutional Taint

15      The government will likely argue that, even if *Arlington Heights* applies, the
16  "challenged action" is the 1952 INA, not the 1929 INA. But neither Ninth Circuit nor
17  Supreme Court precedent allows a reenactment to cure discrimination from an earlier
18  passage of a law.

19      The Supreme Court actually addressed this question in *Hunter v. Underwood*, 471
20  U.S. 222, 227 (1985). Delegates at the 1901 Alabama constitutional convention wrote
21  a provision denying the right to vote to people convicted of certain crimes, specifically
22  crimes that they believed were "more frequently committed by blacks." Id. Writing for
23  a unanimous court, Justice Rehnquist held that that provision was unconstitutional
24  under *Arlington Heights*, even though its defenders argued that subsequent edits to the
25  list of crimes in the last 80 years had "legitimated the provision." *Id.* At 233. The

---

27  3009-620, 3009-629.



1    Hunter Court held that these changes to the statute were irrelevant. *Id.* The Court

2    noted that it was not deciding whether the provision "would be valid if enacted today

3    without any impermissible motivation[,]" instead, the Court held that the original

4    enactment "was motivated by a desire to discriminate against blacks[,]" "continues to

5    this day to have that effect[,]" and thus "violate[d] equal protection under *Arlington*

6    *Heights.*" *Id.*

7         *Hunter* was reaffirmed in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). In Abbott, the

8    Supreme Court refused to consider the legislature's racial motives behind a 2013

9    redistricting map that had been repealed and replaced with a court-approved version.

10   *Id.* at 2325. Abbott declined to rely on Hunter because it was a "very different

11   situation" where the discriminatory provision was "never repealed." *Id.* Though time

12   had "pruned" the list of disqualifying offenses in *Hunter*, "the amendments *did not alter*

13   the intent with which the article, including the parts that remained, had been adopted."

14   *Id.* (emphasis added).

15   **F. No reenactment has meaningfully altered § 1326 or grappled with its**

16   **racially-motivated origins.**

17        Congress has never meaningfully debated or confronted the history behind

18   illegal reentry, nor has it ever consciously reenacted it for non-racial reasons.

19   Congresses recodification of illegal reentry in the McCarran-Walter Act of 1952

20   contained no direct debate or discussion of the 1929 law – the Senate Report for the

21   1952 reenactment outlines the continuity between the two laws, recommending that

22   the "the present act of March 4, 1029, should be reenacted" in the new version and its

23   provisions "carried forward." The Immigration and Naturalization Systems of the

24   United States, S. Rep. No. 81-1515, 655, 656 (1950).

25        Congress's failure to confront the racially-discriminatory reasons for enacting §

26   1326 is not surprising given that the statute has undergone little change in the last

27   century. *See Abbott*, 138 S. Ct. at 2316 (declining to consider the legislature's original

28   motive because the provision had been "substantially changed" and "markedly

**ER-199**

altered"). The 1929 version of illegal reentry stated that if a noncitizen has been "arrested and deported in pursuance of law" and later "enters or attempts to enter the United States," they "shall be guilty of a felony" and be "punished by imprisonment for not more than two years." Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929). Similarly, the current version states that if a noncitizen has been "denied admission, excluded, deported, or removed" and later "enters, attempts to enter, or is at any time found in, the United States," they shall be "imprisoned not more than two years." 8 U.S.C. § 1326(a). These versions "bear substantially similar language" to one another. *United States v. Rizo-Rizo*, 16 F.4th 1292, 1298 (9th Cir. 2021). Aside from minor clarifications,[48] the statute criminalizes the same core conduct it did in 1929—returning to the U.S. after a prior deportation.

For instance, Congress never criminalized (in § 1326 or elsewhere) entering the U.S. on a visa and staying beyond the permitted time period. 1-ER-10. Yet visa overstays now outnumber border crossers two-to-one as a percentage of the newly-undocumented population.[49] Even after the attacks of 9/11—perpetrated by individuals who came legally on visas and overstayed[50]—Congress never updated the statute to criminalize conduct that poses a *greater* threat to national security than unlawfully crossing the border.[51] This legislative inertia suggests that Congress has

---

[48] The current version also includes reentries that occur when an order of removal is outstanding and exempts people who have either obtained, or need not seek, consent to reenter. *See* 8 U.S.C. § 1326(a). Though the 1952 Congress removed language requiring that the noncitizen be "deported in pursuance of law," the Supreme Court then held that a deportation must "comport with the constitutional requirement of due process." *United States v. Mendoza-Lopez*, 481 U.S. 828, 835, 837 (1987).

[49] Richard Gonzales, For 7th Consecutive Year, Visa Overstays Exceeded Illegal Border Crossings, NPR (Jan. 16, 2019, 7:02 PM), https://www.npr.org/2019/01/16/686056668/for-seventh-consecutive-year-visa-overstays-exceeded-illegal-border-crossings.

[50] *See* "From the 9/11 Hijackers to Amine El-Khalifi: Terrorists and the Visa Overstay Problem," Before the Subcomm. On Border and Maritime Security of the H. Comm. on Homeland Sec., 112th Cong. 1 (2012) (noting that several of the 9/11 hijackers overstayed their visas and that "[e]ntering a country and overstaying a visa has been the preferred method for terrorists actually to enter our country"),

https://www.govinfo.gov/content/pkg/CHRG-112hhrg76600/html/CHRG-112hhrg76600.htm.

[51] *See* "Visa Overstay Tracking: Progress, Prospects and Pitfalls," Before the Comm. On Homeland

1    never meaningfully considered the intent behind § 1326, nor adopted it for non-
2    discriminatory reasons.

3          Constitutional scholars agree that a discriminatory taint continues to infect §
4    1326. As one explained, the "operative core" of the law has been "carried forward
5    functionally unchanged." W. Kerrel Murray, Discriminatory Taint, 135 Harv. L. Rev.
6    1192, 1252, 1253 (2022). "Congress's reenactments have neither specifically referenced
7    the 1929 law nor engaged with the risks of perpetuating a plausibly discriminatory
8    past." Id. at 1252–53. What's more, "no intervening event" has "cut[] the continuity
9    chain," and "the mere passage of time is insufficient, as is the mere presence of
10   intervening reenactment." Id. at 1252.

11         And the Ninth Circuit has relied on the legislative history surrounding the
12   original version of illegal reentry to determine congressional intent. In Rizo-Rizo, the
13   Court pointed to the "legislative history" of § 1326's "precursor statute" to interpret
14   the lesser-included offense of misdemeanor § 1325—despite its later reenactment. 16
15   F.4th at 1298. And in United States v. Corrales-Vazquez, 931 F.3d 944, 947 (9th Cir. 2019),
16   the Court discussed the origins of the lesser included offense of § 1325 and Congress's
17   "minimal alteration" of the statute in 1952. Had this reenactment rendered the history
18   surrounding the 1929 version of the statute irrelevant, it would have made no sense
19   for the Court to consider it in these cases.

20   **G. Discriminatory intent also motivated the reenacted version of illegal**
21   **   reentry.**

22         The 1952 Congress, as a factual matter, did not simply fail to repudiate racial
23   animus. They chose to recodify and make harsher illegal reentry at the same time as
24   they expanded grounds for deportation and limited discretionary relief from
25   deportation. They did so over a presidential veto. And the same Congress also passed,
26   a few months earlier, a discrete piece of alien harboring legislation known as the

27   ───────────────
28   Sec., 111th Cong. 1 (2010)
     https://www.cfr.org/sites/default/files/pdf/2010/03/AldenTestimony3.25.2010.pdf.

**ER-201**
MOTION TO DISMISS PURSUANT TO ARLINGTON HEIGHTS

1   "Wetback Bill" that exempted employers from prosecution. Exempting employers,

2   who incentivize illegal immigration and are vastly more responsive to deterrence than

3   impoverished and uneducated Mexican workers, in the same proverbial breath as

4   reenacting illegal reentry, and with full knowledge of the disparate impact of illegal

5   reentry on Mexican migrants, is among the many factors demonstrating racial animus

6   was a motivating factor for the 1952 Congress.

7       In *Carrillo-Lopez,* following a day-long evidentiary hearing, the district court

8   explicitly ordered post-hearing briefing on the question of "whether the racial animus

9   motivating the Act of 1929 tainted the statute's reenactment in 1952[.]" *United States v.*

10  *Carrillo-Lopez,* 2021 WL 3667330, *9, n.18 (D. Nev. Aug. 18, 2021). The district court

11  then concluded that race remained a "motivating factor" in the 1952 reenactment. *Id.*

12  at *10 –18. The district court relied on a historian's testimony regarding Congress's

13  willingness to remain silent, and how that silence was particularly telling given that

14  President Truman vetoed the Immigration and Nationality Act on the basis that it "

15  'continue[d], practically without change' discriminatory practices first enacted in 1924

16  and 1929." *Id.* at *12 (quoting Truman's veto statement).

17      Furthermore, Deputy Attorney General Peyton Ford wrote a letter to Congress

18  in support of the law that used the "racially derogatory term 'wetback'" and proposed

19  expanding the law to include people "found in" the U.S. *Id.* at *13. Not only did this

20  reflect "the racial environment and rhetoric in 1952 … specifically with regard to

21  Mexican . . . people," it was also "the only recommendation adopted by Congress" and

22  "the only substantive change" to § 1326. *Id.* Indeed, "the same Congress during the

23  same time frame" passed a law known as the "Wetback Bill," which was "aimed strictly

24  at Mexicans" and debated with frequent use of that racial slur. *Id.* at *14.

25      In the Eastern District of Washington, Judge Peterson held an evidentiary

26  hearing that was focused, for large parts, on this exact question. A historian, S.

27  Deborah Kang, an Associate Professor in the Department of History at the University

28  of Virginia, testified about the legislative history of the 1952 reenactment and the more

modern amendments. Exhibit P, Transcript, *United States v. Munoz-De La O*, 2:20-CR0134-RMP. With regard to the 1952 reenactment, Dr. Kang testified that the McCarren-Walter Act was passed on the landscape of the forced repatriation drives of the 1930s and the Bracero Program that began in 1942. Exh. P at 25–33. She testified about hearings on the Senate floor between senators and INS where it is clear that what the bill was intended to do was continue the compromise, which began in 1929, between southwestern agribusiness, who wanted cheap and exploitable labor from Mexico, and nativists, who wanted to expel those of Mexican descent. Exh. P at 32–33, 38–40. She testified that, in her opinion, "Congress would not have recodified 1326 were it not for racial animus." Exh. P at 45. She testified that her opinion was based on "the pervasive racial animus of the times, [and] the racial animus that was expressed during the debates over the act." Exh. P at 45. In short: the 1929 and 1952 Acts are the same Act, and the reenactment cannot cure the discrimination that motivated the passage of the 1929 law. But even if it could, the 1952 law is also infected with the same discrimination.

## H. Disparate impact need not reflect discrimination from modern-day law enforcement.

To show disparate impact, Mr. Gomez-Reyes does not need to show that the law is being applied unfairly. Disparate impact requires a party to show only that a law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). This analysis is purely mathematical and does not require the disparity to be motivated by *current* discrimination against the targeted group. *See Hunter*, 471 U.S. at 233 (requiring only that the "*original* enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect") (emphasis added).

The Supreme Court's recent DACA decision does not hold to the contrary. In *Regents*, 140 S. Ct. at 1915, a plurality noted that one source of "[p]ossible evidence" of a discriminatory intent was a provision's "disparate impact on a particular group[.]"

**ER-203**

1    To show that a discriminatory intent motivated DACA's rescission, the respondents

2    cited the "disparate impact of the rescission on Latinos from Mexico, who represent

3    78% of DACA recipients[.]" *Id.* While *Regents* held that this fact was not "sufficient"

4    to prove a discriminatory intent in that case, it did not hold that it was irrelevant. *Id.* at

5    1915–16.

6        Here, the U.S. Sentencing Commission reports that over 99% of the people

7    convicted of illegal reentry in 2021 were Hispanic.[52] This statistic is 22% higher than

8    the percentage of Hispanics in the undocumented population as a whole,[53] an

9    overrepresentation suggesting that § 1326 reaches a disproportionately high number

10   of people from the racial group it was created to harm. The attached chart is based

11   upon the northern border only, and shows that there is, in fact, a disparity in

12   prosecutions based on race. In other words, the fact that Mexico borders the U.S. does

13   not erase the disparate impact of illegal reentry—it shows that the law is working

14   precisely as the 1929, and 1952, legislators intended. Thus, contrary to the district

15   court's belief, evidence of disparate impact need not be motivated by animus to be

16   relevant to a finding of discriminatory intent.

17   **III.    Sections 1326 and 1325 continue to disparately impact Latine**

18   **defendants.**

19       *Arlington Heights* requires challengers to show that a law was enacted with a

20   discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265.

21   Here, not only were racism and eugenics a discriminatory purpose motivating the

22   enactment of the first border crossing laws, such laws continue to disparately impact

23   Hispanic defendants.

24

25

26   [52] United States Sentencing Commission, Quick Facts Illegal Reentry Offenses, Research and
     Publications (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-
27   publications/quick-facts/Illegal_Reentry_FY21.pdf.

28   [53] *Profile of the Unauthorized Population: United States,* Migration Policy Institute (2019),
     https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

1      In fiscal year 2021, of the 15,755 illegal reentry cases reported, 99% of the
2  defendants were Hispanic.[54] In FY 2020, of the 23,759 illegal reentry cases reported,
3  99.1% of the defendants were Hispanic.[55] In FY 2019, of the 22,077 illegal reentry
4  cases reported, 99% of the defendants were Hispanic.[56] In FY 2018, of the 18,241
5  illegal reentry cases reported, 98.8% of the defendants were Hispanic.[57] In FY 2017,
6  of the 15,767 illegal reentry cases reported, 98.9% of defendants were Hispanic.[58] In
7  FY 2016, of the 15,744 illegal reentry cases reported, 98.7% of the defendants were
8  Hispanic.[59] In FY 2015, of the 15,715 cases reported, 98.7% of defendants were
9  Hispanic.[60] In FY 2014, of the 16,556 cases reported, 98.3% of defendants were
10  Hispanic.[61] In FY 2013, out of 18,498 illegal reentry cases reported, 98.1% of
11  defendants were Hispanic.[62]

12  _____

13  [54] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2021),
14  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY21.pdf (last accessed September 12, 2022).

15  [55] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2020),
16  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf (last accessed September 12, 2022).

17  [56] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2019),
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf (last accessed September 12, 2022).

18  [57] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2018),
19  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY18.pdf (last accessed September 12, 2022).

20  [58] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2017),
21  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY17.pdf (last accessed September 12, 2022).

22  [59] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2016),
23  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY16.pdf (last accessed September 12, 2022).

24  [60] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2015)
25  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Illegal_Reentry_FY15.pdf (last accessed September 12, 2022).

26  [61] United States Sentencing Commission Quick Facts, "Illegal Reentry" (FY 2014)
27  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick-Facts_Illegal-Reentry_FY14.pdf (last accessed September 12, 2022).

28  [62] United States Sentencing Commission Quick Facts "Illegal Reentry" (FY 2013)
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

1     Overall, these disparities are comparable to disparities that have supported

2 other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at

3 497 (concentrating most low-income housing in neighborhoods that are 75%

4 Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of

5 Mexican or other Hispanic origin); *Community Improvement*, 583 F.3d at 704 (excluding

6 71% Latino areas from benefits, while extending those benefits to other areas that

7 were only 48% Latino).

8     The executive branch continues to wield § 1326 as a tool of mass prosecution

9 that disproportionately affects Mexican and other Hispanic immigrants. In April 2018,

10 then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting

11 illegal entry.[63] The following month, Sessions made clear at an address delivered in San

12 Diego that "the Department of Homeland Security is now referring 100 percent of

13 illegal Southwest Border crossings to the Department of Justice for prosecution. And

14 the Department of Justice will take up those cases."[64]

15     Both Sessions and Stephen Miller, a senior policy advisor to President Trump

16 and the architect of the zero-tolerance policy,[65] have drawn inspiration from the

17 discriminatory immigration laws of the 1920s. In a series of leaked emails, Miller lauded

18 the immigration policies of this era, suggesting to a journalist, "This would seem a

19 good opportunity to remind people about the heritage established by Calvin Coolidge,

20

21

22 facts/Quick_Facts_Illegal_ReentryFY13.pdf (last accessed September 12, 2022).

23 [63] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at*: https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

24 [64] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

25

26

27 [65] *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

28

which covers four decades of the 20th century"—i.e., the decades between the 1924 Act and its repeal in 1965.[66] Likewise, in a 2015 interview with Breitbart, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that when immigration levels were "about this high in 1924," the President and Congress "changed the policy, and it slowed down immigration significantly."[67] He warned that repeal of those policies in 1965 had primed the country for a "surge far past what the situation was in 1924."[68]

This evidence demonstrates that § 1326 has disparately impacted Hispanic immigrants and continues to do so today. Combined with Mr. Gonzalez-Reyes's showing that racial discrimination was a "motivating factor" in its passage, he has satisfied his initial burden under *Arlington Heights* to demonstrate that the laws violate equal protection.

## IV. The burden of proof shifts to the government.

Because Mr. Gomez-Reyes has shown both a discriminatory purpose and a disparate impact underlying § 1326 and § 1325, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor"). The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr.

---

[66] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[67] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[68] *Id.*

Gomez-Reyes has not yet shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *Democratic National Committee,* 948 F.3d at 998 (referencing ten-day bench trial); *Arce,* 793 F.3d at 991. Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights. Hunt*, 526 U.S. at 545. At the end of this hearing, if the government has not carried its burden to show that the crime of illegal reentry would have been enacted without a racially discriminatory motive, the Court must dismiss the charges.

Respectfully submitted,

Dated: March 31, 2022

*s/ Nina B. Papachristou*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
Ramiro Gonzalez-Reyes

ER-208

**NINA B. PAPACHRISTOU**
California State Bar No. 345688
**Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
_____Retained     __X__Appointed

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

PRESIDING JUDGE Hon. Ruth Bermudez Montenegro  COURT   REPORTER   ECR/Adrian Baule

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.  3:23-cr-00251-RBM |
| (Appellee/Respondent) Plaintiff, | ) | |
| | ) | |
| v. | ) | **NOTICE OF APPEAL** |
| | ) | **(CRIMINAL)** |
| **Ramiro Gomez-Reyes,** | ) | |
| (Appellant/Petitioner) Defendant. | ) | |
| _____ | ) | |

Notice is hereby given that Ramiro Gomez-Reyes, appellant/petitioner above-named, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the:

(X) Final Judgment

(  ) Sentence Only (18 U.S.C. § 3742) Sentence Imposed _____.

(  ) Order (Describe): _____.

entered in this proceeding on the 26th day of January 2024.

DATED:     February 9, 2024                    /s/ Nina B. Papachristou
                                               **Nina B. Papachristou**

Transcripts Required**   __x__Yes     _____No    Date Ordered _____.

Date (    ) Indictment    (  ) Information   (    )   Filed:
Bail Status  In Custody .

Will there be a request to expedite the appeal and set a schedule faster than that normally set?
Yes _____No __X___ (NOTE:  This does not alleviate requirement of filing a motion to expedite which must be done in accordance with FRAP 27.)

*Pursuant to Fed. R. Crim. P. 32(a)(2), the defendant may request the clerk to prepare and file the Notice of Appeal.
**If transcript required, transcript order form (CA9-036) must be completed and court reporter contacted to make arrangements for transcription.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>     v.<br><br>RAMIRO GOMEZ-REYES,<br><br>                    Defendant. | Case No.: 23-cr-0251-LAB<br><br>I N F O R M A T I O N<br><br>Title 8, U.S.C., Sec. 1326(a) and (b) - Attempted Reentry of Removed Alien (Felony) |

The United States Attorney charges:

On or about January 17, 2023, within the Southern District of California, defendant RAMIRO GOMEZ-REYES, an alien, knowingly and intentionally attempted to enter the United States of America with the purpose, i.e., conscious desire, to enter the United States without the express consent of the Attorney General of the United States or his/her designated successor, the Secretary of the Department of Homeland Security, after having been previously excluded, deported and removed from the United States, and not having obtained said express consent to reapply for admission thereto; and committed an overt act, to wit, crossing the border from Mexico into the United States, that was a substantial step towards committing the offense, all in violation of Title 8, United States Code, Section 1326(a) and (b).

//

JAG:cd:1/27/2023

ER-210

1    It is further alleged that defendant was removed from the United

2 States subsequent to January 8, 2009.

3    DATED:  ___1/27/2023_____.

4                                    RANDY S. GROSSMAN
                                     United States Attorney
5

6

7                                    JASON A. GORN
                                     Assistant U.S. Attorney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPEAL,CLOSED,BRADY

# U.S. District Court
## Southern District of California (San Diego)
## CRIMINAL DOCKET FOR CASE #: 3:23−cr−00251−RBM All Defendants

Case title: USA v. Gomez−Reyes

Magistrate judge case number:  3:23−mj−00159−DDL

Date Filed: 02/16/2023

Date Terminated: 02/06/2024

Assigned to: District Judge Ruth
Bermudez Montenegro

Appeals court case number:
24−724 USCA

**Defendant (1)**

| | | |
|---|---|---|
| **Ramiro Gomez−Reyes**<br>*TERMINATED: 02/06/2024* | represented by | **Federal Defenders**<br>Federal Defenders of San Diego<br>225 Broadway<br>Suite 900<br>San Diego, CA 92101−5008<br>(619)234−8467<br>Fax: (619)687−2666<br>Email: cassd_ecf@fd.org<br>*TERMINATED: 01/20/2023*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community*<br>*Defender Appointment* |
| | | **Nina B. Papachristou**<br>Federal Defenders of San Diego, Inc.<br>225 Broadway<br>Suite 900<br>San Diego, CA 92116<br>619−234−8467<br>Email: nina_papachristou@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community*<br>*Defender Appointment* |
| | | **Timothy Robert Garrison**<br>Federal Defenders of San Diego<br>225 Broadway<br>Suite 900<br>San Diego, CA 9210−5030<br>(619) 234−8467<br>Email: timothy_garrison@fd.org<br>*TERMINATED: 02/09/2024*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community*<br>*Defender Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| 8:1326 (a), (b) − Attempted<br>Reentry of Removed Alien | Custody of the BOP for 24 months, 3 years<br>supervised release, $100 special assessment remitted |

ER-212

(Felony)                                    and fine waived
(1)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                       **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                              **Disposition**

8:1326 – Attempted Entry After
Deportation

---

**Plaintiff**

**USA**                        represented by   **U S Attorney CR**
                                               U S Attorneys Office Southern District of
                                               California
                                               Criminal Division
                                               880 Front Street
                                               Room 6293
                                               San Diego, CA 92101
                                               (619)557–5610
                                               Fax: (619)557–5917
                                               Email: Efile.dkt.gc2@usdoj.gov
                                               *TERMINATED: 01/19/2023*
                                               *LEAD ATTORNEY*
                                               *Designation: Assistant United States
                                               Attorney*

                                               **David Eugene Fawcett**
                                               DOJ–USAO
                                               880 Front Street
                                               Room 6293
                                               San Diego, CA 92110
                                               619–546–8984
                                               Email: david.fawcett@usdoj.gov
                                               *TERMINATED: 03/29/2023*
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant United States
                                               Attorney*

                                               **James Miao**
                                               DOJ–USAO
                                               880 Front Street
                                               Suite 6293
                                               San Diego, CA 92101
                                               619–366–5647
                                               Email: james.miao@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant United States
                                               Attorney*

# ER-213                **Jason Alexander Gorn**

DOJ–USAO
880 Front Street
Suite 6293
San Diego, CA 92101
619–546–6695
Email: Jason.Gorn@usdoj.gov
*TERMINATED: 02/27/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant United States*
*Attorney*

**Francisco Anaya Nagel**
United States Attorney's Office
880 Front Street
Room 6293
San Diego, CA 92101
619–546–6745
Email: francisco.nagel@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/17/2023 | | Arrest of Ramiro Gomez–Reyes (no document attached) (cdw) [3:23–mj–00159–DDL] (Entered: 01/18/2023) |
| 01/18/2023 | 1 | COMPLAINT as to Ramiro Gomez–Reyes. (Attachments: # 1 Info Sheet)(cdw) [3:23–mj–00159–DDL] (Entered: 01/18/2023) |
| 01/18/2023 | 2 | Set/Reset Duty Hearings as to Ramiro Gomez–Reyes: Initial Appearance set for 1/18/2023 before Magistrate Judge David D. Leshner.. (no document attached) (mef) [3:23–mj–00159–DDL] (Entered: 01/18/2023) |
| 01/18/2023 | 3 | Minute Entry for proceedings held before Magistrate Judge David D. Leshner: Initial Appearance as to Ramiro Gomez–Reyes held on 1/18/2023. Oral proffer confirmed. Appointed Attorney Federal Defenders for Ramiro Gomez–Reyes. Detention Hearing as to Ramiro Gomez–Reyes held on 1/18/2023. USA oral motion for detention(Flight); motion granted as to Ramiro Gomez–Reyes. Defendant ordered detained without prejudice. Order of detention to be filed by Court. Bond set as to Ramiro Gomez–Reyes (1) No Bail. Rule 5 advisement provided. ( Preliminary Hearing set for 1/31/23 at 9:30am before Magistrate Judge David D. Leshner. Arraignment set for 2/16/23 at 9:30am before Magistrate Judge David D. Leshner.) (Interpreter Gabriela Sosa). (CD# 1/18/2023 DDL 23–1:2:03;2:33–2:40(Det Hrg 2:34–2:40)). (Plaintiff Attorney Evangeline Dech, Michael Lasater AUSA). (Defendant Attorney Jessica Oliva, Meagan Nettles FD–S/A). (aje) [3:23–mj–00159–DDL] (Entered: 01/19/2023) |
| 01/18/2023 | 4 | ***Spanish Interpreter needed as to Ramiro Gomez–Reyes (no document attached) (aje) [3:23–mj–00159–DDL] (Entered: 01/19/2023) |
| 01/18/2023 | 6 | ORDER as to Ramiro Gomez–Reyes: The Court orders the United States to comply with the continuing duty to disclose evidence which is favorable to the defendant as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. Upon finding that the government has failed to comply with this order, the Court may, as appropriate, order the production of such information, grant a continuance, impose evidentiary sanctions, or, in extreme cases, dismiss charges.. Signed by Magistrate Judge David D. Leshner on 1/18/23. (aje) [3:23–mj–00159–DDL] (Entered: 01/19/2023) |
| 01/18/2023 | 7 | ORDER OF DETENTION as to Ramiro Gomez–Reyes. Signed by Magistrate Judge David D. Leshner on 1/18/2023. (cxl) [3:23–mj–00159–DDL] (Entered: 01/19/2023) |
| 01/19/2023 | 5 | NOTICE OF ATTORNEY APPEARANCE Jason Alexander Gorn appearing for USA. (Gorn, Jason)Attorney Jason Alexander Gorn added to party USA(pty:pla) (maq). [3:23–mj–00159–DDL] (Entered: 01/19/2023) |
| 01/20/2023 | 8 | NOTICE OF ATTORNEY APPEARANCE: Nina B. Papachristou appearing for Ramiro Gomez–Reyes (Papachristou, Nina)Attorney Nina B. Papachristou added to party Ramiro Gomez–Reyes(pty:dft) (mjw). [3:23–mj–00159–DDL] (Entered: |

| | | 01/20/2023) |
|---|---|---|
| 01/20/2023 | 9 | Notice of Assertion of Rights by Ramiro Gomez–Reyes (Papachristou, Nina) (mjw). [3:23–mj–00159–DDL] (Entered: 01/20/2023) |
| 01/23/2023 | 10 | Order on Stipulated Continuance of a Preliminary Hearing as to Ramiro Gomez–Reyes. Preliminary Hearing set for 2/16/2023 09:30 AM before Magistrate Judge David D. Leshner.. Signed by Magistrate Judge David D. Leshner on 01/23/2023. (mjw) (sjt). [3:23–mj–00159–DDL] (Entered: 01/23/2023) |
| 01/24/2023 | 11 | NOTICE OF ATTORNEY APPEARANCE: Timothy Robert Garrison appearing for Ramiro Gomez–Reyes *As Co–Counsel* (Garrison, Timothy)Attorney Timothy Robert Garrison added to party Ramiro Gomez–Reyes(pty:dft) [3:23–mj–00159–DDL] (Entered: 01/24/2023) |
| 02/02/2023 | 12 | NOTICE OF CHANGE OF HEARING (JUDGE ONLY) as to Defendant Ramiro Gomez–Reyes. On the Court's own motion, Preliminary Hearing and Arraignment set for 2/16/2023 09:30 AM before Magistrate Judge Daniel E. Butcher. (mme) [3:23–mj–00159–DDL] (Entered: 02/02/2023) |
| 02/09/2023 | 13 | NOTICE of Lodgment of Information by USA (Gorn, Jason) (aas). [3:23–mj–00159–DDL] (Entered: 02/09/2023) |
| 02/16/2023 | 14 | INFORMATION as to Ramiro Gomez–Reyes (1) count(s) 1. (acc) (Entered: 02/16/2023) |
| 02/16/2023 | 15 | Minute Entry for proceedings held before Magistrate Judge Daniel E. Butcher: Arraignment on Information as to Ramiro Gomez–Reyes (1) Count 1 held on 2/16/2023. Not Guilty plea entered. Defendant waived Indictment in open court. Motion Hearing/Trial Setting set for 4/3/2023 02:00 PM before Judge Larry Alan Burns. (Interpreter Gabriela Sosa). (CD# 2/16/2023 DEB 23 9:39–9:45). (Plaintiff Attorney Carlos Arguello AUSA–S/A). (Defendant Attorney Daniela Muehleisen S/A). (acc) (Entered: 02/16/2023) |
| 02/16/2023 | 16 | MINUTE ORDER OF RECUSAL in case as to Ramiro Gomez–Reyes. Judge Larry Alan Burns is no longer assigned. Case reassigned to District Judge Ruth Bermudez Montenegro for all further proceedings. The new case number is 23–CR–0251–RBM. (no document attached) (mjw) (Entered: 02/16/2023) |
| 02/17/2023 | 17 | NOTICE OF CHANGE OF HEARING as to Defendant Ramiro Gomez–Reyes. On court's own motion, Motion Hearing/Trial Setting set for 4/3/2023 at 2:00 PM is RESET to 3/24/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. (axc) (Entered: 02/17/2023) |
| 02/25/2023 | 18 | NOTICE OF ATTORNEY APPEARANCE David Eugene Fawcett appearing for USA. *Removing AUSA Jason Gorn* (Fawcett, David)Attorney David Eugene Fawcett added to party USA(pty:pla) (jpp). (Entered: 02/25/2023) |
| 03/06/2023 | 19 | MOTION to Compel Discovery , MOTION to Preserve Evidence , MOTION for Leave to File Further Motions by Ramiro Gomez–Reyes. (Papachristou, Nina) (jpp). (Entered: 03/06/2023) |
| 03/06/2023 | 20 | Joint MOTION to Continue *Motion Hearing/Trial Setting* by Ramiro Gomez–Reyes. (Papachristou, Nina) (jpp). (Entered: 03/06/2023) |
| 03/07/2023 | 21 | MINUTE ORDER as to Ramiro Gomez–Reyes: 20 Joint MOTION to Continue *Motion Hearing/Trial Setting* filed by Ramiro Gomez–Reyes is GRANTED. Motion Hearing/Trial Setting set for 3/24/2023 9:00 AM is CONTINUED to 4/14/2023 09:00 AM in Courtroom 5B befoe District Judge Ruth Bermudez Montenegro. Excludable(s) started as to Ramiro Gomez–Reyes: XT1 – Continuance granted, failure to continue would stop further proceedings or result in miscarriage of justice 3/7/2023 to 4/14/2023. (no document attached) (axc) (Entered: 03/07/2023) |
| 03/29/2023 | 22 | NOTICE OF ATTORNEY APPEARANCE James Miao appearing for USA. (Miao, James)Attorney James Miao added to party USA(pty:pla) (jpp). (Entered: 03/29/2023) |
| 03/31/2023 | 23 | MOTION to Dismiss Information *Pursuant to Arlington Heights* by Ramiro Gomez–Reyes. (Attachments: # 1 Exhibit A–P)(Papachristou, Nina) (alns). (Entered: 03/31/2023) |

ER-215

| 03/31/2023 | 24 | MOTION to Dismiss Information *Pursuant to 1326(d)* by Ramiro Gomez–Reyes. (Attachments: # 1 Exhibit A–D)(Papachristou, Nina) (alns). (Entered: 03/31/2023) |
|---|---|---|
| 04/04/2023 | 25 | NOTICE OF HEARING ON MOTION in case as to Defendant Ramiro Gomez–Reyes 23 MOTION to Dismiss Information *Pursuant to Arlington Heights*, 24 MOTION to Dismiss Information *Pursuant to 1326(d)*. On court's own motion, Motion Hearing/Trial Setting set for 4/14/2023 is RESET to 4/28/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro.Government Responses due by 4/14/2023.(no document attached) (axc) (Entered: 04/04/2023) |
| 04/11/2023 | 26 | MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss Information *Pursuant to 1326(d) , Unopposed* by USA as to Ramiro Gomez–Reyes. (Attachments: # 1 Exhibit 1)(Miao, James) (jpp). (Entered: 04/11/2023) |
| 04/12/2023 | 27 | ORDER granting 26 unopposed Motion for Extension of Time to File response to motion to dismiss pursuant to 1326(d) by 4/21/2023 as to Ramiro Gomez–Reyes (1). Signed by District Judge Ruth Bermudez Montenegro on 4/12/2023.(jpp) (Entered: 04/12/2023) |
| 04/12/2023 | 28 | NOTICE OF CHANGE OF HEARING as to Defendant Ramiro Gomez–Reyes. On court's own motion, Motion Hearing set for 4/28/2023 is RESET to 5/5/2023 01:30 PM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. (axc) (Entered: 04/12/2023) |
| 04/14/2023 | 29 | RESPONSE in Opposition by USA as to Ramiro Gomez–Reyes re 23 MOTION to Dismiss Information *Pursuant to Arlington Heights* (Miao, James) (jpp). (Entered: 04/14/2023) |
| 04/21/2023 | 30 | RESPONSE in Opposition by USA as to Ramiro Gomez–Reyes re 24 MOTION to Dismiss Information *Pursuant to 1326(d) , Motion for Leave to File Supplemental Briefing* (Attachments: # 1 Exhibit Record of Sworn Statement, # 2 Exhibit Statement of Rights, # 3 Exhibit Attorney Information, # 4 Exhibit Letter from Defendant, # 5 Exhibit Form I–831, # 6 Exhibit Illinois Records Request)(Miao, James) (jpp). (Entered: 04/21/2023) |
| 04/28/2023 | 31 | REPLY TO RESPONSE to Motion by Ramiro Gomez–Reyes re 24 MOTION to Dismiss Information *Pursuant to 1326(d)* (Papachristou, Nina) (jpp). (Entered: 04/28/2023) |
| 05/02/2023 | 32 | RESPONSE in Opposition by USA as to Ramiro Gomez–Reyes re 24 MOTION to Dismiss Information *Pursuant to 1326(d) , Supplemental Briefing* (Attachments: # 1 Exhibit 7 – Transcript of Guilty Plea, # 2 Exhibit 8 – Indictment)(Miao, James) (jpp). (Entered: 05/02/2023) |
| 05/05/2023 | 33 | Minute Entry for proceedings held before District Judge Ruth Bermudez Montenegro: Motion Hearing as to Ramiro Gomez–Reyes held on 5/5/2023 re denying 23 Motion to Dismiss Information Pursuant to Arlington Heights; denying 24 Motion to Dismiss Information Purusant to 1326(d). Motion Hearing/Trial Setting set for 6/9/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. Excludable(s) started as to Ramiro Gomez–Reyes: XT – Continuances granted 05/05/2023 to 06/09/2023.. (Interpreter Cynthia Herber). (Court Reporter/ECR Adrian Baule). (Plaintiff Attorney James Miao AUSA). (Defendant Attorney Nina Papachristou FD). (no document attached) (axc) (Entered: 05/05/2023) |
| 05/11/2023 | 34 | REPLY TO RESPONSE to Motion by Ramiro Gomez–Reyes re 24 MOTION to Dismiss Information *Pursuant to 1326(d) Response to Supplemental Briefing* (Papachristou, Nina) (aas). (Entered: 05/11/2023) |
| 05/16/2023 | 35 | MINUTE ORDER from Judge Ruth Bermudez Montenegro. The Court has considered Defendants Response (Doc. 34) to the United States Supplemental Briefing. For the reasons stated on the record at the hearing on May 5, 2023, the Court affirms its tentative ruling as its final ruling. (no document attached) (jpp) (Entered: 05/16/2023) |
| 06/09/2023 | 36 | Minute Entry for proceedings held before District Judge Ruth Bermudez Montenegro: Motion Hearing/Trial Setting as to Ramiro Gomez–Reyes is continued on defense counsel's oral request for 6/30/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro.Time excluded on joint oral request from 6/9/2023 to 6/30/2023. (Interpreter Mylene Green). (Court Reporter/ECR Adrian Baule). (Plaintiff |

| | | Attorney James Miao AUSA). (Defendant Attorney Nina Papachristou FD). (no document attached) (axc) (Entered: 06/09/2023) |
|---|---|---|
| 06/26/2023 | 37 | Joint MOTION to Continue *Motion Hearing/Trial Setting* by Ramiro Gomez–Reyes. (Papachristou, Nina) (jpp). (Entered: 06/26/2023) |
| 06/27/2023 | 38 | MINUTE ORDER as to Ramiro Gomez–Reyes. 37 Joint Motion to Continue filed by Ramiro Gomez–Reyes is GRANTED. Motion Hearing/Trial Setting set for 6/30/2023 is CONTINUED to 8/7/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. Excludable started as to Ramiro Gomez–Reyes: XT1 – Continuance granted, Failure to continue would stop further proceedings or result in a miscarriage of justice 6/30/2023 to 8/7/2023.(no document attached) (ave) (Entered: 06/27/2023) |
| 07/24/2023 | 39 | MOTION to Suppress *Field Statements*, MOTION to Suppress *Post–Arrest Statement*, MOTION for Order *for Evidentiary Hearing*, MOTION for Leave to File Further Motions by Ramiro Gomez–Reyes. (Papachristou, Nina) (jpp). (Entered: 07/24/2023) |
| 07/24/2023 | 40 | NOTICE of Lodgment re 39 MOTION to Suppress *Field Statements* MOTION to Suppress *Post–Arrest Statement* MOTION for Order *for Evidentiary Hearing* MOTION for Leave to File Further Motions (Papachristou, Nina) (jpp). (Entered: 07/24/2023) |
| 07/31/2023 | 41 | NOTICE OF CHANGE OF HEARING as to Defendant Ramiro Gomez–Reyes. On court's own motion, Motion Hearing/Trial Setting set for 8/7/2023 is RESET for 8/16/2023 01:30 PM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. (axc) (Entered: 07/31/2023) |
| 07/31/2023 | 42 | RESPONSE in Opposition by USA as to Ramiro Gomez–Reyes re 39 MOTION to Suppress *Field Statements* MOTION to Suppress *Post–Arrest Statement* MOTION for Order *for Evidentiary Hearing* MOTION for Leave to File Further Motions (Attachments: # 1 Declaration Declaration of BPA Stephen Cabrera)(Miao, James) (jpp). (Entered: 07/31/2023) |
| 08/16/2023 | 43 | Minute Entry for proceedings held before District Judge Ruth Bermudez Montenegro: Motion Hearing/Trial Setting as to Ramiro Gomez–Reyes held on 8/16/2023. 39 Motion to Suppress Field Statements is denied; 39 Motion to Suppress Post–Arrest Statement is denied as moot; 39 Motion for Order for Evidentiary Hearing is denied. Jury Trial set for 11/20/2023, 11/21/2023 and 11/22/2023 09:00 AM in Courtroom 5B before District Judge Ruth Bermudez Montenegro.Motion In Limine Hearing set for 11/9/2023 01:30 PM in Courtroom 5B before District Judge Ruth Bermudez Montenegro. Motion In Limine due by 10/19/2023, Responses due by 10/26/2023. Final Discovery and Rule 16 Disclosures, including all expert disclosures as set forth in the amended Rule 16(a){1}G), shall be completed 30 days before trial. Jury instructions, verdict forms, and trial briefs are to be filed per Criminal Chambers Rules. Time excluded on joint oral request from 8/16/2023 to 11/20/2023. (Interpreter Edith Monroy, Salvador Castellanos). (Court Reporter/ECR Adrian Baule). (Plaintiff Attorney James Miao AUSA). (Defendant Attorney Nina Papachristou FD, Timothy Garrison FD). (no document attached) (axc). (Entered: 08/16/2023) |
| 08/17/2023 | 44 | MOTION for Fingerprint Exemplars , MOTION for Reciprocal Discovery , MOTION for Leave to File Further Motions by USA as to Ramiro Gomez–Reyes. (Miao, James) (aas). (Entered: 08/17/2023) |
| 09/06/2023 | 45 | ORDER granting 44 Governments Motions for Fingerprint Exemplars and Reciprocal Discovery as to Ramiro Gomez–Reyes (1). Signed by District Judge Ruth Bermudez Montenegro on 9/06/2023.(jpp) (Entered: 09/07/2023) |
| 10/19/2023 | 46 | NOTICE *FRCRP 16(a)(1)(G), FREs 701–705, 404(b), 609, 902(11)* by USA (Miao, James) (jpp). (Entered: 10/19/2023) |
| 10/19/2023 | 47 | In Limine MOTION to Admit *A–File Documents and Testimony*, In Limine MOTION to Admit *Expert Testimony*, In Limine MOTION to Admit *Defendant's Field Statements*, In Limine MOTION to Admit *Rule 609 Evidence*, In Limine MOTION to Exclude *Certain References by Defendant*, In Limine MOTION to Exclude *Collateral Attacks on Defendant's Removal*, In Limine MOTION to Exclude *Evidence of Duress and Necessity*, In Limine MOTION to Exclude *Evidence and Experts Not Previously* |

| | | |
|---|---|---|
| | | *Disclosed* by USA as to Ramiro Gomez–Reyes. (Nagel, Francisco)Attorney Francisco Anaya Nagel added to party USA(pty:pla) (jpp). (Entered: 10/19/2023) |
| 10/19/2023 | 48 | In Limine MOTION for Attorney Voir Dire , In Limine MOTION to *Preclude* Evidence Under Rule 404(b), In Limine MOTION to Exclude Evidence Under Rule 609 , In Limine MOTION to Exclude Evidence *Produced After Discovery Deadline*, In Limine MOTION for Leave to File Further Motions , In Limine MOTION to Preclude Evidence , In Limine MOTION to Preclude Hearsay , In Limine MOTION to Preclude Testimony , In Limine MOTION to Preclude Documents , In Limine MOTION to Suppress Statements *Made Involuntarily* by Ramiro Gomez–Reyes. (Papachristou, Nina) (jpp). (Entered: 10/19/2023) |
| 10/26/2023 | 49 | RESPONSE in Opposition by Ramiro Gomez–Reyes re 47 In Limine MOTION to Admit *A–File Documents and Testimony*In Limine MOTION to Admit *Expert Testimony*In Limine MOTION to Admit *Defendant's Field Statements*In Limine MOTION to Admit *Rule 609 Evidence*In Limine MOTION to Exclude *Certain References by Defendant*In Limine MOTION to Exclude *Collateral Attacks on Defendant's Removal*In Limine MOTION to Exclude *Evidence of Duress and Necessity*In Limine MOTION to Exclude *Evidence and Experts Not Previously Disclosed* (Papachristou, Nina) (jpp). (Entered: 10/26/2023) |
| 10/26/2023 | 50 | RESPONSE in Opposition by USA as to Ramiro Gomez–Reyes re 48 In Limine MOTION for Attorney Voir Dire In Limine MOTION to *Preclude* Evidence Under Rule 404(b)In Limine MOTION to Exclude Evidence Under Rule 609 In Limine MOTION to Exclude Evidence *Produced After Discovery Deadline*In Limine MOTION for Leave to File Further Motions In Limine MOTION to Preclude Evidence In Limine MOTION to Preclude Hearsay In Limine MOTION to Preclude Testimony In Limine MOTION to Preclude Documents In Limine MOTION to Suppress Statements *Made Involuntarily* (Miao, James) (jpp). (Entered: 10/26/2023) |
| 11/03/2023 | 51 | NOTICE of Lodgment of Plea Agreement by USA , *Rule 11 Consent* (Miao, James) (jpp). (Entered: 11/03/2023) |
| 11/06/2023 | 52 | NOTICE OF HEARING as to Defendant Ramiro Gomez–Reyes. At request of defense counsel, Change of Plea Hearing set for 11/7/2023 10:00 AM before Magistrate Judge David D. Leshner. (no document attached) (mme) (Entered: 11/06/2023) |
| 11/07/2023 | 53 | Minute Entry for proceedings held before Magistrate Judge David D. Leshner: Change of Plea Hearing as to Ramiro Gomez–Reyes held on 11/7/2023. Plea Tendered by Ramiro Gomez–Reyes Guilty on count 1 of the Information. Excludable(s) started as to Ramiro Gomez–Reyes: XK: 11/07/2023–01/26/2024. PSR Ordered. All pending motions withdrawn. Pending hearing dates vacated. Any objections to Findings due within 14 days. Sentence With PSR set for 1/26/2024 09:00 PM before District Judge Ruth Bermudez Montenegro. (Interpreter Elizabeth Torres). (CD# 11/7/2023 DDL 23 10:15–10:45). (Plaintiff Attorney James Miao, AUSA). (Defendant Attorney Nina Papachristou, FD). (bas1) (Entered: 11/07/2023) |
| 11/07/2023 | 54 | CONSENT TO RULE 11 PLEA before Magistrate Judge David D. Leshner by Ramiro Gomez–Reyes. (jpp) (Entered: 11/08/2023) |
| 11/07/2023 | 55 | CONDITIONAL PLEA AGREEMENT as to Ramiro Gomez–Reyes (jpp) (Entered: 11/08/2023) |
| 11/07/2023 | 56 | FINDINGS AND RECOMMENDATION of the Magistrate Judge upon a Tendered Plea of Guilty as to Ramiro Gomez–Reyes: Recommending that the district judge accept the defendant's plea of guilty.. Signed by Magistrate Judge David D. Leshner on 11/7/2023. (jpp) (Entered: 11/08/2023) |
| 11/20/2023 | 57 | NOTICE OF CHANGE OF HEARING as to Defendant Ramiro Gomez–Reyes. Sentence With PSR is reset for 1/26/2024 09:00 AM (TIME ONLY) in Courtroom 5B before District Judge Ruth Bermudez Montenegro. (axc) (Entered: 11/20/2023) |
| 12/06/2023 | 58 | ORDER ACCEPTING GUILTY PLEA as to count(s) 1 of the Information, as to Ramiro Gomez–Reyes, adopting 56 Findings and Recommendation. Signed by District Judge Ruth Bermudez Montenegro on 12/6/2023. (axc) (Entered: 12/06/2023) |
| 12/20/2023 | 59 | PRE–SENTENCE REPORT as to Ramiro Gomez–Reyes. Report prepared by: Naomi Stalbaum. (Document applicable to USA, Ramiro Gomez–Reyes.) (Hong, C.) |

ER-218

| | | (Entered: 12/20/2023) |
|---|---|---|
| 01/19/2024 | 60 | SENTENCING MEMORANDUM by Ramiro Gomez–Reyes (Papachristou, Nina) (jpp). (Entered: 01/19/2024) |
| 01/19/2024 | 61 | SENTENCING SUMMARY CHART by Ramiro Gomez–Reyes (Papachristou, Nina) (jpp). (Entered: 01/19/2024) |
| 01/19/2024 | 62 | SENTENCING SUMMARY CHART by USA as to Ramiro Gomez–Reyes (Miao, James) (jpp). (Entered: 01/19/2024) |
| 01/19/2024 | 63 | SENTENCING MEMORANDUM by USA as to Ramiro Gomez–Reyes (Miao, James) (jpp). (Entered: 01/19/2024) |
| 01/26/2024 | 64 | Minute Entry for proceedings held before District Judge Ruth Bermudez Montenegro: Sentence With PSR Hearing held on 1/26/2024 for Ramiro Gomez–Reyes (1), Count(s) 1, Custody of the BOP for 24 months, 3 years supervised release, $100 special assessment remitted and fine waived. Appeal waived. (Interpreter Rodolfo Martinez). (Court Reporter/ECR Adrian Baule). (Plaintiff Attorney James Miao AUSA). (Defendant Attorney Nina Papachristou FD). (Michelle McHale USPO). (no document attached) (axc) (Entered: 01/26/2024) |
| 02/06/2024 | 65 | JUDGMENT as to Ramiro Gomez–Reyes (1), Count(s) 1, Custody of the BOP for 24 months, 3 years supervised release, $100 special assessment remitted and fine waived. Signed by District Judge Ruth Bermudez Montenegro (jpp) (Entered: 02/06/2024) |
| 02/09/2024 | 66 | NOTICE OF APPEAL by Ramiro Gomez–Reyes re 65 Judgment, Fee Waived (Notice of Appeal electronically transmitted to US Court of Appeals.) (Papachristou, Nina) (dim). (Entered: 02/09/2024) |
| 02/09/2024 | 67 | NOTICE *of Withdrawal of Attorney* by Ramiro Gomez–Reyes re 11 Notice of Attorney Appearance – Defendant, (Garrison, Timothy) (jpp). (Entered: 02/09/2024) |
| 02/09/2024 | 68 | USCA Case Number: 24–724 as to Ramiro Gomez–Reyes Re: ECF No. 66 Notice of Appeal to 9th Circuit filed by Ramiro Gomez–Reyes. (Attachments: # 1 Attorney Appeal Case Opening, # 2 Pro Se Appeals Case Opening, # 3 Ninth Circuit Appellate Mentoring Program, # 4 Appellate Practice Guide)(dim)(jrd) (Entered: 02/09/2024) |
| 02/09/2024 | 69 | USCA Time Schedule Order for 66 Notice of Appeal to 9th Circuit: (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court, provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 3/1/2024 (see Ninth Circuit Rule 10–3.2); Due date for filing of transcripts in US District Court is 4/1/2024.) (cc: Court Reporter). (dim)(jrd) (Entered: 02/09/2024) |
| 02/15/2024 | 70 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Ramiro Gomez–Reyes for proceedings held on 05/05/23; 08/16/23; 11/07/23; 01/26/24 re 66 Notice of Appeal to 9th Circuit. (Papachristou, Nina) (dim). (Entered: 02/15/2024) |
| 02/15/2024 | 71 | TRANSCRIPT ORDER – For hearing(s) on 11/07/2023 (Papachristou, Nina) (ddf). (Entered: 02/15/2024) |
| 03/08/2024 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing as to Ramiro Gomez–Reyes held on 5/05/2023, before Judge Ruth Bermudez Montenegro. Court Reporter/Transcriber: Adrian Baule. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 3/29/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/6/2024. (jpp)(jrd) (Entered: 03/08/2024) |
| 03/08/2024 | 73 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing / Trial Setting as to Ramiro Gomez–Reyes held on 8/16/2023, before Judge Ruth Bermudez Montenegro. Court Reporter/Transcriber: Adrian Baule. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before |

| | | |
|---|---|---|
| | | the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 3/29/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/6/2024. (jpp)(jrd) (Entered: 03/08/2024) |
| 03/08/2024 | <u>74</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Sentencing Hearing as to Ramiro Gomez–Reyes held on 1/26/2024, before Judge Sentencing Hearing. Court Reporter/Transcriber: Adrian Baule. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 3/29/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/6/2024. (jpp)(jrd) (Entered: 03/08/2024) |
| 03/13/2024 | <u>75</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Change of Plea Hearing as to Ramiro Gomez–Reyes held on 11/7/2023, before Judge David D. Leshner. Court Reporter/Transcriber Echo Reporting. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 4/3/2024. Redacted Transcript Deadline set for 4/15/2024. Release of Transcript Restriction set for 6/11/2024. (dim) (Entered: 03/13/2024) |